Anita JOHN, Appellant,

v.

John BAKER, Appellee.

No. S–8099.

Supreme Court of Alaska.

Sept. 8, 1999.

ment." *See Van Sandt v. Brown,* 944 P.2d 449, 451 (Alaska 1997) (citation omitted).

Andrew Harrington and Mark Regan, Alaska Legal Services Corporation, Fairbanks, for Appellant.

J. John Franich, Assistant Public Advocate, Fairbanks, Brant McGee, Public Advocate, Anchorage, and Deborah Niedermeyer, Fairbanks, for Appellee.

Harold N. Brown and Michael J. Walleri, Tanana Chiefs Conference, Inc., Fairbanks, for Amicus Curiae Native Village of Northway.

Heather R. Kendall–Miller and Martha L. King, Native American Rights Fund, Lloyd Benton Miller, Anchorage, and Vance A. Sanders, Juneau, for Amici Curiae Native Village of Venetie Tribal Government and Alaska Inter–Tribal Council.

Vance A. Sanders, Law Office of Vance A. Sanders, LLC, Juneau, for Amici Curiae Paskenta Band of Nomlaki Indians, Scotts Valley Band of Pomo Indians, and Death Valley Timbisha Shoshone Tribe.

D. Rebecca Snow, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Amicus Curiae State of Alaska.

Lois J. Schiffer, Assistant Attorney General, David C. Shilton and Ethan G. Shenkman, Attorneys, Department of Justice, Washington, D.C., John D. Leshy, Solicitor and Sandra J. Ashton, Office of the Solicitor, Department of the Interior, Washington, D.C.; for Amicus Curiae United States.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

*O P I N I O N*

FABE, Justice.

I. *INTRODUCTION*

Seeking sole custody of his two children, John Baker, a member of Northway Village, filed a custody petition in the Northway Tribal Court. Anita John, the children's mother and a member of Mentasta Village, consented to Northway's jurisdiction. After the tribal court issued an order granting shared custody, Mr. Baker filed an identical suit in state superior court. Although Ms. John moved to dismiss based on the tribal court proceeding, the superior court denied the motion and awarded primary physical custody to Mr. Baker. Ms. John appeals, arguing that as a federally recognized tribe, Northway Village has the inherent sovereignty to adjudicate custody disputes between its members and that the superior court therefore should have dismissed the state case.

This appeal raises a question of first impression. We must decide whether the sovereign adjudicatory authority of Native tribes exists outside the confines of Indian country. After reviewing evidence of the intent of the Executive Branch, as well as relevant federal statutes and case law, we conclude that Native tribes do possess the inherent sovereign power to adjudicate child custody disputes between tribal members in their own courts. We therefore reverse and remand to the superior court to determine whether the tribal court's custody determination should be recognized by the superior court under the doctrine of comity.

II. *FACTS AND PROCEEDINGS*

Anita John and John Baker are Alaska Natives; Ms. John is a member of Mentasta Village and Mr. Baker is a member of Northway Village. Although they never married, Ms. John and Mr. Baker had two children together: John Jr., born in July 1991, and Emmanuel, born in June 1992. The family lived together in Ms. John's village until the parents ended their relationship in 1993. For the next two years, Ms. John and Mr. Baker cooperated in sharing custody of John

Jr. and Emmanuel. This cooperation ended in July 1995 when Mr. Baker refused to return the children to Ms. John.

In July 1995 Mr. Baker filed a petition with the Northway Tribal Court requesting sole custody of John Jr. and Emmanuel. The tribal court sent a notice to the parties on August 10 informing them of their right to be present at the custody hearing, and both parents participated in the hearing held on August 29. At the conclusion of the hearing, Tribal Court Judge Lorraine Titus ordered the parents to share custody of the children on an alternating monthly schedule. Judge Titus stated, however, that this arrangement would be temporary and that she would reconsider the custody question in one year, before the oldest child entered school.

The parents followed the tribal court's order from September to December, deviating from the alternating schedule only so that Ms. John could care for the children while Mr. Baker was serving a sentence for DWI. During these months Mr. Baker appealed to the tribal court to change its custody order, but the court denied his request. Dissatisfied with the tribal court's custody determination, Mr. Baker filed a separate action in state court in December. In the affidavit accompanying the state complaint, required at that time under the Uniform Child Custody Jurisdiction Act (UCCJA),[1] Mr. Baker misled the superior court by stating that he was "unaware of any custody proceeding regarding the children, except as provided herein, in Alaska, or any other jurisdiction."

Citing the tribal court proceedings, Ms. John filed a motion to dismiss the state court action. The superior court denied her motion. Ruling first that the Indian Child Welfare Act (ICWA)[2] did not apply to a custody dispute between parents, the court concluded that it had subject matter jurisdiction over the suit. The court then stated that even if the tribal court had concurrent jurisdiction, "the facts of this case [would] require" superior court involvement. The court pointed to the state's access to a child custody investigator and to the parents' different tribal

---

1. Former AS 25.30.010 *et seq.*

2. 25 U.S.C. § 1901 *et seq.*

affiliations as facts justifying its involvement in the case.

The superior court's initial temporary custody order was identical to the tribal court's. The parties therefore continued with the alternating monthly custody schedule until April 1996, when the superior court altered its temporary order to give Mr. Baker primary custody. The superior court's final order, entered after trial, maintained Mr. Baker as primary physical custodian and granted Ms. John visitation every other weekend during the school year and for at least eight weeks during the summer. Although it recognized that both parents had experienced problems with substance abuse in the past, the superior court found that Mr. Baker was in better control of his problems than Ms. John. In addition, the court stated that Ms. John needed to address other issues, such as her severe depression. Ms. John appealed to this court, arguing that the superior court should have granted her motion to dismiss.

Shortly after we initially held oral argument in this appeal, the United States Supreme Court decided *Alaska v. Native Village of Venetie Tribal Government (Venetie II )*.[3] We then requested supplemental briefing, asking the parties to address how the *Venetie II* decision affects the issues presented.

## III. *DISCUSSION*

Resolving this appeal requires us to examine the nature and scope of Native American self-government in Alaska. We must decide whether Northway Village had the jurisdiction to adjudicate a custody dispute involving children who are tribal members. If Northway possessed such jurisdiction, we must then decide whether the superior court should have dismissed Mr. Baker's identical state suit.

In a line of decisions beginning with *Native Village of Nenana v. State, Department of Health & Social Services*,[4] and ending in *In re F.P.*,[5] we held that Native villages in Alaska do not have the power to adjudicate some types of child custody disputes. Recognizing the existence of these precedents, Ms. John presents two alternative arguments for finding tribal jurisdiction in this case. First, she argues that we can rule in her favor without overruling *Nenana* and *F.P.* because those decisions do not apply to the facts of this appeal. Second, she contends that even if *Nenana* and *F.P.* do apply, we should reconsider their holdings. Ms. John claims that, regardless of whether they occupy Indian country, Alaska Native villages can adjudicate child custody disputes between members because of their status as federally recognized tribes.

Mr. Baker's briefing focuses on perceived flaws in the tribal court's decision in this case. He therefore claims that even if Northway Village generally has jurisdiction to decide child custody disputes between members, state courts should not recognize this particular decision because the proceedings violated due process and because his children are not members of Northway Village. We evaluate each of the parties' arguments after discussing the relevant standard of review.

### A. *Standard of Review*

■ We rely on our independent judgment to decide legal questions such as the scope of tribal court subject matter jurisdiction and the meaning of federal statutes.[6] In exercising our independent judgment, we will adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[7]

### B. *Our Prior Decisions on Tribal Court Jurisdiction to Decide Custody Disputes Do Not Apply to This Case.*

Mr. Baker claims that the holdings in *Nenana* and *F.P.* compel the conclusion that

---

3. 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998).

4. 722 P.2d 219 (Alaska 1986).

5. 843 P.2d 1214 (Alaska 1992).

6. *See Hydaburg Coop. Ass'n v. Hydaburg Fisheries*, 925 P.2d 246, 248 (Alaska 1996); *In re T.N.F.*, 781 P.2d 973, 975 (Alaska 1989).

7. *See Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

Northway is without jurisdiction in this case. Although not conceding that these decisions apply to the facts before us, Ms. John asks us to reconsider the holdings of those decisions. All the amici, including the United States and the State of Alaska, join Ms. John in urging us to reconsider these decisions and recognize tribal court jurisdiction. Before we decide whether to re-examine our precedents, we must determine whether they apply to the facts before us. Accordingly, we begin our analysis with an examination of whether it is necessary that we revisit *Nenana* and *F.P.* in order to decide this case.

Although the holdings in *Nenana* and *F.P.* touched upon the contours of tribal court jurisdiction, both of those decisions were rooted in a pair of federal laws that may not apply to the facts of the dispute between Ms. John and Mr. Baker: Public Law 280 [8] (P.L. 280) and the Indian Child Welfare Act (ICWA).[9] If this case does not fall within the scope of either of those pieces of legislation, then the holdings in our prior decisions are not squarely before us today, and it may be unnecessary to reconsider them.

### 1. The holdings of Nenana and F.P.

*Nenana* and *F.P.* dealt with the question of tribal court jurisdiction in cases falling under ICWA in Alaska. In *Nenana*, the village petitioned a superior court under ICWA to transfer a child-in-need-of-aid proceeding to the village's jurisdiction.[10] Interpreting ICWA, the superior court ruled that transfer was improper because the village had not petitioned the Secretary of the Interior to reassume jurisdiction over child custody proceedings.[11]

In evaluating the arguments on appeal in *Nenana*, we first considered § 1918(a) of ICWA,[12] which states that any Indian tribe that became subject to state jurisdiction under P.L. 280 may "reassume" jurisdiction over child custody proceedings by petitioning the Secretary of the Interior.[13] Public Law 280 is a federal statute that grants several states, including Alaska, jurisdiction over all civil and criminal matters arising in Indian country.[14] In *Nenana*, we interpreted § 1918(a)'s reassumption requirement to mean that P.L. 280 had vested exclusive jurisdiction over child custody matters in state courts, and that the state exercised exclusive jurisdiction until a particular tribe successfully petitioned the Secretary of the Interior.[15] Because the village of Nenana had not petitioned the Secretary of the Interior for reassumption, we affirmed the superior court's denial of the petition for transfer.[16]

In *F.P.*, we were asked to reconsider *Nenana*'s holding in light of the Ninth Circuit's decision in *Native Village of Venetie I.R.A. Council v. Alaska (Venetie I ).*[17] The question before the Ninth Circuit in *Venetie I* was whether ICWA required the State of Alaska to recognize tribal court child custody determinations.[18] The state argued that because P.L. 280 had granted state courts exclusive jurisdiction over all civil disputes, the villages could not exercise any child custody jurisdiction without first petitioning the Secretary of the Interior.[19] The Ninth Circuit resolved the dispute by addressing two issues: first, "whether the native villages are inherently sovereign, at least insofar as domestic relations or child-custody issues are concerned,"

---

8. Act of August 15, 1953, Pub.L. 83–280, 67 Stat. 588 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–26, 28 U.S.C. § 1360).

9. 25 U.S.C. § 1901 *et seq.*

10. *See* 722 P.2d at 220.

11. *See id.* at 221.

12. *See id.*

13. 25 U.S.C. § 1918(a).

14. *See* 28 U.S.C. § 1360(a). Enacted in 1953, P.L. 280 required five states to assume civil and criminal jurisdiction over affairs in Indian country, and allowed other states to assume such jurisdiction voluntarily. In 1958, Alaska was added to the list of mandatory P.L. 280 jurisdictions. *See* Act of Aug. 8, 1958, P.L. No. 85–615, § 2, 72 Stat. 545.

15. *See Nenana,* 722 P.2d at 221.

16. *See id.*

17. 944 F.2d 548 (9th Cir.1991).

18. *See id.* at 550.

19. *See id.* at 556, 558.

and second, "whether Congress has stripped the villages of that aspect of sovereign authority which encompasses child-custody determinations."[20] Although suggesting that it saw no impediment to a finding of sovereignty, the court concluded that sovereign status depended on a factual analysis that should be conducted by the district court.[21] It then held that P.L. 280 had not stripped the villages of sovereignty over child custody issues because it had granted the states only concurrent jurisdiction.[22]

In *F.P.*, we disagreed with the Ninth Circuit's conclusions on both the issue of sovereignty and on the meaning of P.L. 280. Addressing the sovereignty question first, we stated that the Ninth Circuit's "opinion is contrary to *Native Village of Stevens v. Alaska Management & Planning*,[23] where we concluded that 'the history of the relationship between the federal government and Alaska Natives indicates that Congress intended that most Alaska Native groups not be treated as sovereigns.' "[24] Moving to the second step in the *Venetie I* analysis, we reiterated our view that P.L. 280 had granted the states exclusive jurisdiction over child custody matters, quoting from the portion of *Nenana* that interpreted ICWA's § 1918(a).[25] We therefore reaffirmed our prior holding that tribal courts lack jurisdiction over child custody proceedings under ICWA until they successfully reassume jurisdiction by filing a petition with the Secretary of the Interior.[26]

In sum, our decisions to limit tribal adjudicatory power in *Nenana* and *F.P.* turned on

our interpretation and application of ICWA and P.L. 280. In order to determine if those decisions are controlling, then, we must examine whether those two federal laws similarly apply to the case presently before us.

### 2. *ICWA does not apply to the dispute between Mr. Baker and Ms. John.*

■ ICWA's provisions, including the reassumption requirement of § 1918(a) that we interpreted in *Nenana* and *F.P.*, apply only to "child custody proceedings" as defined by the statute.[27] ICWA's § 1903 specifically excludes from this definition an award of custody to one of the parents in a *divorce* proceeding. Ms. John relies on this language to argue that ICWA is inapplicable to this dispute because it will result in a custody award to a parent. Thus, we must decide whether a custody battle between unmarried parents qualifies for the divorce exception to ICWA.[28]

■ Congress's intent in enacting ICWA suggests that the divorce exception should apply to this case. Congress created ICWA because it was alarmed by the number of Indian children removed by state agencies from their parents and tribes and placed into non-Indian homes.[29] In the policy declaration incorporated into ICWA itself, Congress stated that the statute's dual purpose was "to protect the best interests of Indian children and to promote the stability and security of

---

**20.** *Id.* at 556.

**21.** *See id.* at 559.

**22.** *See id.* at 562.

**23.** 757 P.2d 32 (Alaska 1988).

**24.** *In re F.P.*, 843 P.2d 1214, 1215 (Alaska 1992) (internal ellipsis and citation omitted).

**25.** *See id.* at 1215–16.

**26.** *See id.* at 1216. *But see id.* at 1217–18 (Rabinowitz C.J., dissenting) (reasoning that "it is inconsistent with the doctrine of inherent tribal sovereignty to conclude that § 1918 of the ICWA and Public Law 280, taken together, divest tribes of even concurrent jurisdiction over child custody matters" (citation omitted)).

**27.** *See* 25 U.S.C. §§ 1911, 1918.

**28.** Although the superior court ruled that ICWA did not apply to this custody dispute and neither party has appealed this aspect of the court's decision, Mr. Baker now argues that ICWA does apply. Even though Mr. Baker arguably has not preserved this issue for appeal, this court can affirm on any grounds. *See Gunderson v. University of Alaska, Fairbanks*, 922 P.2d 229, 236 n. 9 (Alaska 1996). Moreover, we address the question of ICWA's applicability because it is "critical to a proper and just decision," and the "parties have had an opportunity to brief it." *In re K.E.*, 744 P.2d 1173, 1174 (Alaska 1987) (citation omitted).

**29.** *See* 25 U.S.C. § 1901.

Indian tribes and families."[30] The legislative history emphasizes this dual purpose, stating that the statute "seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society."[31]

The custody dispute between Ms. John and Mr. Baker raises neither of the concerns ICWA sought to address. Whatever the outcome of the custody battle, John Jr. and Emmanuel will continue to split their time between the homes of their Native parents and their Native villages. Because this case does not pose the possibility that the children will be removed from their parents or their tribes, ICWA's exclusive jurisdiction provision as well as its intricate procedural guidelines are unnecessary to protect the family's or the tribes' interests.

Specific legislative history also suggests that Congress intended the divorce exception to apply to *any* parental custody dispute. Commenting on a draft of ICWA, the Department of the Interior wrote to Congress suggesting that it create exceptions to the type of proceedings covered by the Act. Stating that the "protections provided by this act are not needed in proceedings between parents," the Department of the Interior advocated for the divorce exception.[32] Apparently agreeing with the Department's view, Congress inserted the divorce exception into ICWA. The legislature's decision to create the exception based on the Department's opinion that ICWA's protections were unnec-

essary in disputes between *parents* suggests that Congress intended for the exception to apply to all parental custody battles.

Relying on the legislative history, the Bureau of Indian Affairs has concluded that Congress intended for the divorce exception to apply to all "domestic relations proceedings ... so long as custody is awarded to one of the parents."[33] Additionally, the courts that have considered the question have concluded that ICWA does not apply to disputes between unmarried parents.[34] Based on this case law, the conclusions of the Bureau of Indian Affairs, and the purpose of ICWA as expressed in its text and legislative history, we conclude that ICWA does not apply to this inter-parental custody dispute.[35]

> 3. *The Supreme Court's decision in Venetie II suggests that P.L. 280 does not apply to Native tribes occupying Alaska Native Claims Settlement Act lands.*

The United States Supreme Court's recent *Venetie II* decision suggests that P.L. 280, which grants states jurisdiction over disputes in Indian country, has limited application in Alaska because most Native land will not qualify for the definition of Indian country.[36] By its very text, P.L. 280 applies only to Indian country.[37] If Northway Village does not occupy Indian country, then our rulings interpreting P.L. 280 are not germane to this appeal.

---

30. 25 U.S.C. § 1902.

31. H.R.Rep. No. 95–1386, at 23 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546.

32. H.R.Rep. No. 95–1386, at 31.

33. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, 67,587 (1979). Although the Bureau of Indian Affairs did not promulgate these guidelines as regulations, they do represent its interpretation of the statute and as such the guidelines have important but not controlling significance. *See Batterton v. Francis*, 432 U.S. 416, 424–25, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977).

34. *See Walksalong v. Mackey*, 250 Neb. 202, 549 N.W.2d 384, 387 (1996); *see also In re Defender*, 435 N.W.2d 717, 721–722 (S.D.1989).

35. We note that ICWA's inapplicability to all inter-parental custody disputes was an underlying assumption of our decision in *J.W. v. R.J.*, 951 P.2d 1206, 1214 (Alaska 1998).

36. *See* 118 S.Ct. at 954–55.

37. The relevant portion of P.L. 280 reads as follows:

> (a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties *which arise in the areas of Indian country listed* opposite the name of the State to the same extent that such State has jurisdiction over other civil causes of action ...:
> State of Indian country affected
> Alaska All Indian country within the State. ...
> 28 U.S.C. § 1360(a).

In *Venetie II*, the Supreme Court interpreted the Alaska Native Claims Settlement Act (ANCSA),[38] which resolved Native claims to Alaska land by instituting a novel form of Native land ownership.[39] Under this innovative scheme, Congress revoked all existing Indian reservations in Alaska but one, and extinguished all aboriginal title and claims to Alaska land.[40] In exchange, ANCSA entitled Native-owned, state-chartered regional and village corporations to receive approximately forty-four million acres of land and $962.5 million in monetary compensation.[41]

The *Venetie II* Court was faced with the question of whether ANCSA lands qualify as "Indian country" under a federal statute, 18 U.S.C. § 1151, defining the term. Under § 1151, three kinds of Native lands qualify as Indian country: Indian reservations under federal jurisdiction, Indian allotments, and "dependent Indian communities."[42] ANCSA revoked all federal Indian reservations in Alaska but one.[43] The Supreme Court held in *Venetie II* that a village occupying ANCSA lands does not qualify for the "dependent community" definition of Indian country.[44] *Venetie II*'s holding, therefore, appears to undermine the Indian country claims of those Alaska villages, like Northway Village, that occupy ANCSA lands.[45] If Northway Village does not occupy Indian country as a result of *Venetie II*,

then P.L. 280 has no direct relevance to this appeal.

We conclude, then, that neither ICWA nor P.L. 280 applies to the case before us. Since *Nenana* and the decisions that followed it were rooted in the application of these statutes, the rationale underlying those precedents is not specifically called into question today. We accordingly conclude that it is neither necessary nor appropriate at this time to reach the question of whether *Nenana* and its progeny were wrongly decided.[46]

We have determined that the central issue in this appeal—whether tribal courts have jurisdiction over non-ICWA child custody cases arising outside of Indian country—is not affected by our holdings in *Nenana* and *F.P.* To resolve it, we must instead explore the nature of tribal power under federal law.

### C. Tribes without Indian Country Can Adjudicate Internal Child Custody Disputes.

Today we must decide for the first time a question of significant complexity and import: Do Alaska Native villages have inherent, non-territorial sovereignty allowing them to resolve domestic disputes between their own members? After examining relevant federal pronouncements regarding sov-

---

38. 43 U.S.C. § 1601 *et seq.*

39. *See id.* at § 1601(a).

40. *See id.* at § 1603.

41. *See Alaska v. Native Village of Venetie Tribal Gov't* (*Venetie II*), 522 U.S. 520, 118 S.Ct. 948, 951, 140 L.Ed.2d 30 (1998).

42. *See* 18 U.S.C. § 1151; *Venetie II*, 118 S.Ct. at 952.

43. *See* 43 U.S.C. § 1610(b). The sole post-ANCSA Indian reservation in Alaska is the Metlakatla Reservation on the Annette Islands. *See Metlakatla Indian Community, Annette Island Reserve v. Egan*, 362 P.2d 901, 920 (Alaska 1961), *rev'd in part*, 369 U.S. 45, 54–55, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962).

44. *See Venetie II*, 118 S.Ct. at 954–55.

45. As Mr. Baker notes, some Indian country may still exist in Alaska under the second definition,

Indian allotments. There has been no contention that Northway Village occupies such an allotment, however, and for the purposes of this appeal we assume that Northway Village is not Indian country.

46. The United States argues that our prior interpretation of P.L. 280 remains relevant even if Northway Village does not occupy Indian country because it would be contrary to established law to conclude that a tribal court had greater powers outside, rather than inside, of Indian country. It is true that, generally, Indian nations possess greater powers in Indian country than they do outside it. *See, e.g., Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (holding that only in Indian country may tribes exercise powers over non-members). And at least one federal reservation does still exist in Alaska. Thus, the United States correctly notes in its brief that the recognition of Northway's jurisdiction creates a disjunction in Indian law jurisprudence. But this inconsistency does not create a justification to address issues that are not squarely before us.

ereign power, we hold that Alaska Native tribes, by virtue of their inherent powers as sovereign nations, do possess that authority.

1. *We defer to Congress's finding that Alaska Native tribes are sovereign powers under federal law.*

██ We have previously held that tribal status is a non-justiciable political question.[47] We therefore will defer to the determinations of Congress and the Executive Branch on the question of tribal status.[48] If Congress or the Executive Branch recognizes a group of Native Americans as a sovereign tribe, we "must do the same." [49]

Prior to 1993, no such recognition of Alaska villages had occurred. In *Native Village of Stevens v. Alaska Management & Planning*,[50] we conducted an historical analysis and concluded that the federal government had never recognized Alaska villages as sovereign tribes.[51] We relied on this analysis in *F.P.* to hold that Native villages lacked sovereignty.[52]

In 1993, however, the Department of the Interior issued a list of federally recognized tribes that included Northway Village and most of the other Native villages in Alaska.[53] In the list's preamble, the Department of Interior explained that it was issuing the list in order to clarify confusion over the tribal status of various Alaska Native entities. The Department believed that previous lists had been interpreted to mean that Native villages in Alaska, although qualifying for federal funding, were not recognized as sovereign tribes.[54] It sought to rectify this misunderstanding and to reaffirm the sovereign status

of the recognized tribes. In particular, the Department emphasized that the list included those Alaskan entities that the federal government historically had treated as tribes.[55]

The Department also suggested in the preamble that its decision to publish the list was based on a recent opinion by the Solicitor of the Department of Interior, Thomas Sansonetti.[56] In this opinion, Sansonetti evaluated the sovereign tribal status of Alaska Native villages, conducting the same historical analysis as did the *Stevens* court but reaching the opposite conclusion.[57] Although recognizing that Alaska Native villages differed in significant ways from the tribes in the Lower 48, the Solicitor concluded that, for the last half century, Congress and the Interior Department "have dealt with the Alaska Natives as though there were tribes in Alaska." [58]

The language in the preamble to the 1993 list unquestionably establishes that the Department of the Interior views the recognized Alaska villages as sovereign entities. The preamble affirms the Department's view that federally recognized tribes possess governmental authority and autonomy stemming from their tribal status:

> The Bureau of Indian Affairs ... [finds] that the villages and regional tribes listed below have functioned as political entities exercising governmental authority....
>
> . . . .
>
> The purpose of the current publication is ... to eliminate any doubt as to the Department's intention by expressly and un-

47. *See Atkinson v. Haldane*, 569 P.2d 151, 163 (Alaska 1977).

48. *See Native Village of Stevens v. Alaska Management & Planning*, 757 P.2d 32, 34–35 (Alaska 1988).

49. *United States v. Holliday*, 70 U.S.(3 Wall.) 407, 419, 18 L.Ed. 182 (1865).

50. 757 P.2d 32 (Alaska 1988).

51. *See id.* at 34.

52. *See In re F.P.*, 843 P.2d 1214, 1215 (Alaska 1992).

53. *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs [hereinafter 1993 list], 58 Fed. Reg. 54,364, 54,368–69 (1993).

54. *See id.* at 54,364.

55. *See id.*

56. *See id.* at 54,365.

57. *See* U.S. Dep't Interior, Solic. Op. M–36,975 at 8–60 (Jan. 11, 1993).

58. 1993 list, 58 Fed.Reg. at 54,365 (quoting the Solicitor's opinion).

equivocally acknowledging that the Department has determined that the villages and regional tribes listed below are distinctly Native communities and have the same status as tribes in the contiguous 48 states.... *[T]he villages and regional tribes listed* below are not simply eligible for services, or recognized as tribes for certain narrow purposes. Rather, · they *have the same governmental status as other federally acknowledged Indian tribes by virtue of their status as Indian tribes with a government-to-government relationship with the United States* ....[59]

And for those who may have doubted the power of the Department of the Interior to recognize sovereign political bodies, a 1994 act of Congress appears to lay such doubts to rest. In the Federally Recognized Tribe List Act of 1994,[60] Congress specifically directed the Department to publish annually "a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians."[61] The Department published tribal lists for 1995 through 1998,. all of which include Alaska Native villages such as Northway, based on this specifically delegated authority.[62]

■ The text and legislative history of the Tribe List Act demonstrate that Congress also views the recognized tribes as sovereign bodies. In the Act's findings section, Congress discusses the "sovereignty" of federally recognized tribes.[63] Similarly, the House report to the Act provides that federal recognition "institutionalizes the tribe's qua-

si-sovereign status."[64]· Acknowledging that federal recognition "is no minor step," the report states that such recognition "permanently establishes a government-to-government relationship between the United States and the recognized tribe as a 'domestic dependent nation.'"[65]

Through the 1993 tribal list and the 1994 Tribe List Act, the federal government has recognized the historical tribal status of Alaska Native villages like Northway. In deference to that determination, we also recognize such villages as sovereign entities.

The fact that Northway Village is a federally recognized tribe answers only part of the question posed by this case. Alaska Native villages such as Northway are in a unique position: Unlike most other tribes, Alaska Native villages occupy no reservations and for the most part possess no Indian country. Mr. Baker and the dissent argue that the existence of tribal land—Indian country—is the cornerstone of tribal court jurisdiction and that Congress necessarily withdrew such jurisdiction from Alaska Native villages when it enacted ANCSA.

To evaluate this argument, we must decide how much authority tribes retain in the absence of reservation land. We must, in other words, determine the meaning of "sovereignty" in the context of Alaska's post-ANCSA landscape by asking whether ANCSA, to the extent that it eliminated Alaska's Indian country, also divested Alaska Native villages of their sovereign powers.

**59.** 1993 list, 58 Fed.Reg. at 54,365–66 (emphases added).

**60.** 25 U.S.C. § 479a *et seq.* (West Supp.1998).

**61.** *Id.* at § 479a–1.

**62.** *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 60 Fed.Reg. 9250, 9255 (1995); *see also* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 61 Fed.Reg. 58,211, 58,-215 (1996); Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 62 Fed.Reg. 55,270, 55,275 (1997); Indian Entities Recognized and

Eligible to Receive Services from the United States Bureau of Indian Affairs, 63 Fed.Reg. 71,-941, 71,945 (1998).

**63.** *See* P.L. 103–454, 108 Stat. 4791 (1994).

**64.** H.R.Rep. No. 103–781, at 2–3 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3768, 2769.

**65.** *Id.* at 2. The legislative history to the Act reveals that Congress recognized the dispute over the existence of Indian country in Alaska and did not intend for the tribal recognition list to resolve the dispute. *See id.* at 4–5. But Congress's ambivalence on the Indian country issue does not undermine its recognition of the tribal status of Alaska Native villages.

2. *Tribes retain their sovereign powers to regulate internal domestic affairs unless Congress specifically withdraws their authority to act.*

■ The extent of tribal self-government depends on the intent of Congress.[66] We begin our analysis of congressional intent with the established principle under federal law that "Indian tribes retain those fundamental attributes of sovereignty . . . which have not been divested by Congress or by necessary implication of the tribe's dependent status."[67] The United States Supreme Court explained in *United States v. Wheeler*[68] that this starting point stems from the fact that tribal governance predates the founding of our nation: "The powers of Indian tribes are, in general, inherent powers of a limited sovereignty which has never been extinguished. Before the coming of the Europeans, the tribes were self-governing sovereign political communities. . . . The sovereignty that the Indian tribes retain is of a unique and limited character."[69]

■ Modern tribal sovereignty is certainly not absolute; "[i]t exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, . . . Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status."[70] In explaining this rule, the Supreme Court has articulated a core set of sovereign powers that remain intact even though Indian nations are dependent under federal law; in particular, internal functions involving tribal membership and domestic affairs lie within a tribe's retained inherent sovereign powers.[71]

■ Alaska law, too, has long recognized that sovereign powers exist unless divested. For example, we stated in *Ollestead v. Native Village of Tyonek*[72] that "the principle that Indian tribes are sovereign, self-governing entities" governs "all cases where essential tribal relations or rights of Indians are involved."[73] We recognized then that "Indian affairs are subject to state law but only to the extent that Congress explicitly so provides."[74] In accordance with the Supreme Court's approach in *Wheeler*, reiterated in cases following that decision[75] and established under Alaska law, we presume that tribal sovereign powers remain intact. Thus, we begin by evaluating federal statutes affecting Alaska Natives in order to determine whether Congress has explicitly revoked the inherent sovereignty of Alaska's Native tribes by eliminating their Indian country.

The dissent, however, asks us to begin from the opposite premise. Rather than following the teachings of federal and state law that respect tribal sovereignty by presuming that sovereign power exists unless divested, the dissent quotes language from *Mescalero Apache Tribe v. Jones*,[76] in which the United States Supreme Court noted that "Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens."[77] From this statement the dissent

---

**66.** *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980); *United States v. Wheeler*, 435 U.S. 313, 322–33, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

**67.** *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 146, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982); *see also Wheeler*, 435 U.S. at 323, 98 S.Ct. 1079.

**68.** 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

**69.** *Id.* at 322–33, 98 S.Ct. 1079 (citations and internal quotation marks omitted).

**70.** *Id.* at 323, 98 S.Ct. 1079.

**71.** *See, e.g., Wheeler*, 435 U.S. at 326, 98 S.Ct. 1079; *Montana v. United States*, 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Part III.C.4 *infra* contains a full discussion of the scope of retained sovereignty.

**72.** 560 P.2d 31, 33 (Alaska 1977).

**73.** *Id.*

**74.** *Id.*

**75.** *See, e.g., Montana*, 450 U.S. at 563–67, 101 S.Ct. 1245; *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

**76.** 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

**77.** *Id.* at 148–49, 93 S.Ct. 1267.

deduces what it terms an "allocative principle."[78] Based upon *Mescalero*'s language, the dissent formulates a presumption that would reverse the basic rule and require courts, at least outside of Indian country, to refuse to recognize tribal jurisdiction unless an act of Congress specifically authorizes the exercise of tribal adjudicatory power. We refuse to accept this invitation to deny the existence of tribal sovereignty and to turn federal law on its head.

The dissent's "allocative principle" thesis ignores the teachings of *Wheeler* and the decisions that follow it. In these post-*Mescalero* decisions, the Court has not focused on tribal land as determinative of tribal authority. Instead of interpreting the *Mescalero* language as an across-the-board prohibition of tribal sovereignty in the absence of Indian country, for example, the Court in *Montana v. United States*[79] reconciled the general rule that tribal sovereignty exists unless specifically divested with the *Mescalero* language that state law applies to natives beyond reservation land. But *Montana*, in contrast to the dissent, articulates no test making the existence of reservation land determinative of tribal power. Instead, the *Montana* Court explained that *Mescalero* stands for the proposition that an express congressional delegation of power is required to sustain tribal power when the tribe has sought to control matters outside the scope of internal governmental authority: "[E]xercise of tribal power *beyond what is necessary to protect tribal self-government or to control internal relations* is inconsistent with the dependent status of the tribes, and so cannot

survive without express congressional delegation."[80] The Court has continued to adhere to this proposition, requiring express Congressional delegation of power only when a tribe seeks to exercise power outside of its core sovereign authority.[81]

Thus, in determining whether tribes retain their sovereign powers, the United States Supreme Court looks to the character of the power that the tribe seeks to exercise, not merely the location of events. We accordingly decline to adopt the dissent's approach and·instead follow federal law by beginning from the premise that tribal sovereignty with respect to issues of tribal self-governance exists unless divested. Congress has recognized that a tribe has a strong interest in "preserving and protecting the Indian family as the wellspring of its own future."[82] Because Northway Village's status as a federally recognized tribe is undisputed and its adjudication of child custody disputes over member children is necessary "to protect tribal self-government or to control internal relations," its tribal courts require no express congressional delegation of the right to determine custody of tribal children.

Finally, we note a tenet of federal Indian law on statutory interpretation that informs our analysis of this issue. Supreme Court precedent supplies clear instructions for interpreting ambiguous statutes: Courts must resolve ambiguities in statutes affecting the rights of Native Americans in favor of Native Americans.[83] Thus, we will not light-

---

**78.** Dissent at 774–776.

**79.** 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

**80.** *Id.* at 564, 101 S.Ct. 1245 (emphasis added) (citing *Mescalero*, 411 U.S. at 148, 93 S.Ct. 1267).

**81.** *See, e.g., Duro v. Reina*, 495 U.S. 676, 685–88, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). In *Duro*, the Court held that tribes lacked criminal jurisdiction over nonmember Indians. *See id.* Shortly after the decision, Congress provided for tribal criminal jurisdiction over nonmember Indians. *See* 25 U.S.C. §§ 1301–03 (1983 & Supp. 1998).

**82.** H.R.Rep. No. 95–1386, at 19.

**83.** *See In re F.P.*, 843 P.2d 1214, 1219 (Alaska 1992); *see also South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 118 S.Ct. 789, 800, 139 L.Ed.2d 773 (1998) (recognizing canon of Indian law that federal laws affecting tribal sovereignty should be "construed narrowly in favor of retaining Indian rights"); *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (stating "we must be guided by the eminently sound and vital canon ... that statutes passed for the benefit of dependent Indian tribes are to be liberally construed, doubtful expressions being resolved in favor of the Indians") (internal quotation marks, ellipsis and citations omitted).

ly find that Congress intended to eliminate the sovereign powers of Alaska tribes.

3. *ANCSA itself and post-ANCSA federal statutes regarding tribal sovereignty all support Northway's jurisdiction over child custody matters.*

Ample evidence exists that Congress did not intend for ANCSA to divest tribes of their powers to adjudicate domestic disputes between members. Congress intended ANCSA to free Alaska Natives from the dictates of "lengthy wardship or trusteeship,"[84] not to handicap tribes by divesting them of their sovereign powers. As a principal author of the law has explained, ANCSA "rejected the paternalism of the past and gave Alaska Natives an innovative way to retain their land and culture without forcing them into a failed reservation system."[85] But nowhere does the law express any intent to force Alaska Natives to abandon their sovereignty.

Outside of ANCSA, too, ample evidence exists that Congress did not intend for ANCSA to divest tribes of their powers to adjudicate domestic disputes between members. Post–ANCSA congressional actions such as the Tribe List Act, ICWA, and the Tribal Justice Act indicate that Congress intended for post-ANCSA Alaska Natives to continue to regulate their internal affairs.

We noted above that the Tribe List Act shows Congress's determination that Alaska Native villages are sovereign entities. The inclusion of Alaska Native villages on the tribal lists makes clear that Alaska Natives "have the right, subject to general principles of Federal Indian law, to exercise the same inherent and delegated authorities available to other tribes."[86] And since this court defers to determinations of tribal status by the Executive Branch or by Congress, we similarly accept their conclusion that, even after ANCSA, federally recognized Alaska Native tribes like Northway Village retain sovereignty to adjudicate domestic disputes between members.

To hold otherwise would render the Tribe List Act hollow: If tribes that do not occupy Indian country have no inherent powers of self-governance, the language in the Tribe List Act that expressly reserves to these tribes "the right ... to exercise the same inherent and delegated authorities available to other tribes."[87] would be virtually meaningless. We find untenable the conclusion that Congress intended for the Tribe List Act to be an empty gesture.

The passage of ICWA seven years after ANCSA's enactment also makes clear that Congress did not intend ANCSA to eradicate tribal court jurisdiction over family law matters. ICWA's goal was to increase tribal control over custody decisions involving tribal children. Congress viewed this increased control as vital to the continued sovereignty of the tribes. In the legislative history to ICWA, Congress cited with approval a decision stating that "there can be no greater threat to 'essential tribal relations,' and no greater infringement on the right of the ... tribe to govern themselves than to interfere with tribal control over the custody of their children."[88] Alaska Native villages are explicitly included within ICWA's scope.[89]

ICWA's very structure presumes both that the tribes covered by the Act are capable of adjudicating child custody matters in their own courts and that tribal justice systems are appropriate forums for resolution of child custody disputes.[90] Indeed, legislative history reveals that ICWA's jurisdictional frame-

---

84. *Alaska v. Native Village of Venetie Tribal Gov't (Venetie II)*, 522 U.S. 520, 118 S.Ct. 948, 956, 140 L.Ed.2d 30 (1998).

85. Senator Ted Stevens, Address Before the Alaska Legislature (Apr. 2, 1997), *in* Senate and House Joint Journal Supp. No. 9 at 5, 1997 House Journal 915, *quoted in* Donald C. Mitchell, *Alaska v. Native Village of Venetie: Statutory Construction or Judicial Usurpation? Why History Counts*, 14 Alaska L.Rev. 353, 440 (1997).

86. 58 Fed.Reg. 54,366 (1993).

87. *Id.*

88. *See* H.R.Rep. No. 95–1386 at 15 (alteration in original) (quoting *Wakefield v. Little Light*, 276 Md. 333, 347 A.2d 228, 237–38 (1975)).

89. *See* 25 U.S.C. § 1903(8).

90. *See id.* at § 1911 (providing for extended tribal court jurisdiction in the field of child custody).

work was motivated by concerns over the "failure of State officials, agencies, and procedures to take into account the special problems and circumstances of Indian families *and the legitimate interest of the Indian tribe in preserving and protecting the Indian family as the wellspring of its own future.*"[91] Although the custody dispute at the center of this case falls outside ICWA's scope, Congress's purpose in enacting ICWA reveals its intent that Alaska Native villages retain their power to adjudicate child custody disputes.

■ The Tribal Justice Act,[92] enacted in 1993, further evidences the congressional view that the Native villages retain governmental powers. The Act provides financial support for tribal court activities without drawing distinctions between those tribes that occupy Indian country and those that do not and specifically includes Alaska Native villages recognized as tribes within its scope.[93] Additionally, in the Act's findings section, Congress recognizes that all "Indian tribes possess the inherent authority to establish their own form of government," that "tribal justice systems [are] the appropriate forums for the adjudication of disputes affecting personal and property rights," and that "traditional tribal justice practices are essential to the maintenance of the culture and identity of Indian tribes."[94]

Based on the intent of Congress, as revealed by the Tribe List Act, ICWA, and the Tribal Justice Act, we conclude that Alaska Native villages do possess governmental powers over child custody matters.[95] We next examine federal decisional law regarding tribal sovereignty to see what guidance they provide on the issue of Northway's post-ANCSA jurisdiction.

4. *Federal case law suggests that post-ANCSA, Alaska's tribes retain non-territorial sovereignty that includes power over child custody disputes.*

Ms. John and the amici argue that the existence of Indian country is linked only to the tribe's power over land and nonmembers, not to its power over members. Thus, they claim that even if Northway Village does not occupy Indian country, it can nevertheless adjudicate disputes between its members.

Because the traditional reservation-based structure of tribal life in most states forms the backdrop for the federal cases, courts have not had occasion to tease apart the ideas of land-based sovereignty and membership sovereignty. Consequently, the federal decisions do not conclusively answer the question of what happens when a law like ANCSA separates membership and land completely by allowing a federally recognized tribe to redefine its relationship to state and federal governments by eliminating the idea of Indian country. But federal case law does provide significant support for our conclusion that federal tribes derive the power to adjudicate internal domestic matters, including child custody disputes over tribal children, from a source of sovereignty independent of the land they occupy.

■ The federal decisions discussing the relationship between Indian country and tribal sovereignty indicate that the nature of tribal sovereignty stems from two intertwined sources: tribal *membership* and tribal *land.* The United States Supreme Court has recognized the dual nature of Indian sovereignty for more than a century and a half; the Court has explained that, under federal law, "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory."[96]

91. H.R.Rep. No. 95–1386 at 19 (emphasis added).

92. 25 U.S.C. § 3601 *et seq.* (West Supp.1998).

93. *See* 25 U.S.C. § 3601, 3602(3).

94. *Id.* at § 3601(4), (6), (7).

95. *See County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation,* 502 U.S. 251, 265–66, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) (holding that "when two [or more] stat-

utes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." (alteration in original) (internal quotation marks omitted)).

96. *United States v. Mazurie,* 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) (citing *Worcester v. Georgia,* 6 Pet. 515, 557, 8 L.Ed. 483 (1832)).

Tribes not only enjoy the authority to exercise control within the boundaries of their lands, but they also possess the inherent "power of regulating their internal and social relations." [97]

Mr. Baker and the dissent argue that many federal decisions construing the nature of tribal sovereignty view the existence of Indian country as the critical factor in determining the existence or extent of tribal authority. But the case law does not fairly support the view that the existence of Indian country is an absolute prerequisite to the existence of sovereign tribal power.

To the contrary, in a series of decisions exploring the nature of tribal sovereignty, the Court has noted the crucial role tribal membership plays in defining the scope of tribal authority. The distinction between members and nonmembers has often been treated as a dispositive factor in federal Indian jurisprudence. In *United States v. Wheeler*,[98] for example, the Court held that although tribes enjoy less sovereignty than foreign nations by virtue of their dependent relationship with the federal government, tribes retain the core power to regulate internal affairs:

> The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe. Thus, Indian tribes can no longer freely alienate to non-Indians the land they occupy. They cannot enter into direct commercial or governmental relations with foreign nations. And, as we have recently held, they cannot try nonmembers in tribal [criminal] courts.
>
> These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily

inconsistent with their freedom independently to determine their external relations. *But the powers of self-government,* including the power to prescribe and enforce internal criminal laws, are of a different type. They *involve only the relations among members of a tribe. Thus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status.*[99]

Other decisions similarly stress the importance of tribal power to regulate internal domestic relations. Three years after *Wheeler*, the Court in *Montana v. United States* [100] reaffirmed the significance of tribal membership and reaffirmed the importance of Native American self-governance: "Thus, in addition to the power to punish tribal offenders, the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members." [101] The Court has stated that a tribe's authority to "determine rights to custody of a child of divorced parents of the tribe" falls within the boundaries of inherent tribal sovereignty.[102] Again in 1990, the Court in *Duro v. Reina* [103] emphasized the fundamental importance of membership, noting the federal law's consistency "in describing retained tribal sovereignty ... in terms of a tribe's power over its *members.*" [104] In deciding that the Salt River Pima–Maricopa tribe was without jurisdiction to prosecute criminally a man not eligible for membership, the Court emphasized the crucial distinction between members and nonmembers of the tribe. The court also noted the importance of membership throughout different areas of federal Indian law, including taxation, regulation of hunting and fishing, and civil and criminal court juris-

---

**97.** *Id.* (quoting *United States v. Kagama*, 118 U.S. 375, 381–82, 6 S.Ct. 1109, 30 L.Ed. 228 (1886)).

**98.** 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

**99.** *Id.* at 326, 98 S.Ct. 1079 (citations omitted).

**100.** 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

**101.** *Id.* at 564, 101 S.Ct. 1245 (citation omitted).

**102.** *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 170, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (citing *Fisher v. District Court*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976)).

**103.** 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990).

**104.** *Id.* at 685, 110 S.Ct. 2053.

756

diction.[105]

■ The Supreme Court has also applied these principles in the specific context of tribal authority to handle civil disputes in tribal justice systems. Tribes "have power to make their own substantive law in internal matters, and to enforce that law in their own forums."[106] And tribal courts may also have jurisdiction to "resolve civil disputes involving nonmembers, including non-Indians"[107] when the civil actions involve essential self-governance matters such as membership or other areas where "the exercise of tribal authority is vital to the maintenance of tribal integrity and self-determination."[108] The key inquiry, according to the Court, is not whether the tribe is located in Indian country, but rather whether the tribe needs jurisdiction over a given context to secure tribal self-governance: "If state-court jurisdiction over Indians ... would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law."[109]

*Fisher v. District Court*[110] provides an example of the Supreme Court's recognition of the dual nature of sovereignty in the case law. *Fisher*, like the case before us, was a family law dispute between Native American parents. The Northern Cheyenne Tribal Court removed Ivan Fisher from his mother's home and placed him with another tribal member, who wished to adopt him.[111] In determining that the Montana state courts had no jurisdiction over the Runsaboves' adoption proceeding, the Supreme Court noted that the tribal court had exclusive jur-

isdiction in part because "the adoption proceeding is appropriately characterized as litigation arising on the Indian reservation."[112] But two paragraphs later the Court stated that "[t]he exclusive jurisdiction of the Tribal Court ... [derives] from the quasi-sovereign status of the Northern Cheyenne Tribe under federal law."[113] This description of Native sovereignty as stemming from the tribe itself is at odds with the dissent's theory that a tribe's ability to adjudicate internal disputes is premised solely on the basis of its location within Indian country.

*Fisher* therefore reflects both a recognition of territorial bases of sovereignty and an understanding that tribal status itself includes the power to adjudicate internal child custody disputes. Indeed, the *Fisher* court concluded that allowing Montana's state courts to hear the custody case between Native parents "plainly would interfere with the powers of self-government ... exercised through the Tribal Court" and voiced its concern that such usurpation "would cause a corresponding decline in the authority of the Tribal Court."[114] Although that case took place on a reservation, the considerations of noninterference and respect for tribal forums invoked by the *Fisher* court apply outside of Indian country.

The dissent interprets *Fisher* in quite a different way. Along with *DeCoteau v. District County Court,*[115] *Fisher* is one of two decisions that the dissent believes illustrates its theory that no tribal court jurisdiction whatsoever can exist without Indian country. But these decisions do not support the dis-

105. *See id.* at 686–89, 110 S.Ct. 2053.

106. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 55–56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (citations omitted).

107. *Duro v. Reina,* 495 U.S. 676, 687, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990) (citing *Santa Clara,* 436 U.S. at 65–66, 98 S.Ct. 1670; *Williams v. Lee,* 358 U.S. 217, 223, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959)).

108. *Id.* at 688, 110 S.Ct. 2053 (citing *Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation,* 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989)).

109. *Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 15, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) (citing

*Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976)).

110. 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976).

111. *See id.* at 383, 96 S.Ct. 943.

112. *Id.* at 389, 96 S.Ct. 943.

113. *Id.* at 390, 96 S.Ct. 943.

114. *Id.* at 387–88, 96 S.Ct. 943.

115. 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).

sent's thesis that tribal sovereignty exists only within Indian country.

*DeCoteau* involved the narrow jurisdictional issue of whether South Dakota's state courts could assert any jurisdiction over the conduct of tribal members on a reservation, something normally within the tribe's exclusive jurisdiction. The Court expressly stated that the only issue presented by the case was whether the reservation existed;[116] the Court did not consider the implications of the reservation's existence because it accepted a stipulation by the parties that the state had jurisdiction if the reservation had been terminated by Congress.[117] After describing the legal agreement between the parties, which the Court assumed without deciding was an accurate one,[118] the Court noted in footnote 2 that the parties relied on 11 U.S.C. §§ 1151(a) and (c) in formulating their stipulation. This statute defines "Indian country" for purposes of criminal jurisdiction, and the Court noted that the law "generally applies as well to questions of civil jurisdiction."[119] Footnote 2 amounts, then, to little more than a passing recognition of settled case law interpreting that statute's usual meaning and scope. That this was all the Court meant to say in footnote 2 is illustrated by the Court's reference to that footnote in *Venetie II*, which cited *DeCoteau* not for any bright-line jurisdictional test but only for the long-standing holding that § 1151 generally applies to both criminal and civil cases.[120] Moreover, the *Venetie II* court makes clear that any allocative significance that exists in the concept of Indian country

pertains to a tribe's territorial power over its land, not its members.[121]

*Fisher* teaches even less about the existence of any kind of rule equating Indian country with sovereign adjudicatory power. The *Fisher* Court asked only whether Montana had any basis to assert *concurrent* jurisdiction over the Runsaboves' adoption proceeding; it assumed that the tribal court retained some form of jurisdiction, either exclusive or concurrent, stemming from the tribe's right to govern itself.[122] Because it found that state court jurisdiction would interfere with the tribe's self-governance and diminish the authority of the tribal court, and because the state had no interest in the dispute since all relevant events took place on Indian land, the Court held that the tribe had exclusive jurisdiction over the adoption.[123] But *Fisher* does not imply that jurisdiction must lie exclusively in one forum or another. The Supreme Court viewed the case before it as one in which Indian jurisdiction was unquestioned and the only issue presented was whether Montana had any form of jurisdiction at all. Thus, *Fisher*'s holding—that Indian land may be a prerequisite to *exclusive* tribal jurisdiction—in no way answers the question of whether the tribal court retains *concurrent* jurisdiction over tribal relations without such land.[124]

Following in the line of *Wheeler* and *Montana*, a pair of recent tax decisions illustrates that *DeCoteau* and *Fisher* leave today's dispute unanswered. And they indicate that the Supreme Court has been careful to note that the general rule that "Indians going beyond reservation boundaries have general-

---

**116.** *See id.* at 427, 95 S.Ct. 1082.

**117.** *See id.* at 426–28 & n. 3, 95 S.Ct. 1082.

**118.** *See id.*

**119.** *Id.* at 427 n. 2, 95 S.Ct. 1082.

**120.** *See Alaska Native Village of Venetie Tribal Gov't (Venetie II )*, 522 U.S. 520, 118 S.Ct. 948, 952, 140 L.Ed.2d 30 (1998).

**121.** *See id.* at 952 n. 1 (noting that tribes and the federal government have "primary jurisdiction over *land* that is Indian country" but saying nothing about jurisdiction over members) (emphasis added).

**122.** *See Fisher*, 424 U.S. at 386–89, 96 S.Ct. 943.

**123.** *See id.* at 387–89 & n. 14, 96 S.Ct. 943.

**124.** The dissent also describes *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), as a case discussing "jurisdiction over 'lands' in order to determine jurisdiction over tribal members." Dissent at 782. But *Solem* determines the existence of Indian country for the purpose of applying an Act of Congress that vests the *federal government* with exclusive jurisdiction over certain crimes committed on Indian reservations, and thus does not address tribal jurisdiction except in the context of that Act. *See id.* at 464–65 & nn.1 & 2, 104 S.Ct. 1161.

ly been held subject to non-discriminatory state law otherwise applicable to all citizens of the State" [125]—the source of the dissent's "allocative principle"—does not mean that a tribe must forego its fundamental self-governance because of a lack of Indian country. In *Oklahoma Tax Commission v. Sac and Fox Nation,*[126] the Court specifically declined to answer the question of "whether the Tribe's right to self-governance could operate independently of its territorial jurisdiction to pre-empt the state's ability to tax income ... when the employee does not reside in Indian country."[127] Two years later, in *Oklahoma Tax Commission v. Chickasaw Nation,*[128] the Supreme Court emphasized that the question of a tribe's internal powers absent Indian country was undecided, but implied that a tribe's ability to retain fundamental powers of self-governance is the more important principle.

The *Chickasaw Nation* Court held that Oklahoma could not collect several challenged taxes within an Indian reservation but could collect taxes on tribal members living outside Indian country. The court noted that generally applicable state laws are usually enforceable against Natives in the absence of Indian country.[129] But the Court also implied that its result would be different had the parties' dispute implicated the tribal self-governance concerns raised by a family law matter integral to tribal self-governance. In explaining its rationale, the Supreme Court said: "Notably, the Tribe has not asserted here, or before the Court of Appeals, that the State's tax infringes on tribal self-governance."[130] Only after *twice* emphasizing that the Chickasaw Nation did not raise

self-governance claims and that the Court was thus procedurally foreclosed from considering such arguments did the Court reach its decision.[131]

The custody dispute between Ms. John and Mr. Baker lies at the core of sovereignty—a tribe's "inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members."[132] By deliberately leaving the door open for tribal governments to conduct internal self-governance functions in the absence of Indian country, *Chickasaw Nation* and *Sac and Fox Nation* suggest that Northway Village has jurisdiction to hear this dispute because the right to determine custody of Indian children, unlike Oklahoma's motor fuels tax, "infringes on tribal self-governance."[133]

As recently as last year, the Supreme Court reaffirmed the notion that the existence of Indian country is not a dispositive factor in determining jurisdiction. In *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.,*[134] the Court held that tribes enjoy sovereign immunity from civil lawsuits asserting contract claims regardless of whether the contracts were formed on or off Indian land.[135] Although the case dealt with a different set of factual circumstances than the present dispute, it is notable that only the *Kiowa Tribe* dissenters believed that the "generally applicable state laws" rule should apply to hold the tribe subject to suit for a promissory note executed outside of Indian country.[136] Although the dissenters claimed that the immunity doctrine should not apply to conduct unrelated to the

---

125. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

126. 508 U.S. 114, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993).

127. *Id.* at 126, 113 S.Ct. 1985 (citations omitted).

128. 515 U.S. 450, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995).

129. *See id.* at 465, 115 S.Ct. 2214.

130. *Id.* at 464, 115 S.Ct. 2214.

131. *See id.* at 464–65 & n. 14, 115 S.Ct. 2214.

132. *Montana v. United States,* 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *see also United States v. Wheeler,* 435 U.S. 313, 322–28, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

133. *Chickasaw Nation,* 515 U.S. at 464, 115 S.Ct. 2214.

134. 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998).

135. *See id.* at 1705.

136. *See id.* at 1705–08 (Stevens, J., dissenting).

tribe's Indian country,[137] the majority refused to accept this narrow territorial conception.[138] We similarly refuse to accept it today.

Decisions of the United States Supreme Court support the conclusion that Native American nations may possess the authority to govern themselves even when they do not occupy Indian country.[139] The federal decisions contain language supporting the existence of tribal sovereignty based on either land or tribal status. Indian law jurisprudence stresses the central importance of membership and the fundamental powers of tribes to adjudicate internal family law affairs like child custody disputes. Decisions like *Chickasaw Nation* and *Sac and Fox Nation* suggest that tribes without Indian country do possess the power to adjudicate internal self-governance matters. We hold that the type of dispute before us today—an action for determination of custody of the children of a member of Northway Village— falls squarely within Northway's sovereign power to regulate the internal affairs of its members.

██ Although Ms. John is not a member of Northway Village, she argues that the children themselves are eligible for tribal membership. This is a critical fact that must be determined by the superior court on remand, as we discuss in Part III.E.3. A tribe's inherent sovereignty to adjudicate internal domestic custody matters depends on the membership or eligibility for membership of the child. Such a focus on the tribal affilia-

tion of the children is consistent with federal statutes such as ICWA, which focuses on the child's tribal membership as a determining factor in allotting jurisdiction.[140] Because the tribe only has subject matter jurisdiction over the internal disputes of tribal members, it has the authority to determine custody only of children who are members or eligible for membership.[141]

5. *Alaska's state courts retain concurrent jurisdiction over this dispute.*

██ Although we recognize Northway's jurisdiction to adjudicate child custody disputes between village members, its jurisdiction is not exclusive. The State of Alaska can also exercise jurisdiction over such disputes. This is so because villages like Northway presumably do not occupy Indian country, and federal law suggests that the only bar to state jurisdiction over Indians and Indian affairs is the presence of Indian country.[142] Outside Indian country, all disputes arising within the State of Alaska, whether tribal or not, are within the state's general jurisdiction.[143] Thus the state, as well as the tribe, can adjudicate such disputes in its courts. A tribe's inherent jurisdiction does not give tribal courts priority, or presumptive authority, in disputes involving tribal members.

Several state and federal courts have also recognized the existence of concurrent state-tribal jurisdiction over tribal family law disputes when one or both parents do not reside

137. *See id.* at 1707.

138. *See id.* at 1705.

139. At least one federal judge has voiced the opinion that in enacting ANCSA, Congress intended that Native villages retain sovereignty over members even though such sovereignty was "without territorial reach." *State of Alaska ex rel. Yukon Flats Sch. Dist. v. Native Village of Venetie Tribal Gov't,* 101 F.3d 1286, 1303 (9th Cir.1996) (Fernandez, J. concurring).

140. *See* 25 U.S.C. § 1903(4) (defining "Indian child" under ICWA as a child who is a tribal member or eligible for membership).

141. Consent of both parents may be an alternative basis for tribal court jurisdiction in child

custody cases, as federal law supports the determination that tribes have jurisdiction over consenting nonmembers in some situations. *See Montana v. United States,* 450 U.S. 544, 565, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (recognizing a tribe's power to regulate activities of nonmembers who enter consensual relationships with the tribe or its members). Here, Ms. John consented to have this action decided in a Northway tribal forum. But we need not decide at this time whether her consent is sufficient to confer jurisdiction on the tribal court in this case, given that we remand for determination of the children's tribal affiliation.

142. *See, e.g., Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

143. *See* AS 22.10.020(a).

on reservation land. For example, in *In re Marriage of Skillen*,[144] the Supreme Court of Montana considered whether Montana state courts had jurisdiction to hear a dispute over the custody of an Indian child. One of the parties was the child's non-Indian father, who lived off the reservation.[145] After discussing congressional intent as revealed in ICWA, the UCCJA, and the Parental Kidnapping Prevention Act (PKPA)[146] and examining federal case law, the Montana court determined that tribal courts have exclusive jurisdiction over children domiciled on reservation land and that "when an Indian child resides off the reservation, the state court and tribal court share concurrent jurisdiction."[147] The *Skillen* court noted that recognition of concurrent jurisdiction reflected the delicate balance under federal law of a state court's "obligation to respect the sovereignty of Indian tribes in relation to [the court's] responsibility to uphold and enforce the laws of this state."[148]

Although we base our decision in this case on the decisions of Congress and the Supreme Court, we, like the *Skillen* court, also believe that policy considerations support our recognition of concurrent jurisdiction. Tribal jurisdiction over child custody cases involving

member children will further the goal under both federal and state law of best serving the needs of Native American children.

For example, the fact that many of Alaska's Native villages are located far from the courtrooms of our state trial courts limits our state judicial system's ability to respond to the needs of many Alaska Natives.[149] Moreover, we have recognized that Alaska is home to "uniquely divergent cultures," including many "Native cultures which remain today much as they were prior to the infusion of Anglo–American culture."[150] Because of this great diversity, barriers of culture, geography, and language combine to create a judicial system that remains foreign and inaccessible to many Alaska Natives.[151] These differences have "created problems in administering a unified justice system sensitive to the needs of Alaska's various cultures."[152] By acknowledging tribal jurisdiction, we enhance the opportunity for Native villages and the state to cooperate in the child custody arena by sharing resources. Recognizing the ability and power of tribes to resolve internal disputes in their own forums, while preserving the right of access to state courts, can only help in the administration of justice for all.[153]

**144.** 287 Mont. 399, 956 P.2d 1 (1998).

**145.** *See id.* at 4–5.

**146.** 28 U.S.C. § 1738A(a).

**147.** *Skillen*, 956 P.2d at 18; *see also In re Larch*, 872 F.2d 66, 69 (4th Cir.1989) (noting that ICWA "discloses that Congress recognized that there can be concurrent jurisdiction in state and tribal courts"); *United States ex rel. Cobell v. Cobell*, 503 F.2d 790, 795 (9th Cir.1974) (holding that, in a custody case between tribal members where the children reside off the reservation, the tribe and state would share concurrent jurisdiction if the tribe's law had not explicitly disclaimed tribal jurisdiction over marriage, divorce, and adoption); *Wells v. Wells*, 451 N.W.2d 402, 405 (S.D. 1990) (recognizing concurrent state-tribal jurisdiction over a custody action between a Native American mother and a non-Indian father where the mother and children moved off the reservation).

**148.** *Skillen*, 956 P.2d at 18.

**149.** *See, e.g.*, Alaska Court System, Report of the Alaska Supreme Court Advisory Committee on Fairness and Access ix (1997) ("Urban residents have far more access to justice system services

than village residents. One-fourth of Alaskans do not live within reasonable reach of many court system services."); *id.* at 104–11 (noting dramatic access problems for rural Alaskans).

**150.** *Calista Corp. v. Mann*, 564 P.2d 53, 61 (Alaska 1977).

**151.** *See, e.g.*, Alaska Court System, Report of the Alaska Supreme Court Advisory Committee on Fairness and Access 49 (1997) ("Many [interviewees] believed that the courts do not understand Alaska Native cultures and family structures . . . ."); *id.* at 92 (noting that 36% of Alaska Natives speak a Native language at home).

**152.** *Calista*, 564 P.2d at 61.

**153.** *See, e.g.*, Alaska Court System, Report of the Alaska Supreme Court Advisory Committee on Fairness and Access 107–08 (1997) (recommending that state courts "greatly enhance equality in the effective delivery of justice system services by associating or blending [ ] local resources [like tribal courts] with the formal court system" and noting that "[t]he western justice system is not always the most appropriate model for the problems of many rural areas").

The continuing existence of concurrent state jurisdiction also lays to rest a number of the dissent's concerns. Contrary to the dissent's assertions that "[t]he doors of Alaska's courts will no longer be open to all Alaskans" [154] and that urban Alaska Natives will be required to adjudicate their cases in remote villages,[155] Native parents who live in Anchorage and do not wish to avail themselves of a distant tribal forum will still be able to resolve their custody disputes in Anchorage Superior Court. Indeed, Alaska Natives who for any reason do not wish to have their disputes adjudicated in a tribal court will retain complete and total access to the state judicial system. Because state courts retain concurrent jurisdiction, there is no "mandatory tribal court jurisdiction." [156]

The existence of concurrent state jurisdiction also reveals the inapplicability of the dissent's proposed "allocative principle" to our decision today. Even if there existed an iron-clad rule that state law must always apply to Natives outside of Indian land, the outcome we reach today would not violate that rule. *Mescalero* teaches that "Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens." [157] The dissent, citing no persuasive authority, mistakenly attempts to shape this statement into a rule between competing exclusive jurisdictions. But because the jurisdiction of Alaska state courts remains unaffected by our recognition of concurrent tribal court jurisdiction, the dissent's argument in this regard is essentially a straw man. Our formulation does not rob the state of its exercise of judicial power over Alaska Natives; rather, the state will continue to address these disputes either directly, through the exercise of concurrent jurisdiction, or indirectly, through the doctrine of comity.

**D.** *Tribal Law Applies to Child Custody Disputes Adjudicated by Tribal Courts.*

Ms. John and the amici argue that Northway should be able to apply its own law, including tribal law and custom, in resolving a custody dispute that falls within its jurisdiction. We agree.

 Decisions addressing tribal power to adjudicate internal matters state that tribes have the "power to make their own substantive law in internal matters and to enforce that law in their own forums." [158] Similarly, the Supreme Court has stressed that tribal sovereignty is valuable precisely because it enables Native Americans "to control their own internal relations, and to preserve their own unique customs and social order." [159] Because Alaska Native tribes have inherent sovereignty to adjudicate internal tribal disputes, the tribes must be able to apply their tribal law to those disputes. Thus, tribal sovereignty over issues like family relations includes the right to enforce tribal law in resolving disputes.

**E.** *The Doctrine of Comity Properly Governs State Recognition of Tribal Court Decisions.*

 We must also determine whether the superior court should have dismissed Mr. Baker's identical state suit. After examining whether states should afford tribal court judgments full faith and credit, we conclude that the comity doctrine provides the proper framework for deciding when state courts should recognize tribal court decisions.

*1. Full faith and credit*

 ICWA requires courts to extend full faith and credit to tribal court decisions involving "child custody proceedings" as that

---

**154.** Dissent at 766.

**155.** Dissent at 804.

**156.** Dissent at 803.

**157.** *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

**158.** *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 55–56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (citations omitted); *see also United States v. Quiver,* 241 U.S. 602, 603–604, 36 S.Ct. 699, 60 L.Ed. 1196 (1916).

**159.** *Duro v. Reina,* 495 U.S. 676, 685–86, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990).

term is defined by the statute.[160] But, as we stated above, this parental custody dispute does not qualify as a "child custody proceeding" under ICWA. Thus, ICWA's full faith and credit provision does not apply in this case.

Other than ICWA, no federal or state law suggests that courts should grant full faith and credit to tribal court judgments. The full faith and credit provision of the federal constitution applies only to states.[161] As one federal court recently concluded, nothing in the Constitution's text or in the debates of the constitutional convention suggests that the framers believed that the clause would apply to tribes.[162]

Further, federal legislation implementing the Constitution's Full Faith and Credit Clause has extended its application only to United States territories and possessions.[163] Because Congress specifically distinguished between territories and possessions and Indian tribes in enacting ICWA's full faith and credit clause, we do not view this legislation as extending the full faith and credit requirement to tribal judgments.[164]

 Similarly, the UCCJA and the PKPA, which require courts to recognize and enforce certain child custody determinations, apply only to "states."[165] The two statutes define "state" to mean a state, territory or possession of the United States, the District of Columbia, and the Commonwealth of Puerto Rico.[166] Neither of the statutes' legislative histories contains any evidence suggesting that the laws apply to Indian tribes. Because ICWA's full faith and credit provision reveals that Congress does not view Indian tribes as "states, territories or possessions," the PKPA does not accord full faith and credit to tribal judgments.[167] And in the absence of proof that the Alaska legislature specifically intended the UCCJA to include Indian tribes, we follow the principle of statutory interpretation instructing that all omissions be treated as exclusions.[168] We therefore conclude that the UCCJA does not apply to tribal judgments.[169]

Because no federal or state law applies the full faith and credit requirement to tribal court decisions, we turn to consideration of the comity doctrine.

### 2. Comity

 Comity is the principle that "the courts of one state or jurisdiction will give effect to the laws and judicial decisions of another state or jurisdiction, not as a matter of obligation, but out of deference and mutual respect."[170] The comity doctrine governs the recognition afforded by courts in the United States to judgments of foreign na-

---

**160.** *See* 25 U.S.C. § 1911(d).

**161.** *See* U.S. Const. art. IV, § 1.

**162.** *See Wilson v. Marchington,* 127 F.3d 805, 808 (9th Cir.1997).

**163.** *See* 28 U.S.C. § 1738.

**164.** ICWA's full faith and credit clause provides that "[t]he United States, every State, every territory or possession of the United States, and *every Indian tribe* shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe...." 25 U.S.C. § 1911(d) (emphasis added). *See also Wilson,* 127 F.3d at 809 (reaching the same conclusion after comparing the language in ICWA and § 1738).

**165.** *See* 28 U.S.C. § 1738A(a); AS 25.30.120.

**166.** *See* 28 U.S.C. § 1738A(b)(8); AS 25.30.909.

**167.** *But see In re Larch,* 872 F.2d 66, 68 (4th Cir.1989) (holding that the PKPA does apply to tribes because tribal court judgments are entitled

to full faith and credit under certain circumstances and tribes are similar to states for purposes of sovereignty and jurisdiction). We are unpersuaded by the reasoning of the *Larch* court in light of the contrary evidence we discussed above.

**168.** *See* Norman J. Singer, 2A *Sutherland Statutory Construction* § 47.23 (5th ed.1992).

**169.** State courts interpreting their own versions of the UCCJA have reached contrary conclusions regarding the meaning of the term "state." *See, e.g., Martinez v. Superior Court,* 152 Ariz. 300, 731 P.2d 1244, 1247 (App.1987) (holding that an Indian tribe qualifies as a territory of the United States and thus is a state for purposes of the UCCJA); *Sengstock v. San Carlos Apache Tribe,* 165 Wis.2d 86, 477 N.W.2d 310, 314 (App.1991) (holding that the term "state" does not include an Indian tribe).

**170.** *Brown v. Babbitt Ford, Inc.,* 117 Ariz. 192, 571 P.2d 689, 695 (App.1977).

tions.[171] Comity "is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other."[172] Although Indian tribes, as domestic dependent nations, differ from foreign countries, we agree with the Ninth Circuit that comity affords the best "analytical framework for recognizing tribal judgments."[173] Numerous state courts have reached the same conclusion.[174] We therefore hold that, as a general rule, our courts should respect tribal court decisions under the comity doctrine.[175]

▓▓▓ In certain limited circumstances, however, state recognition of tribal judgments may be inappropriate. We conclude, as did the Ninth Circuit, that our courts should refrain from enforcing tribal court judgments if the tribal court lacked personal or subject matter jurisdiction.[176] A requirement that a tribal court possess personal jurisdiction over litigants appearing before it ensures that the tribal court will not be called upon to adjudicate the disputes of parents and children who live far from their tribal villages and have little or no contact with those villages.

▓▓▓ We also agree with the Ninth Circuit that state courts should afford no comity to proceedings in which any litigant is denied due process.[177] In deciding whether tribal court proceedings complied with due process, courts should consider whether the parties received notice of the proceedings and whether they were granted a full and fair opportunity to be heard before an impartial tribunal that conducted the proceedings in a regular fashion.[178] An indication that the judiciary was dominated by the opposing litigant would suggest that due process had been violated.[179]

▓▓▓ But this due process analysis in no way requires tribes to use procedures identical to ours in their courts. The comity analysis is not an invitation for our courts to deny recognition to tribal judgments based on paternalistic notions of proper procedure.[180] Instead, in deciding whether a party was denied due process, superior courts should strive to respect the cultural differences that influence tribal jurisprudence, as well as to recognize the practical limits experienced by smaller court systems.[181]

▓▓▓ Additionally, superior courts should not deny recognition to tribal judgments simply because they disagree with the outcome reached by the tribal judge or because they conclude that they could better resolve the dispute at issue.[182] Thus, suggesting—as the superior court did in this case—that state jurisdiction was proper because "significant

---

171. *See Hilton v. Guyot*, 159 U.S. 113, 163, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

172. *Id.* at 163–64, 16 S.Ct. 139.

173. *Wilson v. Marchington*, 127 F.3d 805, 810 (9th Cir.1997).

174. *See, e.g., Fredericks v. Eide–Kirschmann Ford, Mercury, Lincoln, Inc.*, 462 N.W.2d 164, 167–68 (N.D.1990); *Mexican v. Circle Bear*, 370 N.W.2d 737 (S.D.1985); *Custody of Sengstock v. San Carlos Apache Tribe*, 165 Wis.2d 86, 477 N.W.2d 310 (App.1991).

175. *See Wilson*, 127 F.3d at 809.

176. *See id.* at 810 (establishing these factors as guidelines for the federal courts after reviewing the *Hilton* decision, the Restatement (Third) of Foreign Relations Law, and principles of Indian law).

177. *See id.*

178. *See Hilton*, 159 U.S. at 202–03, 16 S.Ct. 139.

179. *See* Restatement (Third) of Foreign Relations Law, § 482 cmt. b (1986).

180. *See Wilson*, 127 F.3d at 811.

181. Relying on the Restatement (Third) of Foreign Relations Law, the Ninth Circuit also held that federal courts have the discretion to deny recognition to a tribal judgment if (i) the judgment was obtained by fraud; (ii) the judgment conflicts with another final judgment that is entitled to recognition; (iii) the judgment is inconsistent with the parties' contractual choice of forum; or (iv) recognition of the judgment, or the cause of action upon which it is based, is against the public policy of the United States or the forum state in which recognition is sought. *See Wilson*, 127 F.3d at 810. Because the facts of this case do not implicate any of these discretionary factors, we do not decide the extent to which our state courts could also, in their discretion, deny recognition to tribal decisions based on them.

182. *See Hilton*, 159 U.S. at 202–03, 16 S.Ct. 139.

expertise will be required to resolve this difficult dispute," has no place in a comity analysis.

■ Although the comity analysis is not an invitation for superior courts to disregard tribal decisions with which they substantively disagree, the comity analysis, when properly applied, does allow state courts to refuse to enforce a tribal order that "is against the public policy of the United States or the forum state in which recognition is sought." [183] This aspect of the comity analysis should lay to rest the dissent's concern that our decision today will open the floodgates to tribal decisions that are *fundamentally* inconsistent with the public policies underlying Alaska law.[184] But we would ignore the fundamental meaning of sovereignty and insult tribal systems of justice to reason that because tribal law is different it is inferior.[185]

### 3. *Applying the comity doctrine in this case*

Mr. Baker argues that the superior court should decline to recognize Judge Titus's decision under the comity doctrine for two reasons. First, he contends that because his children are members of Mentasta Village, rather than Northway Village, the tribal court lacked subject matter jurisdiction over the dispute. Second, he maintains that Northway's tribal court system does not comport with due process because it does not provide appellate procedures.

■ The superior court never had the opportunity to address these arguments through the framework of the comity doctrine as we have outlined it above. Further, we are unable to resolve these claims be-cause the record on appeal contains no information about the tribal membership of the children or the review procedures available in the Northway Tribal Court. We therefore remand to the superior court to allow it to consider Mr. Baker's claims in its application of the comity doctrine.

■ We would, however, like to provide the superior court with guidance in resolving these claims. First, although this is not an ICWA case, we conclude that ICWA provides the most appropriate test for deciding when a tribal court has subject matter jurisdiction over a particular custody dispute. Under ICWA, the relevant factor is the *child's* tribe.[186] Thus, we agree with Mr. Baker that the Northway court had jurisdiction over this case only if the children are members or are eligible for membership in the village. In determining the children's membership status, the superior court should apply tribal law.[187]

Second, we do not decide in this appeal whether due process requires tribal courts to provide an appellate or review process. The parties have not fully briefed this issue, and we suspect that conflicting authority exists. Although the Restatement of Foreign Relations Law suggests that *foreign* courts must provide access to review in order to comport with due process,[188] the Supreme Court has held that due process does not require *state* court systems to provide an appellate system.[189] If the superior court finds on remand that Northway Village does not have an appeal or review system, it will need to determine, after detailed briefing, whether the absence of such a system violates due process.[190]

**183.** *Wilson,* 127 F.3d at 810.

**184.** *See* Dissent at 801–803.

**185.** The dissent's concerns about the race to the courthouse appear to be overstated and speculative. To view application of tribal law as merely an attempt to circumvent state laws such as Rule 90.3's child support guidelines is essentially to argue that tribal courts are inadequate, a conclusion soundly rejected by federal laws such as ICWA.

**186.** *See, e.g.,* 25 U.S.C. § 1903(5).

**187.** *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 72 n. 32, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (noting that "[a] tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community").

**188.** *See* Restatement (Third) of Foreign Relations Law, § 482 cmt. b (1986).

**189.** *See, e.g., M.L.B. v. S.L.J.,* 519 U.S. 102, 117 S.Ct. 555, 560, 136 L.Ed.2d 473 (1996).

**190.** We recognize that Ms. John considers the tribal court's order to have been merely temporary, and therefore believes that the issue posed is whether state courts should be able to interfere

## IV. CONCLUSION

Tribal courts in Alaska have jurisdiction to adjudicate custody disputes involving tribal members. This jurisdiction is concurrent with that of the state courts. We therefore REVERSE and REMAND to the superior court to determine whether the tribal court's resolution of the custody dispute between Ms. John and Mr. Baker should be recognized under the doctrine of comity.

MATTHEWS, Chief Justice, joined by COMPTON, Justice, dissenting.

### TABLE OF CONTENTS

I. Introduction ................................................ 766

II. Historical Setting........................................... 768

III. How This Case Should Be Decided ......................... 771

IV. Summary of the Majority's Reasoning...................... 772

V. The Allocative Principle of State and Tribal Power ......... 774
 A. The Allocative Principle Is a Fundamental Component of American Indian Law ................................................ 774
 B. The Supreme Court Has Traditionally Viewed Whether or Not a Case Arose in Indian Country as a Threshold Issue............................. 777
 C. Indian Country as a Jurisdictional Concept Encompasses Tribal Power over Both Tribal Lands and Members ................................. 778
 D. The Majority's Decision Is Internally Inconsistent with Regard to the Importance of a Territorial Basis for Tribal Court Jurisdiction .......... 779

VI. Indian Country Is a Prerequisite for the Exercise of Tribal Court Adjudicatory Authority...................................... 780
 A. The Supreme Court Has Never Held that a Tribe's Inherent Powers Can Be the Basis for Exercising Tribal Adjudicatory Authority Outside of Indian Country ................................................ 780
 B. At Least Two of the Inherent Powers Recognized in *United States v. Wheeler* Do Not Extend Beyond Indian Country....................... 780
 1. A Tribe's Inherent Power to Criminally Sanction Its Members Does Not Extend Outside of Indian Country .............................. 781
 2. A Tribe's Inherent Power to Regulate Domestic Relations Among Members Does Not Extend to Cases Arising Outside of Indian Country ................................................ 782
 C. *DeCoteau*....................................................... 783

in *pending* tribal court proceedings. It is unclear to us from the record whether Judge Titus considered her order to be temporary or final. In the state system, superior courts regularly issue custody orders that are deemed final and appealable even though the orders provide that custody will be re-examined when a child reaches school age. *See, e.g., West v. Lawson,* 951 P.2d 1200, 1201–02 (Alaska 1998). We therefore treat the tribal order as final for purposes of our comity analysis.

But we note that the result in this case would be the same regardless of whether the tribal order was temporary or final. Although the UCCJA and the PKPA do not apply to tribal court orders, the policy rationale underlying these acts is instructive. Both the UCCJA and the PKPA were enacted in part to prevent litigation of the same custody dispute in separate jurisdictions. *See* 28 U.S.C. § 1738A; AS 25.30.010, Historical and Statutory Notes. Each of the statutes in-

cludes a provision instructing state courts to refrain from exercising jurisdiction over a custody dispute that is already being litigated in another state. *See* 28 U.S.C. § 1738A(g); AS 25.30.050. In fact, this court has recognized that the UCCJA's prohibition against contemporaneous litigation in multiple forums is so strong that an Alaska court should decline to exercise jurisdiction over a case pending in another state's court even if it is unclear that the other state has subject matter jurisdiction. *See Rexford v. Rexford,* 631 P.2d 475, 479 (Alaska 1980) (citing UCCJA Prefatory Note, 9 Uniform Laws Annotated at 116–18). Applying the policy conclusions embodied in these acts, we believe that superior courts should refrain from interfering in pending tribal court proceedings absent unusual circumstances. Once a tribal court has reached a final decision, the comity doctrine will determine the decision's enforceability in state court.

D. *Fisher* ........................................................ 785
 1. *Fisher*'s Language Does Not Support Jurisdiction Outside Indian Country .................................................. 785
 2. *Iowa Mutual*'s Citation to *Fisher* Does Not Persuasively Reinterpret *Fisher*'s Meaning ........................................ 787
 3. *Fisher* Does Not Concern Concurrent State Jurisdiction .............. 788
E. Other Case Law ................................................ 788

VII. Executive and Statutory Authority Relied on by the Majority ................. 790
A. Executive Advocacy as to the Extent of Tribal Court Jurisdiction Is Not Entitled to Special Deference ...................................... 790
B. Statutory Analysis ............................................. 791
 1. The Canon of Construction Favoring Native Americans Is Inapplicable to This Case ................................................ 791
 2. ANCSA ..................................................... 791
 3. The Tribe List Act .......................................... 792
 4. The Tribal Justice Act ....................................... 793
 5. The Indian Child Welfare Act (ICWA) ............................ 793
 a. ICWA Should Not Be Extrapolated ............................. 793
 b. The Majority Decision Ignores Essential Protections Which Congress Built into ICWA ...................................... 794

VIII. Even Assuming that Tribal Courts Have Inherent Sovereign Power to Hear Child Custody Cases Not Arising in Indian Country, the Majority Decision Is Still Erroneous Because It Enables a Tribal Court to Utilize this Power Over a Non–Tribal Member ............................................... 795
A. Case Law: Tribal Inherent Sovereignty Powers Relate Only to Tribal Members .................................................... 796
B. The *Montana* Exceptions Do Not Apply ............................ 797
C. The Absence of Subject Matter Jurisdiction Cannot Be Waived ............ 798
D. Tribal Court Jurisdiction Over Nonmembers Denies Access to State Courts on the Basis of an Unpermitted Racial Classification ................... 798

IX. Court-developed Policy Arguments are an Inappropriate Basis Upon Which to Base Tribal Court Jurisdiction ........................................ 799

X. State Law Applies Outside Indian Country ............................... 800
A. Case Law ..................................................... 800
B. Section 4 of Public Law 280 Requires that the Laws Applied in Tribal Court Must be Consistent with State Law ................................. 801
C. The Rationale of *Erie v. Tompkins* ................................ 802

XI. Conclusion ......................................................... 803

Addendum: P.L. 280 History and Analysis .................................... 805

## I. *Introduction*

Does inherent tribal jurisdiction over custody cases extend beyond Indian country? The majority answers "yes," concluding that tribal sovereignty prevails unless Congress provides otherwise. My answer is "no." Under established principles of federal Indian law, state law governs outside of Indian country unless Congress provides otherwise, and it has not so provided. Moreover, the United States Supreme Court has twice held that inherent tribal jurisdiction over custody applies only to cases arising within Indian country.

Today's opinion changes Alaska society. Alaska law no longer applies to every Alaskan. The doors of Alaska's courts will no longer be open to all Alaskans. More than one-sixth of Alaskan children,[1] regardless of

---

1. Of Alaska's estimated 1998 population of 621,-400, 104,085 are Native Alaskans. *See* Alaska Population Overview: 1998 Estimates, Population Estimate by Race and Ethnicity, 1 (Alaska Dep't of Labor). In addition, Department of Labor estimates indicate that more than 30,000 Native Alaskan Indians, Eskimos, and Aleuts resided outside of Alaska in 1990. *See* Alaska

where they reside, will be subject to the laws of one of 226 village tribal organizations. More than one-sixth of Alaskan adults,[2] regardless of where they reside, will be subject to the domestic relations laws of one of 226 village tribal organizations. These laws, written or unwritten, may be different from the laws of the state, indeed they may conflict with the laws of the state. But their reach will be statewide, and even beyond, governing cases that arise in cities, towns, and villages which may be hundreds of miles from the village whose tribal laws are applied. And the family law cases of more than one out of six Alaskan children and adults now will be subject to adjudication not in the Alaska Court System, but in the tribal courts of one of 226 villages. Some tribal court cases will be decided fairly. Others will not be. But the only remedy Alaskans aggrieved by the application of conflicting laws or unfair decisions will have is to pursue "comity" litigation in the state courts. Relief through this vague doctrine will be uncertain, hard to obtain, and expensive.

Because today's opinion takes a long step away from the Alaska constitutional goal of equal rights under the law and is contrary to federal law, I dissent. Given the importance of this case to the future of Alaska's system of justice, I set forth my views in greater length than is normally required or appropriate in a dissenting opinion.

Today's opinion holds:

(1) That tribal courts have jurisdiction, based on inherent sovereignty, to adjudicate child custody cases which arise outside of Indian country, involving children who are either tribal members or eligible for tribal membership. Such cases involve custody disputes between parents who are tribal members, and between parents when only one parent is a tribal member. The majority also holds that a child's eligibility for tribal membership, taken alone, is a sufficient basis for the assertion of jurisdiction.[3] Thus, any custody dispute involving a child eligible for tribal membership, regardless of the membership status of the adult parties, will fall within the coverage of the opinion.

(2) That when tribal courts decide custody disputes, tribal law controls even where it is inconsistent with state law.[4]

(3) And that Public Law (P.L.) 280,[5] which grants Alaska exclusive jurisdiction of private civil cases arising in Indian country, does not apply to this case.[6]

I disagree with the first two conclusions for reasons developed at length in this dissent.

With respect to the third conclusion, regarding P.L. 280, my observations are as follows. P.L. 280 grants the State of Alaska criminal and civil jurisdiction over cases arising in Indian country. We have held that P.L. 280 grants Alaska exclusive, rather than merely concurrent jurisdiction.[7] The appellant and the amici in this case argue that these holdings are wrong and that tribes have concurrent jurisdiction. Most of their briefing is devoted to this point. P.L. 280, however, focuses on cases arising in Indian country,[8] and the present case does not arise in Indian country. Why then the concern with P.L. 280? The appellant and the amici recognize that Congress could not have intended tribes to have more power outside of Indian country than within Indian country. Thus if Alaska has exclusive jurisdiction to decide private custody cases which arise in Indian country, it has, by necessary implication, exclusive jurisdiction to decide private

Population Overview: 1997 Estimates, Population by Race and Tribal Group, Alaska and U.S. 1980, 1990, Table 1.5, at 23 (Alaska Dep't of Labor).

**2.** Population Overview: 1998 Estimates at 1, *supra* note 1.

**3.** Op. at 759.

**4.** *Id.* at 761.

**5.** Act of August 15, 1953, Pub.L. 83–280, 67 Stat. 588 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–26, 28 U.S.C. § 1360).

**6.** Op. at 747–748.

**7.** *See Native Village of Nenana v. State, Dep't of Health & Soc. Servs.*, 722 P.2d 219, 221 (Alaska 1986); *In re F.P.*, 843 P.2d 1214, 1215–16 (Alaska 1992).

**8.** *See* 18 U.S.C. § 1162(a) (1994).

custody cases which arise outside of Indian country.

Since the majority opinion has not overruled our P.L. 280 cases, it might be sufficient for me to observe that one independent reason why the opinion is wrong is that it conflicts with this necessary implication. But in order to fully answer the arguments of the appellant and the amici concerning P.L. 280 I set forth my views on this issue in an addendum to this opinion. There I explain that our previous cases [9] were properly decided, and that P.L. 280 grants Alaska exclusive jurisdiction over private child custody cases arising in Indian country.

## II. *Historical Setting*

In the body of this dissent, I take direct issue with the majority's conclusion that tribal courts have jurisdiction to hear child custody cases not arising in Indian country. To set the context of this case, I begin with a brief statement of the history of Government–Native relations in Alaska. Without such a statement one might assume, based on the majority opinion, that before the Alaska Native Claims Settlement Act (ANCSA) tribes were "adjudicat[ing] domestic disputes between members," and that I am arguing that Congress in passing ANCSA in 1971 intended to "eradicate tribal court jurisdiction over family law matters." [10] Neither assumption would be correct.

Beginning with the assumption of jurisdiction over Alaska by the United States in 1867, throughout Alaska's history as a territory, and since statehood in 1959, Alaska

Natives have always been subject to the same laws as non-Natives. [11] These laws have always been administered only by territorial and state courts open to Native and non-Native alike. Thus Congress, in passing ANCSA in 1971, did not focus on tribal court jurisdiction because tribal courts had played no significant role in Alaska's legal history.

The history of Government–Native relations in Alaska has been recounted in detail in *Native Village of Stevens v. Alaska Management & Planning,* [12] and *Metlakatla Indian Community, Annette Island Reserve v. Egan.* [13] I will refer here mainly to the conclusions that we have drawn from this history, rather than to the details on which the conclusions are based.

We stated in *Native Village of Stevens* that "the history of the relationship between the federal government and Alaska Natives up to the passage of the Alaska Indian Reorganization Act, 49 Stat. 1250 (1936) indicates that Congress intended that most Alaska Native groups not be treated as sovereigns." [14] "[N]either the Alaska Indian Reorganization Act, nor subsequent Congressional acts have signaled a change from non-sovereign to sovereign status." [15] We supported this conclusion with a detailed examination of court decisions and enactments of Congress and the Territorial Legislature, all indicating that Alaska Natives were governed by general rather than tribal law. [16] We noted that a proviso of the Alaska Indian Reorganization Act of 1936(IRA) which was applicable to most Alaska Native groups explicitly stated that they had not been recognized as tribes. [17]

9. *See supra* note 7.

10. Op. at 753, 754.

11. State law has accommodated and recognized certain traditional Native practices. For example, Native traditional, uncontested adoptions have been recognized in state court proceedings. *See, e.g., Calista Corp. v. Mann,* 564 P.2d 53, 61–62 (Alaska 1977).

12. 757 P.2d 32 (Alaska 1988).

13. 362 P.2d 901 (Alaska 1961), *rev'd in part*, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962) (as to Metlakatla) and *aff'd in part, Organized Village of Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) (as to Kake and Angoon). *See also* Donald C. Mitchell, *Alaska v. Native*

*Village of Venetie: Statutory Construction or Judicial Usurpation? Why History Counts,* 14 Alaska L.Rev. 353 (1997).

14. 757 P.2d at 34.

15. *Id.*

16. *Id.* at 34–41.

17. *Id.* at 40. The proviso stated:

PROVIDED, That groups of Indians in Alaska not recognized prior to May 1, 1936 as bands or tribes, but having a common bond of occupation, or association, or residence within a well-defined neighborhood, community or rural district, may organize to adopt constitu-

We reiterated the following points by quoting from our earlier *Metlakatla* opinion:

> The United States has never entered into any treaty or similar type agreement with any group of Indians in Alaska. None of the Indians of appellant communities have ever been exempt from taxation by the Territory or State of Alaska. Crimes committed by Indians in Alaska have always been punished by the territorial and state courts.... There are not now and never have been tribes of Indians in Alaska as that term is used in federal Indian law. No Indian tribe, independent nation or power has been recognized in Alaska.[18]

> tions and by-laws and to receive charters of incorporation and federal loans under [sections of the Indian Reorganization Act of 1934].
> *Id.* at 39–40.

18. *Id.* at 35–36 (citations omitted). As we observed in *Native Village of Stevens*, since *Metlakatla* was reversed with respect to Metlakatla and affirmed as to Kake and Angoon, the statement that no tribes had been recognized in Alaska was inaccurate because, as the Supreme Court held, the Metlakatlans had received Congressional recognition. *Id.* at 36. We noted that "in all other respects, however, the legal conclusions in *Metlakatla* are accurate." *Id.* The Supreme Court in deciding *Metlakatla* made a number of statements concerning Government–Native relations in Alaska consistent with the views we expressed, including:

> The Indians of southeastern Alaska, who have very substantially adopted and been adopted by the white man's civilization, were never in the hostile and isolated position of many tribes in other States. As early as 1886 a federal judge, holding Alaskan Indians subject to the Thirteenth Amendment, *denied that the principle of Indian national sovereignty* enunciated in *Worcester v. Georgia* 6 Pet. 515, 8 L.Ed. 483, *applied to them. In re Sah Quah*, 31 F. 327 (D.Alaska [1886]).... Alaskan Indians are now voting citizens, some of whom occupy prominent public office in the state government. Metlakatlans, the State tells us, have always paid state taxes, in contrast to the practice described and prescribed for other reservations ... *and it has always been assumed that the reservation is subject to state laws.*
> *Metlakatla*, 369 U.S. at 50–51, 82 S.Ct. 552 (emphasis added) (citations omitted).

19. 757 P.2d at 40.

20. Ten reservations were created. *See* Mitchell, *supra* note 13 at 366–371.

We also noted in *Native Village of Stevens* that a section of the Alaska IRA authorized the Secretary of the Interior to designate as reservations areas of land which had previously been reserved by executive order for the use and occupancy of Alaska Natives or which were actually occupied by them.[19] Some reservations were so designated.[20] These reservations, and the earlier reserves that were not designated as reservations, clearly meet the definition of "Indian country" codified in 1948 in 18 U.S.C. 1151(b) as "dependent Indian communities." But they were not thought to be areas beyond the reach of state law.[21]

21. *See* Letter from Roger Ernst, Asst. Sec'y of the Interior, to Hon. Emanuel Celler, Chairman, Comm. on the Judiciary, House of Representatives (Feb. 25, 1958), S.Rep. No. 58–1872, at 3 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3348–49 ("[T]he general understanding had been that the many native villages in Alaska were not Indian country, and it had been the general practice for Territorial officers to apply Territorial law in the native villages."); Mitchell, *supra* note 13 at 372–374. This is not surprising since the "dependent Indian communities" formulation is taken from the 1938 case of *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938), in which the Court held that a small parcel in Nevada which had been purchased by the federal government for needy Indians was Indian country but that this designation did not mean that state jurisdiction was retracted. The Court stated that its finding of Indian country

> does not deprive the state of Nevada of its sovereignty over the area in question. The federal government does not assert exclusive jurisdiction within the colony. Enactments of the federal government passed to protect and guard its Indian wards only affect the operation, within the colony, of such state laws as conflict with the federal enactments.
> *Id.* at 539, 58 S.Ct. 286. This conception of a state's power in "dependent Indian communities" has changed over the years. The "state law applies except where preempted" approach of *McGowan* has evolved into a general rule expressed most recently by the United States Supreme Court in terms of "primary jurisdiction" in Indian country "rest[ing] with the Federal Government and the Indian tribe ..., and not with the States". *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 118 S.Ct. 948, 952 n. 1, 140 L.Ed.2d 30 (1998) (citation omitted). Joseph D. Matal, *A Revisionist History of Indian Country*, 14 Alaska L.Rev. 283, 314–38 (1997), describes this change in detail.

This assumption was challenged in 1957 in the case of *In re McCord.*[22] That case involved the prosecution for statutory rape of two Natives who resided, and committed their alleged offenses, on a reserve created by executive order encompassing the village of Tyonek. Tyonek had been issued a constitution under the Alaska IRA. The defendants contended that Tyonek was Indian country and was thus beyond the reach of the laws of the Territory of Alaska and that the federal act extending certain federal crimes to Indian country did not apply to statutory rape.[23] Territorial District Court Judge McCarrey accepted these arguments and dismissed the charges against the defendants.[24]

While the *McCord* decision disturbed conventional assumptions and threatened to leave a law enforcement void at least on those reserves which were occupied by villages which had IRA constitutions, its immediate effects were short-lived. Within a year Congress had added the Territory of Alaska to the list of states governed by P.L. 280.[25] This action, taken in response to the *McCord* decision, extended the criminal and civil laws of the territory to Indian country under the administration of the territorial courts.[26]

This was the historical setting in 1971 when ANCSA was passed revoking all reservations except Metlakatla. Native sovereignty issues, tribal law, and tribal court jurisdiction were not within the scope of ANCSA.[27]

Alaska law was thought to apply to all Alaskans, both Native and non-Native, and the cases of all Alaskans were decided in Alaska courts.[28] The assumption of Congress and the Department of the Interior in 1971 was that P.L. 280 granted exclusive jurisdiction to the state.[29] And Alaska Native villages had not received formal recognition as tribes.

But three developments of considerable legal significance took place after the passage of ANCSA. First, in the mid-1970's the Department of Interior reversed its field and decided P.L. 280 was a grant of concurrent rather than exclusive jurisdiction to the states.[30] This view was adopted by the Ninth Circuit in *Native Village of Venetie I.R.A. Council v. Alaska (Venetie IRA* ).[31]

Second, the Interior Department in 1993 through Assistant Secretary Deer administratively recognized 226 Alaska Native villages as sovereign tribes.[32]

And third, the Ninth Circuit in *Alaska ex rel. Yukon Flats School District v. Native Village of Venetie Tribal Government (Venetie I* ),[33] ruled that at least some land conveyed under ANCSA qualified as Indian country.

The conjunction of these events promised to have significant and potentially enormous consequences. More than forty-four million acres (an area about the size of the State of

22. 151 F.Supp. 132 (D.Alaska 1957).

23. *Id.* at 133–34.

24. *Id.* at 136. The Assistant U.S. Attorney argued, consistent with the dominant assumptions which I have described, that Tyonek was not Indian country and "that Alaska natives are in a different position as concerns the jurisdiction of criminal offenses than the Indians in the United States proper." *Id.* at 134.

25. Act of August 8, 1958, Pub.L. No. 85–615, 72 Stat. 545 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–26, 28 U.S.C. § 1360).

26. *See* Addendum, *infra* at 807–808.

27. As Senator Ted Stevens, one of the prime architects of ANCSA, stated in 1986, when sovereignty was an issue: "ANCSA was and is a land settlement. It did not terminate the special relationship between Alaska Natives from the Federal Government or resolve any questions concern-

ing the governmental status, if any, of various Native groups. There's not one reference to sovereignty in ANCSA or in the 1971 Conference report." *To Amend the Alaska Native Claims Settlement Act: Hearings on S.2065 before the Subcomm. on Public Lands of the Senate Comm. on Energy and Natural Resources,* 99th Cong., 2d Sess. 329 (1986).

28. *See Native Village of Stevens v. Alaska Management & Planning,* 757 P.2d 32 (Alaska 1988) (discussing historical setting).

29. *See* Addendum, *infra* at 810–811, 812–813.

30. *See id.* at 813.

31. 944 F.2d 548 (9th Cir.1991).

32. *See* 58 Fed.Reg. 54, 364–69 (1993).

33. 101 F.3d 1286 (9th Cir.1996).

Washington) were conveyed under ANCSA. Since virtually every Native village recognized as sovereign by Secretary Deer received an ANCSA conveyance, Alaska might have contained 226 semi-autonomous nations. State functions spanning a broad spectrum of criminal and civil laws might have been transferred to the villages within these enclaves.

This then was the setting in 1998 when the United States Supreme Court decided *Alaska v. Native Village of Venetie Tribal Government (Venetie II)*.[34] In that case the tribal government sought to impose about $161,000 in taxes covering commercial activities within the tribal village on a contractor building a state school on tribal lands transferred under ANCSA.[35] The Ninth Circuit had noted that the ultimate question— "whether Venetie has the authority to tax activities occurring within its territory— turns on whether Venetie occupies Indian country".[36] The circuit court had concluded that Venetie's ANCSA lands were Indian country.[37]

The United States Supreme Court reversed, holding that a tribe's ANCSA lands are not Indian country.[38] Referring to the "dependent Indian communities" definition in 18 U.S.C. § 1151(b), the Court held that a two-part test applied. The lands must have been set aside by the federal government for the use of Indians as Indian land, and the lands must be under continuing federal superintendence.[39] Neither part of the test was met with respect to ANCSA lands.[40] ANCSA revoked all reservations in Alaska except Metlakatla and transferred lands to private state-chartered Native corporations without restraints on alienation. And instead of continuing federal superintendence, one objective of ANCSA was to avoid a "lengthy wardship or trusteeship."[41]

The Supreme Court's decision in *Venetie II* meant that there would not be numerous reservation-like enclaves in Alaska. But in some ways the majority's decision today will have broader consequences than an affirmance of the Ninth Circuit's *Venetie I* decision would have had. If there were Indian country enclaves, tribal jurisdiction would be confined to the enclaves. But without the geographical limits of enclaves, under today's decision tribal jurisdiction extends statewide, and beyond. It follows tribal members, children eligible for membership, and their parents wherever they reside.

III. *How This Case Should Be Decided*

Before turning to a critique of the majority's reasoning I will state in affirmative form how I think this case should be decided. Appellant claims, and the majority concludes, that Northway has inherent sovereignty to regulate domestic relations among members.[42] Tribes unquestionably have certain powers which derive from inherent sovereignty. For example, as the majority notes, tribes have the power to regulate the conduct of members through criminal laws, they have the power to determine their own membership, they have power over the domestic relations of their members, they have the power to prescribe and enforce rules of inheritance for their members, and they have the power to tax.[43] But do all, or any, of these powers extend beyond Indian country? Specifically, the question in this case is: Does the adjudicatory power to decide the custody disputes of parents whose children are tribal members apply to cases not arising in Indian country?

This is a question of federal law. But there is no need to search the reports of the lower federal courts for an answer. The United States Supreme Court has answered

34. 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998).

35. *Id.* at 951.

36. *Venetie I,* 101 F.3d at 1290.

37. *Id.* at 1302.

38. *Venetie II,* 118 S.Ct. at 955–56.

39. *Id.* at 954 & n. 5.

40. *Id.* at 955.

41. *Id.* at 955–56.

42. *See* Op. at 748–749.

43. *Id.* at 755–756.

it, twice. The answer is that a tribe's inherent power to adjudicate the custody cases of tribal children does not extend to cases not arising in Indian country.

In *DeCoteau v. District County Court*,[44] the Court recognized that tribal court jurisdiction would not apply to custody proceedings involving Indian children not residing in Indian country. Because the reservation where the parent and children resided had been terminated, the state court rather than the tribal court had jurisdiction.[45]

In *Fisher v. District Court*,[46] the Court upheld tribal court jurisdiction over children in a dispute concerning whether a state court or a tribal court had jurisdiction, because "all parties resided on the reservation at all relevant times."[47] The court stated that as between state and tribal courts "it is appropriate to predicate jurisdiction on the residence of the litigants."[48]

Thus *DeCoteau* and *Fisher* unequivocally teach that a tribe's inherent power over child custody cases is limited to cases arising in Indian country.

It is no coincidence that the Supreme Court in making the allocative decision involved in *Venetie II* cited Footnote 2 of *DeCoteau*. The Court in *Venetie II* stated: "Although this definition [of Indian country] by its terms relates only to federal criminal jurisdiction, we have recognized that it also generally applies to questions of civil jurisdiction such as the one at issue here. *See DeCoteau v. District County Court for Tenth Judicial Dist.*, 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975)."[49] Footnote 2 of *DeCoteau*, cited by the Court in *Venetie II*, supplies the complete answer to the present case:

If the lands in question are within a continuing "reservation," jurisdiction is in

the tribe and the Federal Government.... On the other hand, if the lands are not within a continuing reservation, jurisdiction is in the State, except for those land parcels which are "Indian allotments, the Indian titles to which have not been extinguished.... While § 1151 is concerned, on its face, only with criminal jurisdiction, the Court has recognized that it generally applies as well to questions of civil jurisdiction."[50]

*DeCoteau* and *Fisher* are specific examples of what I refer to as the "allocative principle"—the basic principle allocating government responsibilities as between states and tribes. The allocative principle holds that within Indian country state laws are generally not applicable to tribal Indians unless Congress has explicitly provided for their application, while outside of Indian country tribal authority generally does not apply unless Congress has clearly expressed that tribal authority should apply.[51] Congress has not provided for tribal jurisdiction in child custody disputes between the parents of Indian children arising outside of Indian country. Therefore based on the general allocative principle, as well as on its specific application to child custody cases in *DeCoteau* and *Fisher*, the Northway tribal court does not have jurisdiction in this case.

## IV. *Summary of the Majority's Reasoning*

The rationale of the majority can be expressed in two syllogisms. The first is as follows:

(1) Tribal sovereignty exists (apparently wherever it is asserted) unless Congress has expressly and unambiguously divested the

---

**44.** 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).

**45.** *Id.* at 427–28 & n. 2, 95 S.Ct. 1082.

**46.** 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976).

**47.** *Id.* at 389 n. 14, 96 S.Ct. 943.

**48.** *Id.*

**49.** *Venetie II*, 118 S.Ct. at 952.

**50.** *DeCoteau*, 420 U.S. at 427 n. 2, 95 S.Ct. 1082.

**51.** *See, e.g., Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 465, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973)). I explain this principle at some length in Part V of this dissent.

tribe of sovereignty in the type of case at issue.[52]

(2) Congress has not expressly and unambiguously divested Alaska tribes of child custody jurisdiction in cases arising outside of Indian country.[53]

(3) Therefore Alaska tribes have custody jurisdiction in cases arising outside of Indian country.

As support for the conclusion reached by this syllogism and as an independent but related rationale the majority also relies on the following second syllogism:

(1) Through the Tribe List Act and Tribal Justice Act, Congress has ratified the Secretary of the Interior's recognition of Alaska tribes as sovereigns, and as sovereigns, they have inherent authority to establish their own forms of government including tribal justice systems.[54]

(2) Unless tribes that do not occupy Indian country have "inherent powers of self-governance," including the power to adjudicate child custody disputes, their sovereignty would be "virtually meaningless." [55]

(3) As Congress did not intend tribal sovereignty to be virtually meaningless, it must have empowered tribes that do not occupy Indian country to exercise inherent powers of self-governance, including child custody jurisdiction, outside of Indian country.[56]

These syllogisms are flawed. In particular the first premise of the first syllogism is wrong because it ignores the basic principle for the allocation of state and tribal functions. Outside of Indian country state laws apply to Indians unless Congress explicitly provides otherwise. Thus, outside of Indian country the premise should not be that tribal sovereignty applies unless Congress provides otherwise, but that state sovereignty applies unless Congress provides otherwise.

The second syllogism is wrong in several respects. In particular, the second premise treats all the inherent tribal powers of self-government alike. In fact, some inherent powers might be effective outside of Indian country, but others definitely are not. Supreme Court case law is clear that, for example, the power to regulate the conduct of tribal members toward each other through the criminal law does not extend beyond Indian country.[57] Equally clear is Supreme Court case law that the power to adjudicate child custody cases does not extend beyond Indian country.

Further, the second premise of the second syllogism is wrong in asserting that sovereignty would be "virtually meaningless" unless tribes which do not occupy Indian country have all the inherent powers of self-government. Indian country is an important limiting factor, but tribes without it still have the inherent power to determine their own forms of organization and membership.[58] Further, tribes have such powers as are delegated them by Congress. Tribal powers under the Indian Child Welfare Act are an important example of delegated powers that involve the need to use tribal justice systems. Other powers may be delegated in the future, as needed in the judgment of Congress. Tribes outside of Indian country are also eligible for special programs and services provided to Indians by the federal government, many of which involve tribal administration of federal grants. Also, such tribes have sovereign immunity. Thus tribal sovereignty for tribes that do not occupy Indian country is not meaningless.

Finally, the conclusion of the second syllogism that Congress must have wanted tribes that do not occupy Indian country to exercise all the powers of inherent self-government outside of Indian country is demonstrably

---

52. Op. at 751–752.

53. *Id.* at 753–754.

54. *Id.* at 753, 754.

55. *Id.* at 753–754.

56. *Id.* at 753–754.

57. *See Organized Village of Kake v. Egan,* 369 U.S. 60, 75, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962).

58. *See, e.g., Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *see also* the Tribal Justice Act, 25 U.S.C. § 3601(4) (1994), which states that "Indian tribes possess the inherent authority to establish their own form of government, including tribal justice systems."

wrong, for Congress's intent was to treat all tribes equally, and Indian country is a limiting factor on the authority of all tribes.[59] Some tribes outside of Alaska also have lost most of their Indian country, and occupy, like Northway, only scattered allotments—yet their authority is limited by the allocative principle. The tribe in *DeCoteau* is one example.

## V. *The Allocative Principle of State and Tribal Power*

### A. *The Allocative Principle Is a Fundamental Component of American Indian Law*

Despite the complexities of the numerous Supreme Court decisions addressing the extent of tribal power with respect to the states, most of these cases either explicitly or implicitly address two issues: (1) whether the litigants and the activity giving rise to the dispute are based in Indian country, and (2) whether there is an act of Congress which expressly supports the particular exercise of state or tribal power.

These two issues are important because, as the Supreme Court stated in *Bryan v. Itasca County*, the general rule is that "State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that state laws shall apply." [60] By contrast, outside of Indian country the "general rule" is that tribal authority does not apply, unless there is a clear congressional expression that it should. As the Supreme Court stated in *Oklahoma Tax Commission v. Chickasaw Nation*, " 'express federal law to the contrary' overrides *the general rule* that 'Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State.' " [61]

In *Mescalero Apache Tribe v. Jones*,[62] the Supreme Court made it clear that this is a firmly established principle of American Indian law that dates back to the 19th century:

> [T]ribal activities conducted outside the reservation present different considerations. "State authority over Indians is yet more extensive over activities ... not on any reservation." *Organized Village of Kake [v. Egan]*, 369 U.S. [60, 75, 82 S.Ct. 562, ·7 L.Ed.2d 573 (1962)]. Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State. *See, e.g., Puyallup Tribe v. Department of Game*, 391 U.S. 392, 398 [88 S.Ct. 1725, 20 L.Ed.2d 689] (1968); *Organized Village of Kake, supra*, 369 U.S. at 75–76 [82 S.Ct. 562]; *Tulee v. Washington*, 315 U.S. 681, 683 [62 S.Ct. 862, 86 L.Ed. 1115] (1942); *Shaw v. Gibson–Zahniser Oil Corp.*, 276 U.S. 575 [48 S.Ct. 333, 72 L.Ed. 709] (1928); *Ward v. Race Horse*, 163 U.S. 504 [16 S.Ct. 1076, 41 L.Ed. 244] (1896).[63]

*Mescalero Apache Tribe* also leaves little doubt that the "principle" it describes is a broad one: "That principle is as relevant to a State's tax laws as it is to state criminal laws,

---

59. *See infra* Dissent Part VI.

60. 426 U.S. 373, 376 n. 2, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (quoting *McClanahan v. State Tax Comm'n*, 411 U.S. 164, 170–71, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)).

61. 515 U.S. 450, 465, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973)) (emphasis added).

62. 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

63. *Id.* at 148–49, 93 S.Ct. 1267. Numerous other Supreme Court decisions after *Mescalero* have continued to recognize this principle. *See, e.g., Kiowa Tribe of Oklahoma v. Manufacturing Techs., Inc.*, 523 U.S. 751, 118 S.Ct. 1700, 1703, 140 L.Ed.2d 981 (1998) ("We have recognized that a State may have authority to tax or regulate tribal activities occurring within the State but outside Indian country.... To say substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit."); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144 n. 11, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (quoting *Mescalero*, 411 U.S. at 148–49, 93 S.Ct. 1267); *Bryan*, 426 U.S. at 376 n. 2, 96 S.Ct. 2102 ("Of course, this pre-emption model [favoring tribal authority] *usually yields different conclusions* as to the application of state laws to tribal Indians who have left or never inhabited federally established reservations.") (emphasis added).

*see Ward v. Race Horse, supra,* at 516, 16 S.Ct. 1076, and applies as much to tribal ski resorts as it does to fishing enterprises. *See Organized Village of Kake, supra."* [64]

Secondary sources have also recognized the existence and importance of the allocative principle. For example, the *American Indian Law Deskbook,* which is a treatise compiled by the Conference of Western Attorneys General, states:

> Determining the presence of Indian country is the benchmark for approaching *the allocation* of federal, tribal, and state authority with respect to Indians and Indian lands.... [T]he Supreme Court has employed [the Indian country definition] to determine the geographical reach of the special Indian law rules governing preemption of state law in civil contexts. Thus the "Indian country" definition is relevant to virtually every aspect of Indian law unless displaced by another statutory formulation of geographical coverage.[65]

The discussion of "Preemption in Indian Law" in *Federal Indian Law,*[66] is also an analysis of the allocative principle. Most of the discussion concerns the "within Indian country" aspect of the principle, because this aspect has received more attention recently. As to the "outside of Indian country" aspect of the allocative principle, this text states:

> Preemption can occur in off-reservation contexts also, but the approach is different:

state law applies to off-reservation Indian activities unless there is "express federal law to the contrary." Examples of such express laws are treaties reserving off-reservation fishing rights.[67]

Thus, the Supreme Court and Indian law scholars and practitioners have consistently recognized the allocative principle and its centrality in federal Indian law jurisprudence.

In its recent *Venetie II* decision, the United States Supreme Court once again emphasized the allocative principle, this time in the context of Alaska Natives. Despite the fact that the power to tax is one of a tribe's inherent powers of self-government,[68] the Supreme Court applied the allocative principle and held that the Venetie tribe did not have the power to levy the tax in question because it was being imposed on an activity on tribal lands outside of Indian country.[69] The Court expressed the allocative principle by first citing Footnote 2 of *DeCoteau.*[70] The Court then stated: "Generally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States. *See, e.g., South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998)."[71] The part of the *Yankton Sioux* opinion cited by the *Venetie II* Court states: "If the divestiture of Indian property ... effected a diminishment of Indi-

---

64. *Mescalero Apache Tribe,* 411 U.S. at 149, 93 S.Ct. 1267.

65. *American Indian Law Deskbook,* 36–37 (Joseph P. Mazurek et al. eds., 2d. ed., 1998) (internal citations and quotations omitted) (emphasis added); *see also Ahboah v. Housing Auth. of Kiowa Tribe,* 660 P.2d 625, 627 (Okla.1983), which is cited by the *Deskbook* in the above discussion for the following statement: *"the touchstone for allocating authority* among the various governments has been the concept of 'Indian Country.' " *Deskbook* at 36 n.46 (emphasis added); *and see* the State of Alaska's Brief in *Venetie II,* 1997 WL 523883 at *18 (citations omitted) ("Indian country is the jurisdictional touchstone for delineating federal, state, and tribal authority over Indian-occupied lands.").

66. David H. Getches & Charles F. Wilkinson, *Federal Indian Law* 331–36 (2d ed.1986).

67. *Id.,* note at 333.

68. *See, e.g., Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) ("The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government.").

69. 522 U.S. 520, 118 S.Ct. 948, 954–56, 140 L.Ed.2d 30 (1998).

70. *Id.* at 952. Because of its importance to this discussion I quote this footnote once again.

> If the lands in question are within a continuing "reservation," jurisdiction is in the tribe and the Federal Government.... On the other hand, if the lands are not within a continuing reservation, jurisdiction is in the State, except for those land parcels which are "Indian allotments, the Indian titles to which have not been extinguished...."

*DeCoteau,* 420 U.S. at 427 n. 2, 95 S.Ct. 1082.

71. *Venetie II,* 118 S.Ct. at 952 n. 1.

an territory, then the ceded lands no longer constitute 'Indian country' as defined by 18 U.S.C. § 1151(a) and the State now has primary jurisdiction over them." [72]

This general rule, with its presumption in favor of state authority outside of Indian country, clearly applies to the present case. The critical issue here, as in *Venetie II* and *DeCoteau*, is whether a tribe can exercise one of its inherent powers outside of Indian country. Nevertheless, the majority ignores this bedrock principle of Indian law jurisprudence in deciding the issue.

Instead of beginning with the premise that state law applies and asking, as the allocative principle requires in cases arising outside of Indian country, whether there is an act of Congress which is in conflict with the assertion of state authority, the majority reverses the principle and begins with the premise that tribal authority applies and asks whether Congress has expressly divested the tribe of jurisdiction in this situation.[73] The majority does this by claiming that *Montana v. United States* [74] "reconciled" the allocative principle, as stated in *Mescalero*, with "the general rule that tribal sovereignty exists unless specifically divested" by Congress.[75] The implication is that the *Montana* Court somehow changed the meaning and scope of the allocative principle, and because of this "reconciliation" the majority claims that "the [Supreme] Court has not focused on tribal land as determinative of tribal authority." [76] This reasoning is simply wrong. As recently as 1995, the Supreme Court referred to the allocative principle as a "general rule" of Indian law jurisprudence.[77]

Moreover, contrary to the majority's assertions, *Montana* did not water down what *Mescalero* 's expression of the allocative principle meant.[78] Rather, *Montana* cited *Mescalero* for the proposition that "even on reservations, state laws may be applied unless such application would interfere with reservation self-government." [79] This statement adds meaning in favor of state power to the "within Indian country" aspect of the allocative principle, but it does nothing to change the meaning of the allocative principle applied outside of Indian country. This is clear from the text of *Mescalero*, because almost immediately after *Mescalero* makes the

---

**72.** *Yankton Sioux Tribe*, 522 U.S. 329, ——, 118 S.Ct. 789, 793, 139 L.Ed.2d 773 (1998).

**73.** See the first premise of the majority's first syllogism *supra* Part IV of this dissent and the majority opinion at 23–25, 27.·

**74.** 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

**75.** Op. at 752. With respect to this general rule, I offer, I fear repetitively, the following observations: In view of the 1993 recognition by Secretary Deer of the tribal status of Alaska's Native villages, *see supra* text accompanying note 32, the existence of their sovereignty is not in issue. They have the same sovereign powers as recognized tribes in other states. In cases where tribal villages or village members occupy Indian country—allotments or other categories of trust property—Alaska tribes have the same powers as tribes in other P.L. 280 states. Likewise, to the extent that tribal villages or village members do not occupy Indian country, Alaska tribes have the same sovereign power as tribes which have little or no Indian country in other states. In neither case is the existence of tribal sovereignty in question, but in Alaska as in the other states tribal powers are constrained by the absence of Indian country. Thus the question in this case is not whether Northway Village Tribe exists as a sovereign, but whether its inherent sovereign powers extend to child custody cases not arising in Indian country.

**76.** Op. at 752.

**77.** *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 465, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (quoting *Mescalero*, 411 U.S. at 148–49, 93 S.Ct. 1267).

**78.** *See* Op. at 752.

**79.** *Mescalero*, 411 U.S. at 148, 93 S.Ct. 1267. There is no doubt, when analyzing both *Mescalero* and *Montana*, that the quote from *Montana* that the majority uses at page 752 of its opinion references the above-quoted language in *Mescalero*. Compare *Montana*, 450 U.S. at 564, 101 S.Ct. 1245 ("[The] exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114.") *with Mescalero*, 411 U.S. at 148, 93 S.Ct. 1267 ("The upshot has been the repeated statements of this Court to the effect that, even on reservations, state laws may be applied unless such application would interfere with reservation self-government. . . . ").

statement quoted in *Montana*, the Court goes on to state the "outside of Indian country" portion of the allocative principle: "But tribal activities conducted outside the reservation present different considerations.... Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." [80] Thus, contrary to the majority's assertions, *Montana*, a case about tribal power over nonmembers on a reservation, does not change the allocative principle's presumption in favor of state authority outside of Indian country.

As noted, the majority's failure to apply the allocative principle leads the majority to proceed from the wrong premise. This, in turn, leads to the erroneous decision in this case. Despite over 100 years of Supreme Court precedent reflecting the allocative principle, the majority goes so far as to state that "whether [a] tribe is located in Indian country" is not a "key inquiry" in cases delineating the extent of tribal jurisdictional power.[81] Such a statement in view of numerous Supreme Court decisions to the contrary turns a blind eye on controlling legal precedent.

B. *The Supreme Court Has Traditionally Viewed Whether or Not a Case Arose in Indian Country as a Threshold Issue*

Contrary to the majority's claim, the Supreme Court has not only viewed whether or not a case arose in Indian country as an important inquiry in cases delineating tribal jurisdiction, the Court has traditionally treated such an inquiry as the threshold issue

upon which the outcome of the case turns. For example, in *McClanahan* the Court stated: "It may be helpful *to begin* our discussion of the law applicable to this complex area with a brief statement of what this case does not involve. We are not here dealing with Indians who have left or never inhabited reservations set aside for their exclusive use...." [82]

Also, in *Organized Village of Kake*, a case involving Native Alaskans, the *first* issue the Court addressed was the status of the land upon which the dispute arose: "The situation here differs from that of the Metlakatlans in that neither Kake nor Angoon has been provided with a reservation." [83] Because the tribe did not reside in Indian country, and there existed no "statutory authority under which the Secretary of the Interior might permit [Kake] to operate fish traps contrary to state law," the Court held that Alaska's fishing laws applied to the tribe.[84]

Likewise in *Venetie II* the first, and only, question which the Supreme Court addressed was whether the tribal lands on which the taxed activity took place were within Indian country.[85] Since the answer was "no" the tribe's inherent power to tax could not be exercised.[86]

Similarly, in *DeCoteau* the Supreme Court affirmed state court jurisdiction over Indian children in a custody proceeding because, as the court held, the case arose on land that no longer was Indian country. Jurisdiction was exclusive.[87] In Indian country the state would have no jurisdiction, outside Indian country the tribe would have no jurisdiction.[88] The Supreme Court's introductory

**80.** *Mescalero*, 411 U.S. at 148–49, 93 S.Ct. 1267 (citations omitted).

**81.** Op. at 756.

**82.** *McClanahan*, 411 U.S. at 167, 93 S.Ct. 1257 (emphasis added) (citations omitted); *see also Oklahoma Tax Comm'n v. Sac and Fox Nation*, 508 U.S. 114, 124, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993) (noting that "[i]t is true that we began our discussion in *McClanahan* by emphasizing that we were not 'dealing with Indians who have left or never inhabited reservations set aside for their exclusive use....' ").

**83.** *Organized Village of Kake*, 369 U.S. at 62, 82 S.Ct. 562.

**84.** *Id.*

**85.** *See* 118 S.Ct. at 951.

**86.** *Id.* at 955–56.

**87.** *See* 420 U.S. at 427 n. 2, 95 S.Ct. 1082.

**88.** *Id.; see also id.* at 467, 95 S.Ct. 1082 (Douglas, J., dissenting).

language makes it clear that whether or not the land was Indian country was the threshold issue upon which the outcome of the case rested: "We hold, for the reasons that follow, that [Congress] terminated the Lake Traverse Reservation, and that *consequently* the state courts have jurisdiction."[89]

### C. Indian Country as a Jurisdictional Concept Encompasses Tribal Power over Both Tribal Lands and Members

As the above discussion of the allocative principle makes clear, Indian country as a jurisdictional concept encompasses tribal power over both tribal lands and tribal members. Remarkably, the majority takes issue with this fundamental and settled principle of Indian law. The majority states that the Supreme Court in *Venetie II* "makes clear that any allocative significance that exists in the concept of Indian country pertains to a tribe's territorial power over its land, not its members."[90] The majority comes to this conclusion, which is at odds with over 100 years of Supreme Court precedent,[91] by reasoning that because the Supreme Court in *Venetie II* "not[ed] that tribes have 'primary jurisdiction over *land* that is Indian country' but [said] nothing about jurisdiction over members" there is no "allocative significance . . . in the concept of Indian country" with regard to questions of tribal jurisdiction over

tribal members.[92] This conclusion has no basis in Indian law jurisprudence.

The Supreme Court in *Venetie II* "[said] nothing about jurisdiction over members"[93] for the simple reason that "jurisdiction over members" was *not* an issue in *Venetie II*. Whether Venetie's ANCSA-granted lands were Indian country and whether Venetie could exercise its inherent power to tax nonmembers on its lands located outside of Indian country were the issues in that case. Nevertheless, according to the majority's logic, if a specific Supreme Court decision, for example, said that all federal courts must obey Supreme Court precedent, the majority would reason that state courts could ignore Supreme Court precedent because the Court's decision did not mention state courts. The Supreme Court's silence on a subject that is not at issue in a case is just that—silence—not some kind of implied legal pronouncement. The Supreme Court itself has recently criticized the type of faulty reasoning in which the majority engages.[94]

Moreover, numerous Supreme Court cases reveal just how mistaken the majority's conclusion is that Indian country is not relevant to the issue of whether a tribe has jurisdictional power over its own members.[95] In each of these cases, the existence of Indian country was the central factor in determining whether the tribe had jurisdictional authority over its members.

89. *Id.* at 427–28, 95 S.Ct. 1082 (emphasis added).

90. Op. at 757.

91. *See supra* Dissent Parts V.A & V.B.

92. Op. at 782 & n. 121.

93. *Id.* at n. 121.

94. *See El Paso Natural Gas Co. v. Neztsosie,* 526 U.S. 473, ——, 119 S.Ct. 1430, 1439, 143 L.Ed.2d 635 (1999) (noting that "[n]ow and then silence is not pregnant" in a case in which the Court reversed the Ninth Circuit for reasoning that tribal court could determine whether it had jurisdiction over putative Price–Anderson actions because although the congressionally mandated jurisdictional scheme of the Price–Anderson Act clearly intended removal as of right to federal courts from state courts, the Act was silent about tribal courts).

95. *See, e.g., Hagen v. Utah,* 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994) (Utah courts properly exercised criminal jurisdiction over an Indian who committed a crime—the diminishment of the Uintah Indian Reservation meant that the location where the crime was committed was no longer Indian country); *Solem v. Bartlett,* 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984) (holding that because the defendant, who was an enrolled member of the Cheyenne River Sioux Tribe, committed a crime on reservation grounds, the state did not have criminal jurisdiction over him); *DeCoteau,* 420 U.S. at 427–28, 95 S.Ct. 1082 (holding that because "[Congress] terminated the Lake Traverse Reservation," and because the events giving rise to the child custody dispute arose on these lands, "the state courts have jurisdiction [over an Indian child custody dispute]."); *Organized Village of Kake,* 369 U.S. at 75, 82 S.Ct. 562 ("It has never been doubted that States may punish crimes committed by Indians, even reservation Indians, outside of Indian country.").

D. *The Majority's Decision Is Internally Inconsistent with Regard to the Importance of a Territorial Basis for Tribal Court Jurisdiction*

As the above discussion shows, there is substantial Supreme Court authority establishing the allocative principle and the importance of Indian country in delineating state and tribal jurisdictional authority. Because this authority undercuts the basis for the majority's decision, the majority spends much effort arguing that Indian country is not relevant or needed for tribal court jurisdiction over members.[96]

Ironically, the majority, at the end of its opinion, impliedly acknowledges the need for a territorial and geographical basis for jurisdiction in cases like the present one. In its discussion of comity, the majority states that state courts should not recognize tribal court judgments if the tribal court lacked personal jurisdiction.[97] But personal jurisdiction is an inherently territory-based concept, involving contact with a forum state—a geographical entity.[98] Thus, the majority opinion says that the proper exercise of tribal court jurisdiction is not dependent on the territorial concept mandated by federal Indian law, Indian country, but it is dependent on some form of territorial nexus.

The majority does not explain how lower courts should apply its new personal jurisdiction concept. The idea of personal jurisdiction relates to a defendant's contacts with a forum state.[99] In cases involving Indians, the analog to the forum state is Indian country. Today, the majority invents a new analog to the state for purposes of personal jurisdiction in Alaska—the tribal village:

> A requirement that a tribal court possess personal jurisdiction over litigants appearing before it ensures that the tribal court will not be called upon to adjudicate the disputes of parents and children who live far from their tribal villages and have little or no contact with those villages.[100]

These assurances that "tribal courts will not be called upon to adjudicate the disputes" of those who live far from tribal villages are illusory, for if a party files a custody suit against another party, Native or non-Native,

---

96. *See, e.g.,* Op. at 752 ("the Court has not focused on tribal land as determinative of tribal authority"); Op. at 754 (tribes "derive the power to adjudicate internal domestic matters ... from a source of sovereignty independent of the land they occupy"); Op. at 755 ("the case law does not fairly support the view that the existence of Indian country is an absolute prerequisite to the existence of sovereign tribal power"); Op. at 756 ("[t]he key inquiry ... is not whether the tribe is located in Indian country"); Op. at 756 ("tribal status itself [without Indian country] includes the power to adjudicate internal child custody disputes").

97. *Id.* at 763.

98. For example, in *Parker v. State, Dep't of Revenue, CSED,* 960 P.2d 586, 587–88 (Alaska 1998) (citations omitted, in part), we explained:
 > For the exercise of personal jurisdiction over a nonresident defendant to be constitutional, the defendant must have sufficient "minimum contacts" with the forum state so that maintaining a suit in the forum state "does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316 [66 S.Ct. 154, 90 L.Ed. 95] (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 [61 S.Ct. 339, 85 L.Ed. 278] (1940)).
 > Jurisdiction is permissible over a nonresident defendant where his contacts with the forum are such that he could reasonably anticipate being haled into court in the forum state. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 [105 S.Ct. 2174, 85 L.Ed.2d 528] (1985).
 > The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.... [I]t is essential in each case that there be some act by which the defendant purposefully avails [him]self of the privilege of conducting activities within the forum State....
 > *Puhlman v. Turner,* 874 P.2d 291, 293 (Alaska 1994). A nonresident defendant must have fair warning that his activities may foreseeably subject him to jurisdiction in Alaska.
 > If the defendant's activities in the forum state are "continuous and systematic," the forum may assert "general jurisdiction" over the defendant, and the cause of action need not arise out of the contacts with the forum state. However, where the cause of action arises out of the contacts with the forum state, the court may have "specific jurisdiction," even where the defendant has only one contact with the forum state.

99. *See supra* note 98.

100. Op. at 763.

that defendant must respond no matter where he or she lives, or risk a default judgment in tribal court. The defendant might be able to raise the defense that the tribal court lacked personal jurisdiction but the uncertainty of the meaning of personal jurisdiction in the context of village tribal courts makes that a strategy whose risks may be unacceptably high for many litigants.[101]

It is anyone's guess how the untested concept of personal jurisdiction premised on tribal villages will play out in our state courts. But it does reveal the foundation upon which the majority's decision rests. Rejecting the need for Indian country as the territorial basis for tribal jurisdiction, the majority in the end substitutes another territorial concept through the doctrine of personal jurisdiction. This is a new path, one not taken by federal Indian law.

## VI. Indian Country Is a Prerequisite for the Exercise of Tribal Court Adjudicatory Authority

### A. The Supreme Court Has Never Held that a Tribe's Inherent Powers Can Be the Basis for Exercising Tribal Adjudicatory Authority Outside of Indian Country

The United States Supreme Court has never held, as the majority does today, that a tribe's inherent sovereignty, in and of itself, independent of Indian country, can be the basis for tribal adjudicatory authority.[102] The majority acknowledges the absence of case law supporting what it does today, but claims that this dearth of legal precedent results from the fact that "courts have not had occasion to tease apart the ideas of land-based sovereignty and membership sovereignty." [103]

This is an erroneous reading of Supreme Court Indian law jurisprudence, for "teasing apart" these concepts is exactly what the Court has done when it has held that state rather than tribal law governs tribal members outside of Indian country. The cases cited in the following subsections illustrate this. They also illustrate a fundamental principle of Indian law, as articulated by the Conference of Western Attorneys General: "[A] tribe's inherent sovereign powers extend only to tribal territory, [therefore] tribal claims of civil and criminal jurisdiction over member actions on fee lands will be dependent upon the status of those lands." [104] This principle is central to the resolution of the present case, but is ignored by the majority.

### B. At Least Two of the Inherent Powers Recognized in United States v. Wheeler Do Not Extend Beyond Indian Country

United States v. Wheeler [105] held that an Indian tribe's "right of internal self-government includes the right to prescribe laws applicable to tribe members and to enforce

---

**101.** Also, the benefit of convenience to Natives in remote villages, noted by the majority at page 760 of its opinion, may prove to be illusory. No decree of a tribal court will be self-executing, just as no decree from another state is enforceable in Alaska without an order from an Alaskan court. Any party who decides not to follow a tribal decree will, therefore, always have the opportunity to raise comity issues in a state court before the tribal decree can be enforced. Thus, after the issues are tried in a tribal court, if a party does not voluntarily comply with the tribal court decree, there must be another proceeding in state court in which the fairness of the tribal court proceeding can be tried. This has the potential to be more time-consuming and expensive than merely proceeding in state court to begin with.

**102.** It is important to note that all the cases upon which the majority relies to support its ruling are cases that discuss the concept of tribal inherent sovereignty, but do so in the context of disputes that arise in Indian country. *See, e.g., United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Thus, the majority attempts to answer the question of whether tribal power extends *beyond* Indian country by relying on cases that involve the exercise of tribal power *in* Indian country. But the absence of Indian country is the critical fact that distinguishes the present case from those relied upon by the majority.

**103.** Op. at 754.

**104.** *American Indian Law Deskbook, supra* note 65, at 55 (emphasis added).

**105.** 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

those laws by criminal sanctions." [106] This "power to punish tribal offenders is part of [a tribe's] own retained sovereignty." [107] Other retained sovereign powers of Indian tribes include the power "to regulate domestic relations among tribe members." [108]

The majority relies heavily on *Wheeler* in holding that the Northway tribal court has jurisdiction in the present case.[109] However, *Wheeler*, itself, does not answer the question posed by the present case because the events giving rise to the crime in *Wheeler* took place solely within the confines of Indian country.[110] Despite its extensive reliance on *Wheeler*, the majority never acknowledges this important difference between *Wheeler* and the present case. Thus, *Wheeler*'s teachings about inherent tribal powers provide limited guidance in the present case. *Wheeler* describes how and from where such inherent powers are derived. But it does not indicate whether such powers extend outside of Indian country—the central issue here.

1. *A Tribe's Inherent Power to Criminally Sanction Its Members Does Not Extend Outside of Indian Country*

In order for the majority's reasoning and result to be correct, there should be authority indicating that the inherent tribal powers described in *Wheeler* extend outside of Indian country. But there is no such authority. To the contrary, there is definitive authority for the opposite conclusion: that a tribe's inherent power to punish tribal members does *not* extend beyond the confines of Indi-

an country. For example, in *Organized Village of Kake*,[111] the Supreme Court observed: "State authority over Indians is yet more extensive over activities ... not on any reservation. It has never been doubted that States may punish crimes committed by Indians, even reservation Indians, *outside of Indian country*." [112] This conclusion is not surprising. Even the majority most likely would not endorse the notion of granting Alaska tribes the authority to criminally punish tribal members; yet, that is the logical extension of today's decision.

In *Solem v. Bartlett*,[113] the Supreme Court made clear that the state's jurisdiction over Indians acting outside of Indian country was exclusive. *Solem* involved a habeas corpus petition of an enrolled member of the Cheyenne River Sioux Tribe.[114] The question was whether the state had jurisdiction over a tribal member who had committed a crime.[115] The Supreme Court, as it has in numerous other cases,[116] resolved this issue by examining whether the actions giving rise to the dispute occurred in Indian country. The Court did so because it regarded actions outside of Indian country by tribal members to be under the exclusive jurisdiction of the state. The Court explained this concept broadly:

> As a doctrinal matter, the States have jurisdiction over unallotted opened lands if the applicable surplus land Act freed that land of its reservation status and thereby diminished the reservation boundaries.

106. *Id.* at 322, 98 S.Ct. 1079.

107. *Id.* at 328, 98 S.Ct. 1079.

108. *Id.* at 322 n. 18, 98 S.Ct. 1079 (citing *Fisher v. District Court*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976)).

109. *See* Op. at 751–752, 755.

110. 435 U.S. at 315 n. 3, 98 S.Ct. 1079.

111. 369 U.S. 60, 82 S.Ct. 562 (1962)

112. *Id.* at 75, 82 S.Ct. 562 (emphasis added); *see also Hagen v. Utah*, 510 U.S. 399, 421, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994) (Utah courts properly exercised criminal jurisdiction over an Indian who committed a crime, since the diminishment of the Uintah Indian Reservation meant

that the location where the crime was committed was no longer Indian country).

A case to which the Supreme Court referred in *Organized Village of Kake*, 369 U.S. at 75, 82 S.Ct. 562, was *Pablo v. People* [23 Colo. 134,] 46 P.2d [P.] 636 (Colo.1896). There a member of the Southern Ute Tribe killed another member of the tribe. Both Indians resided on the reservation, but the crime took place off the reservation. The Colorado Supreme Court held that Colorado state courts, not the tribal court, had jurisdiction.

113. 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984).

114. *Id.* at 465, 104 S.Ct. 1161.

115. *Id.*

116. *See supra* note 95.

On the other hand, federal, state, and tribal authorities share jurisdiction over these lands if the relevant surplus land Act did not diminish the existing Indian reservation because the entire opened area is Indian country.... [117]

*Solem* is an important case because it shows that several of the premises upon which the majority's decision is based are wrong. First, it demonstrates that inherent tribal powers like those recognized in *Wheeler* do not extend beyond Indian country. Second, it shows that state jurisdiction over tribal members outside of Indian country is exclusive, not, as the majority concludes, concurrent with tribal authority.[118] This is clear because the Court held that "the States have jurisdiction" over Indians committing crimes on land that is freed "of its reservation status", but, *"[o]n the other hand,* federal, state, and tribal authorities *share* jurisdiction" if the land is Indian country.[119] Third, it disposes of the majority's unsupported assertion that jurisdiction over "land" has nothing to do with a tribe's jurisdictional authority over members.[120] The entire discussion in *Solem* is expressed in terms of jurisdiction over "lands" in order to determine jurisdiction over tribal members.[121] And fourth, *Solem* does away with the majority's claim that federal courts have not had the occasion to consider or "answer the question of what happens when a law like ANCSA separates [tribal] membership and land."[122] The Supreme Court did just that in *Solem* when it analyzed the surplus land Acts, which like ANCSA, "uncouple[d] reservation status [of the land] from Indian ownership."[123]

### 2. A Tribe's Inherent Power to Regulate Domestic Relations Among Members Does Not Extend to Cases Arising Outside of Indian Country

The majority is correct in noting that tribes have the inherent power to regulate domestic relations among tribal members.[124] Both *United States v. Wheeler*[125] and *Montana v. United States*[126] recognized this power.[127] However, as the discussion above shows, the specific inherent power which was *Wheeler*'s focus—the ability of tribes to criminally punish their members—does not extend beyond Indian country. Therefore, it is logical to conclude that neither do the other inherent powers recognized by *Wheeler*. Supreme Court case law bears this out, at least in terms of the power to decide child custody cases.

Supreme Court precedent holds that the inherent power over child custody cases does not extend to cases not arising in Indian country. One case so holding is *DeCoteau v. District County Court.*[128] The other is *Fisher v. District Court.*[129]

117. 465 U.S. at 467, 104 S.Ct. 1161.

118. Op. at 761.

119. 465 U.S. at 467, 104 S.Ct. 1161 (emphasis added).

120. Op. at 757.

121. 465 U.S. at 467 & n. 8, 104 S.Ct. 1161: *see also* discussion *supra* Dissent Part V.C.

122. Op. at 754.

123. 465 U.S. at 468, 104 S.Ct. 1161. In making this observation I do not mean to suggest that ANCSA's abolition of reserves and reservations affected Northway, although it clearly affected a number of other villages which did occupy reserves or reservations. The briefs do not contain a showing that Northway ever occupied a reserve or reservation. Similarly, the record does not show that the land where the parties resided was, before ANCSA, a reserve, reservation, or other type of Indian country. A pre-ANCSA description of reserves and reservations in Alaska does not mention reserves or reservations at Northway or Mentasta. Federal Field Committee for Development Planning in Alaska, *Alaska Natives & the Land* 444–45 (1968).

124. Op. at 755–756.

125. 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

126. 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

127. 435 U.S. at 322 n. 18, 98 S.Ct. 1079; 450 U.S. at 564, 101 S.Ct. 1245.

128. 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).

129. 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976).

## C. *DeCoteau*

The issue in one of the two consolidated cases in *DeCoteau* was whether the tribal or state court had jurisdiction over custody proceedings involving Indian children.[130] The Supreme Court framed the issue as follows:

In each of the two cases, the South Dakota courts asserted jurisdiction over members of the Sisseton–Wahpeton Tribe for acts done on lands which, though within the 1867 reservation borders, have been owned and settled by non-Indians since the 1891 Act. The parties agree that the state courts did not have jurisdiction if these lands are "Indian country," as defined in 18 U.S.C. § 1151.... [131]

The Court followed this statement with Footnote 2:

*If the lands in question are within a continuing "reservation," jurisdiction is in the tribe and the Federal Government.... On the other hand, if the lands are not within a continuing reservation, jurisdiction is in the State,* except for those land parcels which are "Indian allotments, the Indian titles to which have not been extinguished.... While § 1151 is concerned, on its face, only with criminal jurisdiction, the Court has recognized that it generally applies as well to questions of civil jurisdiction." [132]

The language of Footnote 2 delineates a straightforward jurisdictional scheme whereby tribal courts have jurisdiction over their members only if the actions of such members that gave rise to the dispute took place in Indian country. The majority disagrees, claiming that "the Court [in *DeCoteau* ] did not consider the implications of the reservation's existence because it accepted a stipulation by the parties that the state had jurisdiction if the reservation had been terminated by Congress." [133]

The majority misreads *DeCoteau*. It confuses the stipulation and related assumption in Footnote 3 with the statements of law contained in Footnote 2, and the result is a dramatic mischaracterization of the import of the case. It is not true, as the majority claims, that "[a]fter describing the legal agreement between the parties, which the Court assumed without deciding was an accurate one,[134] the Court noted in [F]ootnote 2 that the parties relied on 11 U.S.C. §§ 1151(a) and (c) in formulating their stipulation." [135] Footnote 2, which precedes rather than follows Footnote 3, describes an entirely different legal concept—one that was not contested by the parties, but was not part of the stipulation described in Footnote 3.

The language of Footnote 2 does not describe the content of any kind of stipulation by the parties. Rather, Footnote 2 contains the Court's explanation as to why the parties to the case did not contest the settled issue that "state courts [do] not have jurisdiction if [the] lands are 'Indian country'." [136]

The fallacy of the majority's reading of *DeCoteau* can be illustrated in two ways. First, a close examination of Footnote 2 reveals that each assertion is supported by a citation to legal authority. It would be illogical to presume that the first two sentences of the footnote (containing the allocative principle) are a description of a stipulation by the parties, but the third sentence is an unannounced segue into the Court's legal analysis.

---

130. 420 U.S. at 426–29, 95 S.Ct. 1082.

131. *Id.* at 427, 95 S.Ct. 1082.

132. *Id.* at 427 n. 2, 95 S.Ct. 1082 (emphasis added) (citations omitted).

133. Op. at 756–757 (citing *DeCoteau*, 420 U.S. at 426–28 & n. 3, 95 S.Ct. 1082).

134. *Id.* at 756–757 (citing Footnote 3 of *DeCoteau* ).

135. *Id.* at 757.

136. 420 U.S. at 427, 95 S.Ct. 1082. At the risk of being overly simplistic, this footnote can be compared to the following situation: If the Court's opinion stated *"The parties agree* that the defendant's confession should be suppressed if the defendant was in custody at the time of the questioning," and was followed by a footnote citing *Miranda* and other cases explaining the ramifications of custodial interrogation, "agree" as used in the text of the opinion could not be interpreted as a stipulation. Rather, it would reflect the parties' settled understanding of the state of the law as illustrated by the footnote.

The second way to disprove the majority's reasoning is to compare the Court's treatment of the issue in Footnote 2 with that of the issue in Footnote 3. Footnote 3, in contrast to 2, does concern an agreement between the parties not to litigate an unsettled question of law. The parties stipulated that fifty percent of the mother's acts occurred on non-Indian, patented land. The Court noted:

> The parties here have assumed that the State had jurisdiction ... if the non-Indian, patented lands were not "Indian country" under 18 U.S.C. § 1151(a). We have made the same assumption. We note, however, that § 1151(c) contemplates that isolated tracts of "Indian country" may be scattered checkerboard fashion over a territory otherwise under state jurisdiction. In such a situation, there will obviously arise many practical and legal conflicts between state and federal jurisdiction with regard to conduct and parties having mobility over the checkerboard territory. How these conflicts should be resolved is not before us.[137]

The Court is explicit about the content of the assumption made by the parties—specifically, that the fifty percent figure would be sufficient to give the state court jurisdiction if the patented land was found not to be Indian country. The Court then raises the counter-argument to this position before openly declaring that the issue was not before the Court and would therefore not be decided. None of this careful disclaimer exists in Footnote 2, because Footnote 2 is a statement of law rather than a description of a stipulation.

The legal principle in Footnote 2 does not indicate where jurisdiction would lie if the activities giving rise to the dispute occurred partly in Indian country and partly outside Indian country. Footnote 3 raises that complex question, but indicates that the parties avoided the issue by stipulating that fifty percent non-Indian country activity would be enough to confer state jurisdiction.[138]

The facts of the present case fall squarely within the legal principle announced in Footnote 2 of *DeCoteau*—if the lands are not within Indian country "jurisdiction is in the State."[139] This is why I believe *DeCoteau* should control the resolution of today's case. The tribe in *DeCoteau*, like tribes, post-ANCSA, in Alaska which previously occupied reserves, had lost its Indian country. Both *DeCoteau* and today's case involve the same main issue—whether a tribal or state court has jurisdiction in an Indian child custody dispute. Thus, the result in our case should be the same as in *DeCoteau*—jurisdiction lies with the state, not tribal, court.

---

137. 420 U.S. at 429 n. 3, 95 S.Ct. 1082.

138. State and federal courts have addressed this question in a variety of ways. The majority cites *In re Marriage of Skillen*, 287 Mont. 399, 956 P.2d 1 (1998), and a few other decisions that hold that tribal and state courts share concurrent jurisdiction of domestic relations issues involving tribal members. Op. at 759–760 & n. 146. These cases indicate that concurrent jurisdiction is a possible resolution to the complex issue of which court has jurisdiction when the dispute arises partly in Indian country and partly outside of Indian country. But such a concurrent jurisdictional scheme is *not* appropriate when the dispute arises completely within Indian country or completely outside of Indian country. In the former type of case, tribal court jurisdiction is exclusive. *See Fisher*, 424 U.S. at 389, 96 S.Ct. 943 ("Since the adoption proceeding is appropriately characterized as litigation arising on the Indian reservation, the jurisdiction of the Tribal Court is exclusive."). In the latter type of case—which is the case we decide today—state court

jurisdiction is exclusive. *See DeCoteau*, 420 U.S. at 427 n. 2, 95 S.Ct. 1082. Thus, the majority's reliance on *Skillen* and the other cases in footnote 146 for its decision that Alaska now has concurrent jurisdiction is unconvincing. *Skillen* and the other cases all involve a hybrid, partly inside/partly outside of Indian country set of circumstances, but such circumstances are decidedly not present in the present case.

This is not to say that the question posed by Footnote 3 and in addressed in *Skillen* will never arise in Alaska. *Venetie II* held that the lands conveyed to Native corporations by ANCSA were not Indian country. 118 S.Ct. at 954–55. But this does not mean that there is no Indian country in Alaska. There are Native allotments and other categories of trust property. Thus, the hybrid circumstances of partly in and partly out of Indian country raised in Footnote 3 of *DeCoteau* and addressed in *Skillen* could arise in Alaska. In such a case, concurrent tribal and state court jurisdiction might be appropriate. But that is not the case here.

139. 420 U.S. at 427 n. 2, 95 S.Ct. 1082.

### D. *Fisher*

In *Fisher*, the Tribal Court of the Northern Cheyenne awarded temporary custody of tribal member Ivan to Josephine Runsabove, also a tribal member, because the court had found that Ivan's mother had neglected him.[140] The tribal court later granted Ivan's mother's request for temporary custody.[141] Four days before the entry of that order, Runsabove and her husband initiated an adoption proceeding for Ivan in Montana state court.[142] Ivan's mother, who was also a tribal member, moved to dismiss this state court case for lack of subject matter jurisdiction, arguing that the tribal court possessed exclusive jurisdiction.[143] Upon receiving a certified question from the state court on the issue of which court had jurisdiction, a tribal appellate court held that the state court was without jurisdiction.[144] The Montana Supreme Court disagreed, holding that the state court had jurisdiction.[145] The United States Supreme Court reversed the Montana Supreme Court, noting that this was a case between Indians "arising out of conduct on an Indian reservation," and "[n]o federal statute sanctions this interference with tribal self-government" because, among other reasons, "Montana has not been granted ... civil jurisdiction" over the reservation under P.L. 280.[146] The Court made it clear that the result would have been different if the litigants had not resided in Indian country:

> Since the adoption proceeding is appropriately characterized as litigation arising on the Indian reservation, the jurisdiction of the Tribal Court is exclusive. The Runsaboves have not sought to defend the state court's jurisdiction by arguing that any substantial part of the conduct supporting the adoption petition took place off the reservation.... *Since all parties resided on the reservation at all relevant times,* and since the reservation has not been

partially terminated, *cf. DeCoteau v. District County Court,* 420 U.S. [425,] 429 n. 3 [95 S.Ct. 1082, 43 L.Ed.2d 300] [ (1975) ], *it appears that none of the acts giving rise to the adoption proceedings occurred off the reservation.* The Runsaboves do not contend otherwise.... *In a proceeding such as an adoption, which determines the permanent status of litigants, it is appropriate to predicate jurisdiction on the residence of the litigants ....* [147]

The Court's teaching is clear: since jurisdiction is to be predicated on the place of residence of the litigants, if the parties to the dispute had resided outside of Indian country the state court would have had jurisdiction. That is the situation in the present case, because the litigants here do not reside in Indian country.

Thus, I believe that *Fisher* squarely answers the issue presented by the present case. But the majority argues that *Fisher* supports *its* holding that the Northway tribal court has jurisdiction in this case. The majority does this in two ways: (1) by misreading *Fisher;* and (2) by citing a subsequent Supreme Court case in an attempt to reinterpret *Fisher*'s analysis and holding. I address each of these efforts in turn.

#### 1. *Fisher's Language Does Not Support Jurisdiction Outside Indian Country*

The majority argues that *Fisher* "provides an example of the Supreme Court's recognition of the dual nature of sovereignty[.]" [148] The majority acknowledges that the language in *Fisher*, cited above, makes it clear that the Supreme Court was holding that jurisdiction was in the tribal court because the child custody dispute arose in Indian country. But, the majority then quotes *Fisher* in the following manner: "[t]he exclusive jurisdiction of the Tribal Court ... [derives] from the quasi-sovereign status of the

---

140. 424 U.S. at 383, 96 S.Ct. 943.

141. *Id.*

142. *Id.*

143. *Id.* at 383–84, 96 S.Ct. 943.

144. *Id.* at 384, 96 S.Ct. 943.

145. *Id.* at 385, 96 S.Ct. 943.

146. *Id.* at 386, 388, 96 S.Ct. 943.

147. *Id.* at 389 & n. 14, 96 S.Ct. 943 (emphasis added) (footnote included).

148. Op. at 756.

Northern Cheyenne Tribe under federal law."[149] From this quote, the majority finds evidence for its "dual nature of sovereignty" theory by stating "*Fisher* therefore reflects both a recognition of territorial bases of sovereignty and an understanding that tribal status *itself* includes the power to adjudicate internal child custody disputes."[150] The use of the word "itself" means that the majority believes that tribal court jurisdiction can be based on territorial sovereignty, *or*, as to cases not arising in Indian country, a tribe's inherent sovereignty. Such a reading is not reasonable.

The Northern Cheyenne Tribe has quasi-sovereign status. The power derived from this status is what enabled the tribe to adjudicate the child custody case in *Fisher*. But the Court made clear that this power does not follow tribal members wherever they reside. Instead, it is confined to cases arising in Indian country.

The majority's "dual nature of sovereignty" reading of *Fisher* presumes that the Supreme Court's analysis in *Fisher* is internally inconsistent. The Supreme Court could not

assert both that if the case arose outside Indian country, the state court would have jurisdiction,[151] and also that "tribal status itself includes the power to adjudicate internal child custody disputes,"[152] arising outside Indian country. *Fisher* is not saying that tribal authority to adjudicate child custody cases is limited to cases arising in Indian country and that such authority is not limited to cases arising in Indian country. Yet that is what the majority's reading comes down to. Rather, *Fisher* can only be read as holding that the tribe has jurisdiction to adjudicate a child custody case involving tribal members because of its quasi-sovereign status, and that this jurisdiction is limited to cases arising in Indian country.[153]

Indeed, consistent with many other Supreme Court cases,[154] *Fisher* treats the question of whether or not the dispute arose in Indian country as a threshold issue, upon which the outcome of the case rests. Finding that the case arose in Indian country, the Court applied the general rule favoring tribal authority in the absence of contrary congressional intent.[155] That *Fisher* treated the ex-

149. *Id.* at 756.

150. *Id.* (emphasis added).

151. *See Fisher*, 424 U.S. at 389 & n. 14, 96 S.Ct. 943.

152. *Op.* at 756.

153. In fact, the quote from *Fisher* on which the majority relies for its "dual nature of sovereignty" conclusion arose in the context of a discussion which did not concern tribal sovereignty and its limitations, but rather a race discrimination claim. The Court in *Fisher* concluded that the "jurisdiction of the Tribal Court is exclusive" "[s]ince the adoption proceeding is appropriately characterized as litigation arising on the Indian reservation." 424 U.S. at 389, 96 S.Ct. 943. With the jurisdictional issue resolved, the Court stated that "[t]he remaining points [raised by the Runsaboves] may be dealt with briefly." *Id.* at 390, 96 S.Ct. 943. The Court then addressed the final issue of the case.

> Finally, we reject the argument that denying the Runsaboves access to the Montana courts constitutes impermissible racial discrimination. *The exclusive jurisdiction of the Tribal Court does not derive from the race of the plaintiff but rather from the quasi-sovereign status of the Northern Cheyenne Tribe under federal law.* Moreover, even if a jurisdictional holding occasionally results in denying an Indian plaintiff a

forum to which a non-Indian has access, such disparate treatment of the Indian is justified because it is intended to benefit the class of which he is a member by furthering the congressional policy of self-government. *Morton v. Mancari*, 417 U.S. 535, 551–555, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

*Id.* at 390–91, 96 S.Ct. 943 (emphasis added).
By this point in the opinion, the Court had already concluded that the tribal court had jurisdiction. As is clearly evident, the analysis in the above paragraph centers on a different issue—the Runsaboves' racial discrimination claim. Nevertheless, the majority attempts to argue that this paragraph both addresses the issue of state versus tribal court jurisdictional authority *and* supports the unwarranted conclusion that tribal jurisdictional authority based only on inherent sovereignty can exist outside of Indian country. This reasoning by the majority is not related to or supported by the above paragraph, which focuses not on tribal jurisdiction but on whether such jurisdiction amounts to impermissible racial discrimination.

154. *See supra* Dissent Part V.B.

155. 424 U.S. at 386, 96 S.Ct. 943 (emphasis added) (citations omitted) ("In litigation . . . arising out of conduct *on an Indian reservation*, resolution of conflicts between the jurisdiction of state and tribal courts has depended, absent a

istence of Indian country as a threshold issue becomes even more clear in light of *Fisher*'s citation to and reliance on *DeCoteau*.

As previously noted, in *DeCoteau* the Supreme Court found that the events giving rise to the Indian child custody dispute in question did *not* take place in Indian country. On that basis, the Court found that the state court had exclusive jurisdiction.[156] *DeCoteau* was twice cited by *Fisher*.[157] *Fisher*, which "predicate[s] jurisdiction on ... residence" must, like *DeCoteau*, be read as standing for the proposition that Indian country is a requirement for tribal court jurisdiction in child custody cases where a tribe exercises its inherent sovereign authority over its members. To read Indian country as somehow merely optional or as just an alternative path to jurisdiction, as the majority does, is plainly inconsistent both with *Fisher* and *DeCoteau*.[158]

### 2. *Iowa Mutual's Citation to Fisher Does Not Persuasively Reinterpret Fisher's Meaning*

The majority attempts to reinterpret *Fisher*'s teachings by relying on the following statement from *Iowa Mutual Insurance Co. v. LaPlante:*[159] "If state-court jurisdiction over Indians or activities on Indian lands would interfere with tribal sovereignty and self-government, the state courts are gener-

ally divested of jurisdiction as a matter of federal law. *See Fisher v. District Court*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976)."[160] The majority maintains that *Iowa Mutual* shows that *Fisher*'s holding stemmed from the tribe's sovereign powers and not its connection to Indian country.[161]

The majority's interpretation of *Iowa Mutual*'s citation to *Fisher* is directly at odds with *Strate v. A-1 Contractors*.[162] *Strate* is a much more recent Supreme Court pronouncement on tribal court adjudicatory authority. It does not simply cite *Fisher*, as *Iowa Mutual* does, but directly explains the holding in *Fisher*, something that *Iowa Mutual* does not do. *Strate* states:

> The Court held in *Fisher* that a tribal court had exclusive jurisdiction over an adoption proceeding when all parties were members of the tribe *and* resided on its reservation.... The Court observed in *Fisher* that state courts may not exercise jurisdiction over disputes *arising out of on-reservation conduct*—even over matters involving non-Indians—if doing so would "infring[e] on the right of *reservation Indians* to make their own laws and be ruled by them." [163]

Later in the opinion, the Court in *Strate* interprets a citation that *Montana v. United States* made to *Fisher*.[164] The Court in *Strate* described *Montana*'s analysis in the

---

governing Act of Congress, on 'whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.' ").

**156.** 420 U.S. at 427–28 & n. 2, 95 S.Ct. 1082.

**157.** *See Fisher*, 424 U.S. at 389 and 389 n. 14, 96 S.Ct. 943 (citing *DeCoteau*, 420 U.S. at 428–30 and 429 n. 3, 95 S.Ct. 1082).

**158.** *Fisher*, correctly interpreted, also highlights an anomalous outcome of the majority's decision—Alaska's Northway tribe, which is not based in Indian country, has broader jurisdiction than the Northern Cheyenne tribe in *Fisher*, whose authority is limited to the territorial confines of its reservation. *See Fisher*, 424 U.S. at 389, 96 S.Ct. 943. Indeed, the essence of *Fisher*, read in conjunction with *DeCoteau*, is that as a tribe loses its reservation or Indian country its tribal court jurisdictional authority is diminished. *See DeCoteau*, 420 U.S. at 427 n. 2, 95 S.Ct. 1082. But the result in today's opinion runs counter to this principle. The majority's deci-

sion can be read as holding that once the point is reached where there is no Indian country, tribal jurisdiction is freed from any territorial requirement and therefore can expand to wherever tribal members reside. *Fisher* and *DeCoteau* contradict this view.

**159.** 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987).

**160.** *Id.* at 15, 107 S.Ct. 971; Op. at 756.

**161.** Op. at 756–757.

**162.** 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997).

**163.** 520 U.S. at 452–53, 117 S.Ct. 1404 (quoting *Fisher*, 424 U.S. at 386, 96 S.Ct. 943) (emphasis added).

**164.** *Id.* at 458, 117 S.Ct. 1404 (quoting *Montana*, 450 U.S. at 566, 101 S.Ct. 1245).

following way: "The [*Montana*] Court referred first to the decision [in *Fisher*] recognizing the exclusive competence of a tribal court over an adoption proceeding when all the parties belonged to the Tribe *and* resided on its reservation. *See Fisher*, 424 U.S. at 386, 96 S.Ct. 943." [165]

*Strate*'s explanation of *Fisher* leaves no doubt that the Supreme Court views the existence of Indian country as a critical factor in *Fisher*'s analysis. Its use of the word "and," not "or," each time it analyzed *Fisher* shows that the Court viewed the tribe's connection to Indian country as a determining factor in its holding that the tribal court in *Fisher* had jurisdiction over the child custody dispute. *Strate*, therefore, closes the door on the majority's interpretation of *Fisher* that would have *Fisher* stand for the proposition that tribal courts can adjudicate child custody cases not arising in Indian country.

Also, *Strate* makes it clear that to the extent that *Iowa Mutual* is cited for authoritative statements on the scope of tribal jurisdictional powers (as the majority does) [166] it is no longer persuasive law. The Supreme Court in *Strate* emphasizes this point throughout its opinion.

> Both [*Iowa Mutual* and *National Farmers Union Insurance Cos. v. Crow Tribe*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985)] describe an exhaustion rule allowing tribal courts initially to respond to an invocation of their jurisdiction; *neither establishes tribal-court adjudicatory authority, even over the lawsuits involved in those cases*. . . . . Recognizing that our precedent has been variously interpreted, we reiterate that *National Farmers* and *Iowa Mutual* enunciate *only* an exhaustion requirement. . . . *These decisions do not expand* or stand apart from *Montana*'s instruction on "the inherent sovereign powers of an Indian tribe." [167]

### 3. *Fisher* Does Not Concern Concurrent State Jurisdiction

The majority states that the main issue in *Fisher* was "whether Montana had any basis to assert *concurrent* jurisdiction." [168] But the word "concurrent" does not appear anywhere in the *Fisher* opinion.

Instead of indicating that it was envisioning a concurrent jurisdictional scheme, the Court stated that it was "appropriate to *predicate* jurisdiction on the residence of the litigants." Because "all parties resided on the reservation at all relevant times" the state court was without jurisdiction.[169] This language contains no hint that the Supreme Court was contemplating a system of shared jurisdiction. To the contrary, the phrase "predicate jurisdiction on the residence of the litigants" fits squarely within the theoretical framework of the allocative principle— tribal jurisdiction if within Indian country and state jurisdiction if outside of Indian country.

*Fisher*'s reliance on and citations to *DeCoteau* also indicate that *Fisher*'s focus was determining whether the state or tribe had exclusive jurisdiction. Both cases centered on the same issue—whether the state or tribal court had jurisdiction over an Indian child custody dispute. Footnote 2 of *DeCoteau* is an explicit statement that the Court viewed the jurisdiction in that case to be exclusive.[170] Nothing in *Fisher*, which was decided only one year after *DeCoteau*, signals a change to a system of concurrent jurisdiction.

### E. *Other Case Law*

In an attempt to illustrate the principle that tribal courts, outside of Indian country, can predicate jurisdictional authority over members and nonmembers on nothing more than the tribe's inherent sovereignty powers,

---

165. *Id.* (emphasis added).

166. *See* Op. at 756.

167. *Strate*, 520 U.S. at 448, 453, 117 S.Ct. 1404 (emphasis added).

168. Op. at 757.

169. *Fisher*, 424 U.S. at 389 n. 14, 96 S.Ct. 943.

170. *See DeCoteau*, 420 U.S. at 427 n. 2, 95 S.Ct. 1082 ("jurisdiction is in the tribe" if the custody dispute took place "within a continuing 'reservation'" and "[o]n the other hand," "jurisdiction is in the State" "if the lands are not within a continuing reservation.").

the majority cites two Supreme Court tax cases,[171] *Oklahoma Tax Commission v. Sac and Fox Nation,*[172] and *Oklahoma Tax Commission v. Chickasaw Nation.*[173] But the majority does not rely on what the Supreme Court actually held in these cases. *Sac and Fox Nation* held that Oklahoma's income tax did not apply to tribal members earning income from tribal employment within Indian country who also resided within Indian country.[174] The Court also held that Oklahoma's vehicle and excise tax and registration fees did not apply to tribal members living in Indian country.[175] *Chickasaw Nation* held that the State of Oklahoma may tax the income of Indian tribal members who work for the tribe in Indian country, but reside outside of Indian country.[176] The Court also held that Oklahoma could not tax motor fuel sold by the tribe within Indian country.[177] Thus, these cases illustrate the continued importance of whether a case arises in Indian country in delineating the proper allocation of tribal and state power.

Despite the holdings in *Sac and Fox Nation* and *Chickasaw Nation,* which do not support today's decision, the majority, through the use of pliable phrases like "the Court implied"[178] or the cases "suggest,"[179] argues that these cases support its decision.[180] The majority goes so far as to argue that "[b]y deliberately leaving the door open for tribal governments to conduct internal self-governance functions in the absence of Indian country, *Chickasaw Nation* and *Sac and Fox Nation* suggest that Northway Village has jurisdiction to hear this [child custody] dispute[.]"[181]

The dicta in these cases[182] do suggest that it is an open question whether a tribe in the exercise of inherent sovereignty may tax income earned from tribal employment in Indian country by members who do not reside in Indian country. Perhaps this also suggests

171. Op. at 758.

172. 508 U.S. 114, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993).

173. 515 U.S. 450, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995).

174. 508 U.S. at 123–25, 113 S.Ct. 1985.

175. *Id.*

176. 515 U.S. at 462–64, 115 S.Ct. 2214.

177. *Id.* at 453, 115 S.Ct. 2214.

178. Op. at 758 (using the term "implied" two times in its discussion).

179. *Id.* at 759.

180. The majority does the same with *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.,* 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), a case which deals with sovereign immunity, not jurisdiction. Op. at 758–759. The two concepts are distinct. A legal obligation may exist, but not be enforceable. The *Kiowa* Court addressed this distinction at some length and reaffirmed the principle that state laws govern conduct outside of Indian country even though a tribe enjoys sovereign immunity for conduct outside of Indian country:

> We have recognized that a State may have authority to tax or regulate tribal activities occurring within the State but outside Indian country. *See Mescalero Apache Tribe v. Jones,*

411 U.S. 145, 148–49 [93 S.Ct. 1267, 36 L.Ed.2d 114] (1973); *see also Organized Village of Kake v. Egan,* 369 U.S. 60, 75 [82 S.Ct. 562, 7 L.Ed.2d 573] (1962). To say substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit. In [*Oklahoma Tax Commission v. Citizen Band] Potawatomi [Indian Tribe of Oklahoma,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991)], for example, we reaffirmed that while Oklahoma may tax cigarette sales by a Tribe's store to nonmembers, the Tribe enjoys immunity from a suit to collect unpaid state taxes. 498 U.S. at 510 [111 S.Ct. 905]. There is a difference between the right to demand compliance with state laws and the means available to enforce them. 118 S.Ct. at 1703.

181. Op. at 758.

182. The *Sac and Fox Nation* statement is as follows:

> Because all of the tribal members earning income from the Tribe may live within Indian country, we need not determine whether the Tribe's right to self-governance could operate independently of its territorial jurisdiction to pre-empt the State's ability to tax income earned from work performed for the Tribe itself when the employee does not reside in Indian country.

508 U.S. at 126, 113 S.Ct. 1985. The *Chickasaw Nation* quote is: " Notably, the Tribe has not asserted here, or before the Court of Appeals,

the possibility that there are other powers derived from inherent sovereignty which extend beyond the boundaries of Indian country.[183] But we know because of *Fisher* and *DeCoteau* that the power to decide child custody cases is not among such powers. Thus, with regard to jurisdiction to hear child custody cases arising outside of Indian country, *Fisher* and *DeCoteau* have already shut the door the majority maintains is still "open."

## VII. Executive and Statutory Authority Relied on by the Majority

As the discussion above demonstrates, substantial case law from the United States Supreme Court establishes the allocative principle. Outside of Indian country, this principle provides that absent "express federal law to the contrary," "beyond reservation boundaries" Indians "have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the state." [184] Since there is no express federal law that grants the Northway tribal court jurisdictional authority over the custody dispute in this case, it should follow, because the dispute arose outside of Indian country, that Northway is without jurisdiction. But the majority finds that "the intent of the Executive Branch" and "federal statutes" is to grant the Northway tribal court jurisdictional authority in the present case, despite the absence of Indian country.[185] As shown below, neither the intent of the executive branch nor any federal statute legitimizes or supports the majority's decision.

### A. Executive Advocacy as to the Extent of Tribal Court Jurisdiction Is Not Entitled to Special Deference

The majority states that "since this court *defers* to determinations of tribal status by the Executive Branch or by Congress, we *similarly* accept their conclusion that, even after ANCSA, federally recognized Alaska Native tribes like Northway Village retain sovereignty to adjudicate domestic disputes between members." [186] While it is true that we give conclusive deference to the determinations of Congress on all matters of federal law, Congress has not concluded that Alaska tribes have authority to adjudicate child custody cases arising outside of Indian country.

It is also true that tribal recognition by the Department of the Interior is given conclusive deference as a non-justiciable political question,[187] presumably because the Department has been delegated authority by Congress to make such a determination. But it does not follow that we give similar deference to the executive branch on questions concerning the extent of tribal authority. In fact, we do not.

Only Congress can prescribe the allocation of authority between tribes and states.[188] Once tribal status has been granted, the executive's role in disputes concerning tribal and state power is usually that of an advocate. While executive recognition of tribal status is non-justiciable, executive advocacy concerning tribal power is not similarly conclusive. To the contrary, in numerous disputes involving the extent of tribal court jurisdiction, the Supreme Court has rejected arguments by the executive branch that urged an expansion of tribal authority.[189]

that the State's tax infringes on tribal self-governance." 515 U.S. at 464, 115 S.Ct. 2214.

183. Alternatively, income earned from tribal employment in Indian country by tribal members who reside outside of Indian country may have a close enough nexus to Indian country to give rise to a presumption favoring tribal jurisdiction under the allocative principle. Another possibility is that the state power to tax such income will be upheld, as it was in *Chickasaw Nation.*

184. *See, e.g., Oklahoma Tax Comm'n v. Chickasaw Nation,* 515 U.S. at 465, 115 S.Ct. 2214; *see also* authorities discussed *supra* Dissent Part V.A.

185. Op. at 743.

186. *Id.* at 753 (emphasis added).

187. *See Atkinson v. Haldane,* 569 P.2d 151, 162–63 (Alaska 1977).

188. *See, e.g., Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) ("Congress has plenary authority to limit, modify or eliminate" tribal powers).

189. *See, e.g., Strate v. A–1 Contractors,* 520 U.S. 438, 447, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997); *Duro v. Reina,* 495 U.S. 676, 685, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990); *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

Thus, the majority opinion is wrong in stating that we must accept the Department of Justice's arguments on tribal court jurisdiction in this case in the same way that we are bound to accept the Interior Department's determination of tribal status.

### B. *Statutory Analysis*

The majority does not acknowledge or apply the "general rule" that, absent "express federal law to the contrary," tribal authority does not extend beyond Indian country.[190] However, the majority does hold that "the intent of Congress, as revealed by the Tribe List Act, ICWA, and the Tribal Justice Act," bestows upon Alaska Native tribal courts the jurisdictional authority to hear child custody disputes arising outside of Indian country.[191] None of the statutes relied upon by the majority grants to tribal courts jurisdiction over child custody cases between parents not arising in Indian country. None is therefore the "express federal law" needed to overcome the presumption against tribal adjudicatory authority outside of Indian country which should control this case.[192]

### 1. *The Canon of Construction Favoring Native Americans Is Inapplicable to This Case*

In analyzing the statutes upon which it relies, the majority uses the canon of construction that requires courts to "resolve ambiguities in statutes affecting the rights of Native Americans in favor of Native Americans."[193] However, it is not at all clear to which statute the majority is applying the canon. There is no statute that the majority cites that can be said, even ambiguously, to bestow concurrent jurisdiction on tribal courts in Alaska.

Further, the canon does not apply for another reason. The parties to this dispute are Anita John and John Baker, both of whom are Native Alaskans. The Native Village of Northway is an amicus curiae. Baker does *not* want the Northway tribal court to have jurisdiction in this case, in part because he believes that his rights and the rights of his children will be adversely affected by the assumption of jurisdiction by the tribal court. Yet, the majority applies its assumption "in favor of Native Americans" for John and the Northway tribe at the expense of Baker. Since Native Alaskans are on both sides of the case, the canon should apply to both, or neither. Either way, it is a non-factor.

The Supreme Court in *Northern Cheyenne Tribe v. Hollowbreast* [194] has recognized this. The Court stated that when a suit involves the competing interests of tribes and tribal members the canon of construction favoring Indians "has no application." [195]

### 2. *ANCSA* [196]

The majority states that "ANCSA itself ... support[s] Northway's jurisdiction over child custody matters." [197] In fact, ANCSA makes clear that of all the things it was intended to do, expanding tribal court jurisdiction in Alaska was *not* one of them.[198] As demonstrated in Section II of this dissent, Alaska Natives have always been subject to the same laws as non-Natives, administered only by territorial and state courts open to both Natives and non-Natives. ANCSA rejected any notion that it should be interpreted as expanding tribal court jurisdiction or Native sovereignty in any way: "Congress finds and declares that—the settlement [of Native Alaskan land claims] should be accomplished rapidly ... without establishing

190. *See, e.g., Chickasaw Nation,* 515 U.S. at 465, 115 S.Ct. 2214.

191. Op. at 754.

192. *See, e.g., Mescalero Apache Tribe,* 411 U.S. at 148–49, 93 S.Ct. 1267.

193. Op. at 752–753 (citing *In re F.P.,* 843 P.2d 1214, 1219 (Alaska 1992)).

194. 425 U.S. 649, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976).

195. *Id.* at 655 n. 7, 96 S.Ct. 1793.

196. 43 U.S.C. §§ 1601–29 (1994).

197. Op. at 753.

198. 43 U.S.C. § 1601(f).

any permanent racially defined institutions, rights, privileges, or obligations. . . ." [199]

Still, the majority proceeds from the premise that "Congress did not intend for ANCSA to divest tribes of their powers to adjudicate domestic disputes between members." [200] Thus, the majority's approach is to look at Congress's intent in ANCSA and ask whether Congress in abolishing reservations and reserves intended to take away important aspects of tribal sovereignty. My view is different. The consequences that flow from the revocation of reserves and reservations by ANCSA are the same as the consequences which would result from the revocation of Indian country with respect to any tribe in the United States. That is why *Fisher* and *DeCoteau* are so persuasive with regard to this case.

The Supreme Court's decision in *Venetie II* [201] vindicates my approach. That decision shows that the revocation of reservations and reserves by ANCSA had the same meaning as the revocation of Indian country elsewhere. For example, the power to tax is an inherent tribal power. [202] But the ruling in *Venetie II* was that because ANCSA revoked the Venetie reserve and did not create new types of Indian country, the village of Venetie could not exercise that power. [203] The Court said that Indian country as defined in 18 U.S.C. § 1151 "generally applies to questions of civil jurisdiction such as the ones at issue here. *See DeCoteau v. District County Court for the Tenth Judicial Dist.*, 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975)." [204] This is important for two reasons. First, it is a statement that the existence or nonexistence of Indian country is determinative of "questions of civil jurisdiction" in Alaska and elsewhere. Second, because the language "such as the ones at issue here" is followed immediately by the citation to *DeCoteau* Footnote 2, it analogizes the

issue in *Venetie II*—the inherent power and jurisdiction to tax—with the issue in *DeCoteau* Footnote 2—the inherent power and jurisdiction over child custody disputes. The consequence of the tribe's loss of Indian country in *DeCoteau* was that the tribe lost the power to adjudicate tribal child custody disputes arising in what was no longer Indian country. *Venetie II*'s citation to Footnote 2 of *DeCoteau* makes clear that the Supreme Court had the analytical framework of *DeCoteau* in mind when the Court examined tribal power, post-ANCSA, in Alaska.

### 3. *The Tribe List Act* [205]

Although the Tribe List Act formally recognizes Alaska Native villages as tribes, it does not in any way expand tribal powers. Rather, as the Department of the Interior explained, Native villages in Alaska "have the right, *subject to general principles of Federal Indian law*, to exercise the *same inherent* and delegated *authorities* available to other tribes. . . ." [206] General principles of federal Indian law would have prevented the Northern Cheyenne tribal court in *Fisher* from assuming jurisdiction over a child custody dispute between tribal members had that dispute arisen outside of Indian country. [207] Similarly in *DeCoteau*, general principles of federal Indian law dictated that a South Dakota court rather than the Sisseton–Wahpeton tribal authorities had jurisdiction over the children there involved because the tribe's reservation had been terminated. Because the same general principles apply to the present case, the result here should be that the Northway tribal court lacks jurisdiction. The addition of Alaska Native villages to the Tribe List Act does nothing more than confirm the correctness of this result.

That special privileges were not intended to be granted Alaska Native tribes is also

199. *Id.* § 1601(b).

200. Op. at 753.

201. 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998).

202. *See, e.g., Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982).

203. 118 S.Ct. at 952–56.

204. *Id.* at 952.

205. 25 U.S.C. §§ 479(a)–479(a–1) (1994).

206. 58 Fed.Reg. 54,366 (1993) (emphasis added).

207. *See Fisher,* 424 U.S. at 389, 96 S.Ct. 943.

made clear by the House Report accompanying the Tribe List Act which states that the Act neither confers nor denies sovereignty. This report stated:

> The Committee notes ... that there is extensive litigation on the subject of the precise sovereign powers of Alaska Native Tribes. While these issues deserve further review by Congress, *nothing in this Act should be construed as enhancing, diminishing, or changing in any way the status of Alaska Native Tribes.* It is the intent of the Committee that its previous position taken in the 1987 amendments to the Alaska Native Land Claims Settlement Act be maintained and that *nothing in this Act shall "confer on, or deny to, any Native organization any degree of sovereign governmental authority over lands ... or persons in Alaska."* P.L. 100–241, Section 2(8)(B). [This] Act merely requires that the Secretary continue the current policy of including Alaska Native entities on the list of Federally recognized Indian tribes which are eligible to receive services.[208]

This language is plain: Congress did not intend the Tribe List Act to be a vehicle for expanding or diminishing tribal power. But the majority explicitly relies on the Tribe List Act as authority to change the allocation of jurisdictional authority over tribal children between tribal and state courts as laid out in decisions of the United States Supreme Court. Thus, the majority "construes" the Act in a way that Congress forbade—it uses the Act as a means to expand tribal jurisdictional authority.

### 4. The Tribal Justice Act [209]

The majority's reliance on the Tribal Justice Act is equally unpersuasive. The Tribal Justice Act focuses primarily on establishing, organizing, and funding, within the Department of the Interior, the Office of Tribal Justice Support.[210] The Act also establishes responsibilities, goals, and funding for the Secretary of the Interior in working toward the development and betterment of tribal justice systems.[211] In its "Findings" the Act is protective of tribal rights that have *already* been established by Congress or the courts.[212] But nothing in the Act extends or bestows *any additional jurisdiction* to tribal courts. And because neither Congress nor the Supreme Court has bestowed upon tribal courts the jurisdiction to hear child custody disputes not arising in Indian country between parents, neither does the Tribal Justice Act.[213]

### 5. The Indian Child Welfare Act (ICWA)

#### a. ICWA Should Not Be Extrapolated

ICWA does not apply to this case. The majority acknowledges this.[214] Nevertheless, the majority relies on "the intent of Congress, as revealed by ... ICWA" for its holding that the Northway tribal court has jurisdiction over the child custody dispute in this case.[215] We have observed that "a statute may form the basis for a common law

---

208. H.R.Rep. No. 103–781, at 5 (1994) (emphasis added), *reprinted in* U.S.C.C.A.N. 3771.

209. 25 U.S.C. §§ 3601–3631 (1994).

210. *Id.* § 3611.

211. *Id.* §§ 3612, 3613, 3614, 3621.

212. *Id.* § 3601(6) ("Congress and the Federal courts have repeatedly recognized tribal justice systems as the appropriate forums for the adjudication of disputes affecting personal and property rights[.]").

213. This is not to say that tribal courts in Alaska are left without any jurisdiction. They have delegated jurisdiction, as in cases to which ICWA applies, 25 U.S.C. §§ 1901–63, and inherent jurisdiction to decide internal matters pertaining to tribal membership and organization. *See* 25 U.S.C. § 3601(4) ("Indian tribes possess the inherent authority to establish their own form of government, including tribal justice systems."). Furthermore, tribal courts can and do perform other important justice-related functions by deferral and consent. For example, state law enforcement authorities may defer prosecution of juvenile offenses with the consent of the juvenile so that the case may be handled by a tribal court. *Directory of Dispute Resolution in Alaska Outside Federal and State Courts*, Alaska Judicial Council (March 1999) at 11–12. For an extensive list of the services performed by tribal courts, *see id.* at 29–102.

214. Op. at 747.

215. *Id.* at 754.

rule which applies beyond the prescribed scope of the statute."[216] That observation was accompanied by a quotation from *Moragne v. States Marine Lines, Inc.*,[217] which indicates when a principle may be extrapolated from legislation and made a part of general decisional law and when extrapolation should not take place. The Supreme Court in *Moragne* stated:

> The legislature does not, of course, merely enact general policies. By the terms of a statute, it also indicates its conception of the sphere within which the policy is to have effect. In many cases the scope of a statute may reflect nothing more than the dimensions of the particular problem that came to the attention of the legislature, inviting the conclusion that the legislative policy is equally applicable to other situations in which the mischief is identical. This conclusion is reinforced where there exists not one enactment but a course of legislation dealing with a series of situations, and where the generality of the underlying principle is attested by the legislation of other jurisdictions. On the other hand, the legislature may, in order to promote other, conflicting interests, prescribe with particularity the compass of the legislative aim, erecting a strong inference that territories beyond the boundaries so drawn are not to feel the impact of the new legislative dispensation.[218]

Because Congress explicitly excluded from ICWA's coverage divorce proceedings[219] and, as the majority points out, this exclusion was intended to encompass child custody proceedings between unmarried as well as married parents,[220] ICWA presents a case in which Congress in recognition of conflicting interests has, to use the language of *Moragne*, "prescribe[d] with particularity the compass of the legislative aim, erecting a strong inference that territories beyond the boundaries so drawn are not to feel the impact of the new legislative dispensation."

Further, we have already held that the extrapolation method that the majority engages in today is inappropriate with regard to ICWA. In *Catholic Social Services, Inc. v. C.A.A.*,[221] we cautioned against interpreting ICWA in ways that extend it beyond its intended scope. In that case the superior court found that under ICWA an Indian child's tribe is entitled to notice of a proceeding for voluntary termination of parental rights, even though the statute itself contained no notice requirement.[222] We reversed, holding that "[i]n enacting [ICWA], Congress has both *created and defined tribal rights in adoption and termination proceedings*. The provisions of the Act ... *define the scope of tribal rights*. *The Act strikes a balance between the sometimes conflicting interests* of Indian parents, Indian children, and their tribes."[223] Today the majority ignores *Catholic Social Services*' admonition that it is the business of Congress, not the courts, to create, define, and also limit the scope of tribal rights with regard to ICWA.[224]

### b. The Majority Decision Ignores Essential Protections Which Congress Built into ICWA

Moreover, even assuming that the majority is correct in its assumption that "the intent of Congress, as revealed by ... ICWA,"[225] could apply to this case, the majority's decision would still be flawed. In enacting ICWA, Congress crafted two important protections relevant to this case which the majority's improvised extension of jurisdiction ignores.

**216.** *Hanebuth v. Bell Helicopter Int'l*, 694 P.2d 143, 146 (Alaska 1984).

**217.** 398 U.S. 375, 392, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

**218.** *Id.* (citation omitted).

**219.** 25 U.S.C. § 1903(1).

**220.** Op. at 746–747.

**221.** 783 P.2d 1159 (Alaska 1989).

**222.** *Id.* at 1161–62.

**223.** *Id.* at 1160 (emphasis added); *see also In re T.N.F.*, 781 P.2d 973, 977 (Alaska 1989) ("We have serious policy reservations concerning the creation of judicial exceptions to the plain language of ICWA....").

**224.** *See generally, Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

**225.** Op. at 754.

First, ICWA provides that before tribes which became subject to state jurisdiction in P.L. 280 states can reassume jurisdiction they must obtain the approval of the Secretary of the Interior to a plan for the reassumption of jurisdiction.[226] The regulations for reassumption of jurisdiction contain detailed provisions designed to insure that any tribe reassuming jurisdiction has an appropriately organized tribal court, and that there are clear procedures for identifying persons who will be subject to its jurisdiction.[227] Further, notice of approval of a reassumption plan must include a clear description of the territory in which jurisdiction will be exercised.[228]

Second, in ICWA cases which arise outside of Indian country tribal courts only have what is called "transfer jurisdiction."[229] This jurisdiction can only be exercised with the consent of both parents.[230] Thus it was the judgment and intent of Congress that tribal court jurisdiction should not reach beyond the boundaries of Indian country in ICWA cases unless both parents agree to the use of the tribal forum. The Department of the Interior guidelines for interpreting ICWA specifically refer to this provision as "an absolute veto power over transfers" to tribal courts by either parent.[231] This power has a purpose which is critical in Alaska. It is to give to either parent of a child not living in Indian country the power to decide whether an adjudication of custody by a tribal court would be inappropriate because of the child's lack of contact with the tribe or its culture. The Interior Department discusses this point in its "Guidelines for State Courts":

The first four criteria in the earlier version were all directed toward the question of whether the child's connections with the reservation were so tenuous that transfer

back to the tribe is not advised.... It is recommended that in most cases state court judges not be called upon to determine whether or not a child's contacts with a reservation are so limited that a case should not be transferred. This may be a valid consideration since the shock of changing cultures may, in some cases, be harmful to the child. This determination, however, can be made by the parent, who has a veto over transfer to tribal court.[232]

The protections which Congress built into ICWA will not be available in cases decided under today's decision. There will be no advance review of the organization and function of tribal courts by an agency with the expertise and authority to conduct such a review. The territorial limits of tribal courts are not defined or established. And the vital parental veto power over tribal court jurisdiction, a power which can be exercised by either parent under ICWA, is simply dispensed with under today's decision.

The loss of these protections illustrates the danger of the extrapolative method used by the majority. Not only is the jurisdiction of tribal courts expanded to cases which Congress considered *and* excluded in enacting ICWA, but important protections which Congress built into ICWA do not survive in the majority's extension of jurisdiction.

VIII. *Even Assuming that Tribal Courts Have Inherent Sovereign Power to Hear Child Custody Cases Not Arising in Indian Country, the Majority Decision Is Still Erroneous Because It Enables a Tribal Court to Utilize this Power Over a Non–Tribal Member*

Even if federal case law supported the majority's position, by holding that the inher-

226. 25 U.S.C. § 1918(a) (1994).

227. 25 C.F.R. 13.11–12 (1999).

228. *Id.* at 13.14(b).

229. *See* 25 U.S.C. § 1911(b) (1994), which states:

In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good

cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: Provided, That such transfer shall be subject to declination by the tribal court of such tribe.

230. *Id.*

231. 44 Fed.Reg. 67,591 (1979).

232. *Id.*

ent sovereign powers of tribes to "regulate internal domestic relations" between their members did extend beyond Indian country in child custody cases, the majority's decision today would still be erroneous because it extends the reach of this power to individuals who are not tribal members. There is no authority to expand a tribe's inherent powers in such a way.

### A. Case Law: Tribal Inherent Sovereignty Powers Relate Only to Tribal Members

The Supreme Court cases that have analyzed the extent of inherent tribal sovereignty have stated that such power pertains to internal tribal matters and tribal members only. The majority recognizes, and even emphasizes, this.[233] Thus, the Court in *Montana v. United States* [234] stated: "[T]he powers of self-government ... involve *only the relations among members of a tribe* .... Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations *among members*, and to prescribe rules of inheritance *for members*." [235] The Supreme Court's "members only" emphasis in its discussions of inherent sovereignty has been purposeful, as was noted by the Court in *Duro v. Reina:* [236] "[In][o]ur discussion of tribal sovereignty in *Wheeler* ... [w]e were consistent in describing retained tribal sovereignty over the defendant in terms of a tribe's power over its *members*." [237] Thus, a tribal court's powers, deriving from its inherent sovereignty, generally do *not* extend to non-tribal members. This was made clear in *Montana* and reemphasized by the Court in *Strate:* "In the

main, the [*Montana*] Court explained, 'the inherent powers of an Indian tribe'—those powers a tribe enjoys apart from express provision by treaty or statute—'do not extend to the activities of nonmembers of the tribe.' " [238]

Throughout its discussion of inherent sovereignty, the majority relies on many of the cases cited above, such as *Montana, Wheeler,* and *Reina,* in support of its conclusion that the Northway tribal court has jurisdiction in this case.[239] However, only near the end of opinion does the majority try to reconcile the fact that while the Supreme Court authority it relies upon to establish the concept of inherent sovereignty emphasizes inherent tribal powers over *members,* the dispute in this case is actually between a tribal member and *nonmember.*[240]

The majority sidesteps this by announcing a new rule that is not based on supporting legal authority. That rule is: "Because the tribe only has subject matter jurisdiction over the internal disputes of tribal members, it has the authority to determine custody only of children who are members or eligible for membership." [241] Thus, the majority authorizes tribal court jurisdiction over cases involving a member Native child where both parents are tribal members and where one parent is a tribal member and one is not.[242]

In a child custody dispute, a court should have jurisdiction over the child and the child's parents or other custodians. The majority states that a tribe "only has subject matter jurisdiction over the internal disputes

**233.** *See* Op. at 754–756.

**234.** 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

**235.** *Id.* at 564, 101 S.Ct. 1245 (first emphasis in original, second and third emphasis added) (quoting *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)).

**236.** 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990).

**237.** *Id.* at 685, 110 S.Ct. 2053 (emphasis in original).

**238.** *Strate,* 520 U.S. at 445–46, 117 S.Ct. 1404; cf. *Reina,* 495 U.S. at 679, 110 S.Ct. 2053 (holding that "the retained sovereignty of the tribe as a political and social organization to govern its own affairs does not include the authority to impose criminal sanctions" on a nonmember Indian who committed murder on the tribe's reservation).

**239.** Op. at 751–752, 755–756.

**240.** *Id.* at 759.

**241.** *Id.*

**242.** *Id.*

of tribal members."[243] Where both parents are tribal members this condition is satisfied. But it is not satisfied when one of the parents is not a tribal member. Since "the powers of self-government . . . involve only the relations among members of a tribe" and since "Indian tribes retain their inherent power to . . . regulate domestic relations among members,"[244] it follows that jurisdiction based on inherent sovereignty cannot extend to disputes involving nonmembers. Accordingly, even assuming that a tribe's inherent powers extend to cases not arising in Indian country, the Northway court should not have jurisdiction in this case because its inherent power does not encompass authority over John, who is not a member of the Native village of Northway.

### B. *The Montana Exceptions Do Not Apply*

The majority states that the consent of a nonmember parent may be an "alternative basis for tribal court jurisdiction in child custody cases."[245] The majority cites *Montana* for this consent theory.[246] But *Montana* does not support this theory.

The majority's cite to *Montana* references one of the two "*Montana* exceptions."[247] *Strate* explains the two exceptions in the context of *Montana:* "*Montana* thus described a general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers" subject to "two exceptions."[248] The two *Montana* exceptions, upon which the majority relies upon as authority to enable the Northway court to exercise inherent sover-

eign power over a consenting nonmember, are as follows:

[(1)] To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians *on their reservations,* even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. [And, (2)] A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians *on fee lands within its reservation* when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.[249]

Neither of the two *Montana* exceptions applies to this case because each specifically involves the exercise of inherent tribal power over nonmembers *in Indian country.* That is not the case here. Thus, the majority's claim that "federal law supports the determination that tribes have jurisdiction over consenting nonmembers in some situations"[250] is only true in the limited context of nonmembers *in Indian country.* No Supreme Court case has held that outside of Indian country, a tribal court has the inherent power to exercise jurisdictional authority over a nonmember, consenting or otherwise. Because there is no authority to support an assertion of inherent tribal powers over nonmembers, this is another basis for holding that the Northway tribal court lacks jurisdiction in this case.[251]

---

243. *Id.* at 759.

244. *Montana,* 450 U.S. at 564, 101 S.Ct. 1245 (quoting *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)).

245. Op. at 759 n.141.

246. *Id.* (citing *Montana,* 450 U.S. at 565, 101 S.Ct. 1245).

247. *See Strate,* 520 U.S. at 446–47, 117 S.Ct. 1404.

248. *Id.* These "two exceptions" allow "in certain circumstances, even where Congress has not

expressly authorized it, tribal civil jurisdiction [to] encompass nonmembers." *Id.* at 446, 117 S.Ct. 1404.

249. *Montana,* 450 U.S. at 565–66, 101 S.Ct. 1245 (internal citations omitted) (emphasis added); *Strate,* 520 U.S. at 446–47, 117 S.Ct. 1404; Op. at 759 n.140.

250. Op. at 759 n.141.

251. This conclusion is also consistent with the Supreme Court's general view of the inherent authority tribal courts have over consenting nonmembers. *See Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 147, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) ("Whatever place consent may have in

### C. The Absence of Subject Matter Jurisdiction Cannot Be Waived

Consent in the context of this case is not effective for another reason. Whether a tribal court can hear cases not arising in Indian country between members and nonmembers is an issue of subject matter jurisdiction.[252] The majority recognizes this.[253] If, as I believe, the tribal court is not empowered to hear member versus nonmember cases because it lacks the power to do so, then it does not matter that the nonmember in this case consented to having the tribal court hear her case. The tribal court is still powerless to hear the case because the lack of subject matter jurisdiction cannot be waived.[254]

### D. Tribal Court Jurisdiction Over Nonmembers Denies Access to State Courts on the Basis of an Unpermitted Racial Classification

Not only do tribes not have inherent power over nonmembers outside of Indian country, but even if such powers were mandated by Congress, the exercise of such power over nonmembers would be constitutionally suspect racial discrimination. This is a complicated subject. It is not critical here because of John's consent. But it is likely to be raised in a variety of contexts in the future. In this dissent I will only highlight the issue by quoting from the Department of Justice's analysis of ICWA legislation when it was first drafted. It appears that the original version of ICWA did not provide for any type of parental veto over the choice of forum, as the law now does. This was a source of concern for the Department of Justice. Then–Assistant Attorney General, and now D.C. Circuit Judge, Patricia Wald, voiced these concerns in a letter to Representative Morris Udall, Chairman of the Committee on Interior and Insular Affairs:

> The [ICWA] bill would appear to subject family relations matters of certain classes of persons to the jurisdiction of tribal courts which are presently adjudicated in State courts. The bill would accomplish this result with regard to three distinct categories of persons. . . . One class would be members of a tribe. Another class would be nontribal members living on reservations, and a third would be nonmembers living off reservations. These three classes would be denied access to State courts for the adjudication of certain family relations matters unless "good cause" is shown under section 102(c) of the bill.

> The general constitutional question raised by [the bill] is whether the denial of access to State courts constitutes invidious racial discrimination violative of the fifth amendment. See Bowling v. Sharp [Bolling v. Sharpe], 347 U.S. 497 [74 S.Ct. 693, 98 L.Ed. 884] (1954).

> . . . .

> [T]here is little support for the constitutionality of this bill as applied to nontribal members living on reservations and the rationale applied by the [Supreme] Court in [Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) and

---

contractual matters and in the creation of democratic governments, it has little if any role in measuring the validity of an exercise of legitimate sovereign authority. . . . Indian sovereignty is not conditioned on the assent of a nonmember."). Congress, through its plenary powers over Indian tribes, can always grant tribal courts the power to hear cases involving consenting nonmembers even outside of Indian country. Indeed, that is what Congress did in allowing "transfer jurisdiction" in ICWA. See 28 U.S.C. § 1911(b) (1994). But unless and until Congress speaks, we are bound by Montana's "general rule" that " 'the inherent powers of an Indian tribe'—those powers a tribe enjoys apart from express provision by treaty or statute—'do not extend to the activities of nonmembers of the tribe.' " Strate, 520 U.S. at 445–46, 117 S.Ct. 1404 (quoting Montana, 450 U.S. at 565, 101 S.Ct. 1245).

**252.** See Perry v. Newkirk, 871 P.2d 1150, 1154 (Alaska 1994) (citations omitted) (noting that one definition of subject matter jurisdiction is "the power to render a judgment over that class of cases within which a particular one falls").

**253.** See Op. at 759 (emphasis added) ("Because the tribe only has subject matter jurisdiction over the internal disputes of tribal members, it has the authority to determine custody only of children who are members or eligible for membership.").

**254.** See Wanamaker v. Scott, 788 P.2d 712, 713–14 n. 2 (Alaska 1990) (because "a court which does not have subject matter jurisdiction is without power to decide a case, this issue cannot be waived, and can be raised at any point during the litigation").

*Fisher v. District Court*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976)], would not save the bill. The simple fact is that the parents of an Indian child may find their substantive rights altered by virtue of their Indian blood and the simple fact of residence on a reservation. The Court has never sanctioned such a racial classification which denied substantive rights, and we are unable to find any persuasive reason to suggest that it would do so.

Our conclusion with regard to nonmembers living on reservations is even more certain in the context of nonmembers living off reservations. In such a situation, we are firmly convinced that the Indian or possible non-Indian parent may not be invidiously discriminated against under the fifth amendment and that the provisions of this bill would do so.[255]

## IX. Court-developed Policy Arguments are an Inappropriate Basis Upon Which to Base Tribal Court Jurisdiction

The majority also reasons that the Northway tribal court should have jurisdiction in today's case based on the following rationale:

Tribal jurisdiction over child custody cases involving member children will further the goal under both federal and state law of best serving the needs of Native American children.... [T]he fact that many of Alaska's Native villages are located far from the courtrooms of our state trial courts limits our state judicial system's ability to respond to the needs of many Alaska Natives.... By acknowledging tribal jurisdiction, we enhance the opportunity for Native villages and the state to cooperate in

the child custody arena by sharing resources. Recognizing the ability and power of tribes to resolve internal disputes in their own forums ... can only help in the administration of justice for all.[256]

This statement is a commendable declaration of policy. But the fact that this statement is just that—a declaration of court-made policy—raises fundamental issues about judicial restraint, separation of powers, and the role of the judiciary.

In *Duro v. Reina*,[257] the Supreme Court held that a tribe's retained sovereignty did not include the authority to impose criminal sanctions on a nonmember Indian who had committed murder on the tribe's reservation. The Court made this holding despite a legitimate concern, voiced by a lower court, that to do so would create a "jurisdictional void" between federal and Indian crimes which might allow the defendant in this case to escape prosecution by either federal or Indian authorities.[258] The Supreme Court, with Justice Kennedy writing for the majority, was unswayed by these arguments, but referred to them in the concluding paragraph of the opinion:

If the present jurisdictional scheme proves insufficient to meet the practical needs of reservation law enforcement, then the proper body to address the problem is Congress, which has the ultimate authority over Indian affairs. We cannot, however, accept these arguments of policy as a basis for finding tribal jurisdiction that is inconsistent with precedent, history, and the equal treatment of Native American citizens.[259]

255. H.R.Rep. No. 95–1386, at 35–38 (1978) (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. 7558, 7560–61.

256. Op. at 760–761.

257. 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990).

258. *Id.* at 683, 110 S.Ct. 2053.

259. *Id.* at 698, 110 S.Ct. 2053 (emphasis added). The Court in *DeCoteau* made a similar statement. Once the Court determined that the tribe's reservation had been terminated, and therefore the child custody case belonged in state court be-

cause it arose outside of Indian country, the *DeCoteau* Court declared that it would not entertain policy arguments on why removing tribal jurisdiction over custody matters would be harmful to the tribe:

Until the Court of Appeals altered the status quo, South Dakota had exercised jurisdiction over the unallotted land of the former reservation for some 80 years. Counsel for the tribal members stated at oral argument that many of the Indians have resented state authority and suffered under it. Counsel for the state denied this and argued that an end to state jurisdiction would be calamitous for all the residents of the area, Indian and non-Indian alike. *These competing pleas are not for us to adjudge,*

In an interesting postscript to this case, Congress passed a statute almost immediately after the *Reina* decision that corrected the problem of the "jurisdictional void."[260] Thus, in that case, our system of separation of powers worked—the courts interpreted the law based on *existing* statutes and precedent, and Congress, persuaded by policy arguments that existing tribal jurisdictional schemes were inadequate, passed legislation to enhance tribal jurisdiction and rectify the problem.

Today, the majority attempts to short-circuit this system, by striking into an area—the expansion of tribal court jurisdiction based on policy arguments—that is solely the realm of Congress. If there is a need for out-of-Indian country tribal court jurisdiction in custody disputes between parents of Indian children, democratic processes are in place which can address this need. Alaska's Senators and Congressman are knowledgeable about and responsive to the needs of Alaska Natives. If there is a case to be made for expanded tribal court jurisdiction our Senators and Congressman are well-positioned to make an effective presentation. It is Congress, not this court, which is competent to decide what is needed and what limitations and protections are appropriate.

## X. State Law Applies Outside Indian Country

The majority concludes that the tribal court may apply its own laws and customs in this case and implies that such tribal laws apply even if they conflict with state laws.[261]

The majority implies, incorrectly, that this has always been the case.[262] But such a regime would be a radical departure from the past.[263] Nevertheless, the majority supports this conclusion by relying on *Santa Clara Pueblo v. Martinez*,[264] which held that tribes have the "power to make their own substantive law in internal matters, and to enforce that law in their own forums."[265] But *Santa Clara Pueblo* is inapplicable to this case. That case involved a member of the Santa Clara Pueblo tribe and her children, all of whom lived and were raised on the Santa Clara Reservation.[266] For that reason, the allocative principle favored tribal authority. By contrast, none of the events in the present case took place on reservation land or other Indian country, and therefore the allocative principle favors state authority. As I show below, the majority's conclusion ignores this important distinction and also conflicts with the purpose of P.L. 280 and its subsequent amendments.

### A. Case Law

The discussion above in Part V of this dissent discusses the allocative principle in terms of whether the Northway tribal court or state court has jurisdiction in this case. This principle also applies to the determination of which law—state or tribal—applies to a given case regardless of which tribunal has jurisdiction. The plain language of the allocative principle makes this clear: "Absent express federal law to the contrary, Indians going beyond reservation boundaries *have generally been held subject to non-discrimi-*

---

for our task [determining whether the former reservation had been terminated and therefore was not Indian country] is a narrow one.
420 U.S. at 449, 95 S.Ct. 1082 (emphasis added).
 We have similarly stated that, especially in areas where we lack institutional competence and authority, we should not make decisions based on policy rationales. *See Industrial Indem. Co. v. State,* 669 P.2d 561, 563 (Alaska 1983) ("[C]ourts must not intrude into realms of policy exceeding their institutional competence.").

260. *See Strate,* 520 U.S. at 446 n. 5, 117 S.Ct. 1404.

261. Op. at 761.

262. *Id.* at 753, 754, 755–756.

263. As the state has recently said: "[T]he long-standing jurisdictional regime and settled understanding in Alaska [is that] state laws apply to all Alaskans, without regard to the particular community in which they live." *See* Brief for Petitioner, *State of Alaska v. Native Village of Venetie,* 1997 WL 523883 at *93. *See generally* the "Historical Setting" discussion *supra* Dissent Part II.

264. 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

265. Op. at 755–756 (quoting *Santa Clara Pueblo,* 436 U.S. at 55–56, 98 S.Ct. 1670 (citations omitted)).

266. *Santa Clara Pueblo,* 436 U.S. at 52, 98 S.Ct. 1670.

*natory state law* otherwise applicable to all citizens of the State."[267] This has always been the case in Alaska.[268] Thus, even if one assumes, as I do only for purposes of the discussion in this section, that the Northway court has jurisdiction in this case, it does *not* logically follow that tribal law controls. To the contrary, because this case arose outside of Indian country, the allocative principle requires the application of state, not tribal, law.

The argument, made by the majority, that the Supreme Court never contemplated applying the allocative principle to situations like those in Alaska where tribal membership has been separated from Indian country,[269] is incorrect. *Solem v. Bartlett* did just that.[270] Moreover, the tribe in *DeCoteau* had lost its reservation in much the way those tribes that had reserves in Alaska did, by an act of Congress.[271] Yet the Supreme Court in *DeCoteau* confirmed the application of state law under the general allocative principle to a child custody case which involved tribal children residing within the boundaries of the former reservation but not in Indian country.[272] And, in *Venetie II*, the Supreme Court confirmed the application of this principle in its most recent Indian law case arising from Alaska.[273]

The Supreme Court also applied the allocative principle to Alaska Natives in *Organized Village of Kake*.[274] There the Court noted that Kake Natives had not "been provided with a reservation," and there was "no statutory authority under which the Secretary of Interior might permit [Kake] to operate fish traps contrary to state law."[275] Thus, the Court held that Alaska's fishing laws applied to the tribe.[276] The interest in continuing the traditional use of fish traps was strong given that the Kake Indian community was "entirely dependent upon salmon fishing."[277] Yet, this important interest had to give way to state law because the tribe did not reside on a reservation and no federal law expressly permitted it to ignore Alaska law. For similar reasons, because there is no statute authorizing tribal courts to apply tribal law to child custody disputes not covered by ICWA and not arising in Indian country, tribal custody laws must give way to state law if they conflict.

The majority's decision allowing tribal law, outside of Indian country, to trump state law simply ignores *Kake, Mescalero Apache Tribe, DeCoteau, Solem, Venetie II,* and the other cases that establish the principle that Indians outside of Indian country are subject to state laws.

B. *Section 4 of Public Law 280 Requires that the Laws Applied in Tribal Court Must be Consistent with State Law*

The majority's decision is also mistaken because it ignores section 4(c) of P.L. 280. This section states:

Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section.[278]

The language of this statute is straightforward: In case of conflict between state and tribal law, P.L. 280 provides that state law governs.

---

267. *Mescalero Apache Tribe,* 411 U.S. at 148–49, 93 S.Ct. 1267 (string citations omitted) (emphasis added).

268. *See supra* Dissent Part II.

269. Op. at 754.

270. 465 U.S. at 468, 104 S.Ct. 1161 (Court analyzing congressional act that, like ANCSA, "uncoupled reservation status [of the land] from Indian ownership.").

271. 420 U.S. at 426–28, 95 S.Ct. 1082.

272. *Id.* at 427–28, 95 S.Ct. 1082.

273. *See* discussion *supra* Dissent Part V.A.

274. 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962).

275. *Id.* at 62, 82 S.Ct. 562.

276. *Id.*

277. *Id.* at 61.

278. 28 U.S.C. § 1360(c) (1994).

To read this section as only applying to litigation in state courts would be erroneous because it would allow two sets of conflicting laws to govern the same transaction or occurrence. For example, state law prohibits custody preferences based on gender.[279] The laws of some tribes may be to the contrary. They may, for example, employ the "tender years" presumption rejected by state law.[280] As another example, state law provides that in a custody dispute between a parent and a non-parent, the parent is to be preferred absent a clear showing that parental custody will be harmful to the child.[281] The laws of some tribes may be different. And as a third example, state law provides for scheduled child support to be paid by an obligor parent.[282] Some tribes may not replicate this schedule.

If tribal laws provide for a particular custodial preference the litigant who will benefit by that preference will have a strong incentive to file in tribal court before his or her opponent files in state court. The reverse of course is also true. And if tribal courts are not bound by the state child support schedule and provide either lower child support or none at all, potential obligor parents will have a strong incentive to file their cases in tribal courts before potential obligees file in state court.

In my view, P.L. 280 clearly requires state law to govern in case of conflict between state and tribal law. The majority holds otherwise. Thus state law can be circumvented if one litigant files in tribal court before the other files in state court. Congress, in enacting P.L. 280, found that Indians would be benefitted by the "extension of State civil jurisdiction to" Indian country.[283] With a goal of making Indians "truly first class citizen[s]," [284] Congress "deemed desirable" the extension to reservations "the substantive civil laws of the respective states insofar as those laws are of general application to private persons or private property...." [285] It seems clear that the model Congress had in mind was that Indian country in P.L. 280 states would be governed by state laws of general application. By necessary implication, Congress must also have intended that state laws would govern outside of Indian country, and that there would not be, as the majority holds, sets of conflicting laws which can be selected by a litigant who wins a race to a courthouse.[286]

### C. The Rationale of Erie v. Tompkins

The majority's result also ignores the fundamental rationale of the landmark case, *Erie Railroad Co. v. Tompkins.*[287] *Erie*

---

**279.** *See, e.g., Johnson v. Johnson,* 564 P.2d 71 (Alaska 1977).

**280.** We have described the tender years presumption as follows: "[A] mother of young children will generally be given preference for custody if the other factors are evenly balanced." *Id.* at 73. We have expressly rejected this presumption. *Id.* at 75.

**281.** *Turner v. Pannick,* 540 P.2d 1051 (Alaska 1975).

**282.** *See* Alaska R. Civ. P. 90.3.

**283.** S.Rep. No. 699 (1953), *reprinted in* 1953 U.S.C.C.A.N. 2409, 2411–12.

**284.** *Id.* at 2411.

**285.** *Id.* at 2412.

**286.** In an adversarial system each party will attempt to use the law to his or her best advantage. If two sets of laws cover the same transaction or dispute, it is rational for each party to act in a way designed to ensure that the law more favorable to the party's position governs the case.

The majority assures us that "[a] tribe's inherent jurisdiction does not give tribal courts priority, or presumptive authority, in disputes involving tribal members." Op. at ——. But the majority understates the breadth of its own holding. The holding of today's decision is that if a parent (Native or non-Native) of a child who is a tribal member or eligible for tribal membership, *see id.* at 759, files a custody dispute in tribal court before state proceedings are initiated, the tribal court has jurisdiction over the case. State courts can only get involved after the tribal court's ruling through comity proceedings. In such circumstances, then, today's decision clearly *is* a grant of priority and presumptive authority to tribal courts.

**287.** 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). One Supreme Court Justice has called *Erie* "one of the most important cases at law in American legal history." Jack H. Friedenthal, Mary Kay Kane, & Arthur R. Miller, *Civil Procedure,* § 4.2 at 195 & n.3 (2d ed.1993) (quoting Justice Black).

overruled *Swift v. Tyson*,[288] which held that federal courts, sitting in diversity, were not necessarily bound by the prior decisions of the courts of the states whose law was being applied. Rather, federal courts, in the interests of developing "general" federal law, could independently evaluate the state law at issue, even if that meant reaching a result different from that which a state court would reach.[289]

In *Erie*, the *Swift v. Tyson* doctrine was abandoned, in part, because it made "rights enjoyed under the unwritten 'general law' vary according to whether enforcement was sought in the state or in the federal court" and it "had prevented uniformity in the administration of the law of the state." [290] Thus, *Erie*'s focus was on maintaining the uniformity of substantive law regardless of the forum chosen by the litigants. As Justice Frankfurter wrote in a later case: "The nub of the policy that underlies *Erie R. Co. v. Tompkins* is that for the same transaction the accident of a suit by [a party to the dispute] in a federal court instead of in a State court a block away, should not lead to a substantially different result." [291]

The majority's decision allowing tribal law to trump state law *creates* the problem that *Erie* and its progeny sought to correct. When a marriage is breaking up, today's decision will create incentives for each party to the marriage to file first in the forum whose laws are thought to be more favorable. Again, it is very unlikely that Congress intended such a result, for it is difficult to see how any rational law-making authority could believe that it is desirable to permit conflicting laws to govern the same transaction.

**288.** 41 U.S.(16 Pet.) 1, 10 L.Ed. 865 (1842).

**289.** *Swift*, 41 U.S. at 13.

**290.** *Erie*, 304 U.S. at 74–75, 58 S.Ct. 817.

**291.** *Guaranty Trust Co. v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

**292.** Op. at 759.

**293.** *See supra* note 1.

**294.** It should also be noted that many of the more than 30,000 ethnic Native Alaskans who do not live in Alaska, *see supra* note 1, may also be

## XI. *Conclusion*

The majority's opinion today is very broad. (1) It holds that a tribe has jurisdiction to adjudicate child custody cases not arising in Indian country, contrary to the general principle that allocates functions between tribes and states, and contrary to two United States Supreme Court decisions which have stated that in custody cases tribal jurisdiction based on inherent sovereignty does not extend to cases not arising in Indian country. (2) In the face of many decades of contrary Supreme Court precedent, and without congressional authorization, it holds that Alaska Natives, outside of Indian country, are subject to tribal law, even if such laws conflict with those of the state. And (3) it gives tribal courts jurisdictional authority over *any* parent (tribal member or not, and Native Alaskan or not) of a child who is a tribal member *or* eligible for tribal membership.[292] Given the large number of Native Alaskans in the state [293] and the significant number of children born from marriages and relationships between Natives and non-Natives, the number of Alaskan citizens who will find themselves subject to mandatory tribal court jurisdiction is very large.[294]

Today's decision also raises many more troubling questions than it answers. I mention just a few.

(1) What type and kind of tribal court will be empowered to exercise the authority conferred by today's decision? The majority speaks about tribal courts as if they are all the same. They are not. Indeed, they are *markedly* different in terms of structure, size, expertise, and experience.[295] Sovereign

subject to tribal court jurisdiction in Alaska given the geographically limitless "membership sovereignty" theory recognized by the majority, and the unexplored parameters of personal jurisdiction in the context of village tribal court jurisdiction. *See* Op. at 754–755, 763.

**295.** *See Directory of Dispute Resolution In Alaska Outside Federal and State Courts*, Alaska Judicial Council, March 1999, at 29–102. Most villages perform mediation and quasi-judicial roles through their village council. The formation of courts as such is a recent development, but as of this writing twenty-three villages have done so. *Id.* at 11. A significant number of villages exer-

status was extended, via the Bureau of Indian Affairs Tribal Recognition List, to 226 Native entities in Alaska.[296] Will all such sovereigns exercise tribal court functions? Even those villages with populations of fewer than fifty people? [297]

(2) Tribal courts are not bound by the United States Constitution. As Justice Stevens noted in *Merrion v. Jicarilla Apache Tribe*, "Tribes may enforce discriminatory rules that would be intolerable in a non-Indian community. The equal protection components of the Fifth and Fourteenth Amendments, which limit federal or state authority, do not similarly limit tribal power." [298] What rules will apply to consenting nonmembers, or nonconsenting nonmembers?

(3) The Supreme Court has held that the powers "to tax," [299] "to prescribe and enforce internal criminal laws," "to regulate domestic relations among members," and "to prescribe rules of inheritance for members," [300] all derive from a tribe's inherent sovereign power. Today, the majority holds that the child custody component of the domestic relations power extends beyond Indian country. Does it logically follow from today's decision that tribal criminal and tort law will follow members outside of Indian country? Can a village council on the Tanana River exercise its sovereign powers to prescribe rules of inheritance for its members, including those who live in Anchorage or Los Angeles, or London? What are the geographical limits, if any, to the "membership sovereignty" [301] that the majority recognizes today? And what

contacts suffice to give a tribal court personal jurisdiction?

(4) More Native Alaskans live in, or within easy driving distance of, cities served by superior courts than live in villages distant from superior courts.[302] And *many* Native Alaskans live very far from the villages with which they are associated. For example, about one-fifth (more than 20,000) of all resident Native Alaskans live in the Municipality of Anchorage.[303] By making these Native Alaskans subject to the jurisdiction of distant village tribal courts, will today's decision *create* the very problem the majority believes it is solving—namely, the problem of requiring Native Alaskans to travel long distances to have their custody disputes adjudicated? And will the interests of children born and raised, for example, in Anchorage be best served if their child custody cases take place in tribal courts in distant villages about which they know little or nothing? Indeed, will the interests of Native children, no matter where they reside, be best served if their non-custodial parents are allowed by a tribal court order to pay child support that is significantly less than they would pay under Alaska Civil Rule 90.3?

I do not know the answers to these questions. One thing that I am sure of, however, is that the ramifications of this case will be felt for many years. Confusion and litigation will proliferate as state and tribal courts try to work out the consequences of this opinion.

Finally, it is important to note what this case is ultimately about—the balance of trib-

cise no judicial or quasi-judicial functions. *Id.* at 12.

**296.** *See supra* note 32.

**297.** Joseph D. Matal, *A Revisionist History of Indian Country*, 14 Alaska L.Rev. 283, 349 n.517. Matal notes that there are many villages with fewer than fifty people and that four villages have populations of fewer than ten people. *Id.*

**298.** 455 U.S. 130, 172, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (Stevens, J., dissenting). The Indian Civil Rights Act imposes some, but not all, of the protections of the Bill of Rights on tribes. *See* 25 U.S.C. § 1302 (1994). But the Act is seemingly enforceable only by a writ of habeas corpus, which means that in cases not involving a detention of the person recognizable under the writ

the Act may be unenforceable. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

**299.** *Jicarilla Apache Tribe*, 455 U.S. at 137, 102 S.Ct. 894.

**300.** *Montana*, 450 U.S. at 564, 101 S.Ct. 1245.

**301.** Op. at 754–755.

**302.** Report of the Alaska Supreme Court Advisory Comm. on Fairness and Access, app. G (1997).

**303.** *Alaska Population Overview: 1998 Estimates, Population Estimate by Race and Ethnicity*, 1 (Alaska Dep't of Labor).

al and state power within Alaska. As Chief Justice Rehnquist stated in *Washington v. Confederated Tribes of the Colville Indian Reservation*, "[a]t issue here is not only Indian sovereignty, but also necessarily state sovereignty as well." [304] The plenary power of the state under the Alaska Constitution is asserted by a system of uniform laws applied equally to all citizens, and by state courts which "shall constitute a unified judicial system...." [305] The result in this case cannot pass muster under the Alaska Constitution unless mandated by federal law. Reduced to

its essence the question here is whether under the circumstances of this case the laws of the United States require that the plenary power of the state give way to tribal power. The answer given by the majority is "yes." Appropriate regard for the Alaska Constitution requires that such an answer not be given unless there are federal laws which require a cession of state authority. Because such laws do not exist, I respectfully dissent.

## ADDENDUM: P.L. 280 HISTORY AND ANALYSIS

### TABLE OF CONTENTS

I. P.L. 280: Introduction ............................................... 805
 A. P.L. 280 and Amendments ........................................ 805
 B. The Supreme Court and P.L. 280 ................................. 808

II. P.L. 280 As Amended Conferred Exclusive Jurisdiction ............... 809
 A. The 1970 Amendment to P.L. 280 ................................. 809
 B. Contemporaneous Administrative Construction .................... 811

III. Conclusion ....................................................... 813

### I. *P.L. 280: Introduction*

After briefly discussing Public Law (P.L.) 280 and *Native Village of Nenana v. State, Department of Health & Social Services*,[1] the majority concludes that "it is neither necessary nor appropriate at this time to reach the question of whether *Nenana* and its progeny were wrongly decided." [2] The majority then notes that its decision today "creates a disjunction in Indian law jurisprudence" because it leaves tribes without Indian country with greater powers than those with Indian country.[3] Because the appellant and amici urge us to overrule the *Nenana* line of cases

and because I believe that courts, including this one, will soon be required to address the disjunction mentioned by the majority, I set forth my views on this issue. For the reasons outlined below, I continue to believe *Nenana* properly held that P.L. 280 granted states exclusive jurisdiction in child custody matters.

### A. *P.L. 280 and Amendments*

P.L. 280 was enacted in 1953[4] and amended in 1958[5] and 1970.[6] Because sections of P.L. 280 are interrelated, I have set out the text of the act in the margin.[7]

**304.** 447 U.S. 134, 181, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (Rehnquist, J., concurring in part).

**305.** Alaska Const. art. IV, § 1.

**1.** 722 P.2d 219 (Alaska 1986), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 649, 93 L.Ed.2d 704 (1986).

**2.** Op. at 748.

**3.** *Id.* at 748 n. 44.

**4.** Act of August 15, 1953, Pub.L. 83–280, 67 Stat. 588 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–26, 28 U.S.C. § 1360).

**5.** Act of August 8, 1958, Pub.L. 85–615, 72 Stat. 545 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–26, 28 U.S.C. § 1360).

**6.** Act of November 25, 1970, Pub.L. 91–523, 84 Stat. 1358 (codified at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–26, 28 U.S.C. § 1360).

**7.** The relevant text of P.L. 280 as enacted in 1953 is set out below with subsequent amendments. The 1958 amendments are redlined * while the 1970 amendments are crossed out and capitalized. All amendments are followed by the date of the amendment.

§ 1162. State jurisdiction over offenses committed by or against Indians in the Indian country

(a) Each of the States or Territories [8/8/58] listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed opposite the name of the State or Territory

P.L. 280 conferred criminal and civil jurisdiction on five "mandatory" states: California, Minnesota, Nebraska, Oregon, and Wisconsin.[8] Section 2, the criminal portion, provided that each state would have

> jurisdiction over offenses committed by or against Indians in the areas of Indian country . . . to the same extent that such State has jurisdiction over offenses committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country as they have elsewhere within the State.[9]

Section 4 conferred civil jurisdiction:

> Each of the States listed . . . shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed. . . . [10]

Section 4 also provided that state civil laws of general application should apply in Indian country as they do elsewhere:

> [8/8/58] to the same extent that such State or Territory [8/8/58] has jurisdiction over offenses committed elsewhere within the State or Territory [8/8/58], and the criminal laws of such State or Territory [8/8/58] shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory [8/8/58]:
> State or Territory [8/8/58] of Indian country affected
> Alaska All Indian country within the Territory [8/8/58] [11/25/70]
> ALASKA ALL INDIAN COUNTRY WITHIN THE STATE, EXCEPT THAT ON ANNETTE ISLANDS, THE METLAKATLA INDIAN COMMUNITY MAY EXERCISE JURISDICTION OVER OFFENSES COMMITTED BY INDIANS IN THE SAME MANNER IN WHICH SUCH JURISDICTION MAY BE EXERCISED BY INDIAN TRIBES IN INDIAN COUNTRY OVER WHICH STATE JURISDICTION HAS NOT BEEN EXTENDED. [11/25/70]
> California All Indian country within the State.
> Minnesota All Indian country within the State, except the Red Lake Reservation.
> Nebraska All Indian country within the State.
> Oregon All Indian country within the State, except the Warm Springs Reservation.
> Wisconsin All Indian country within the State, except the Menominee Reservation.
> (b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water

those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State. . . . [11]

Important provisos were added by subsections (b) and (c) of section 4. Subsection (b) emphasized that alienation or taxation of trust or restricted property was not authorized.[12] Under subsection (c), tribal ordinances or customs were to be given effect in the adjudication of civil cases "if not inconsistent with any applicable civil law of the State. . . ." [13]

Comprehensive congressional reports accompanied P.L. 280. The essence of the legislative history is contained in three paragraphs in the Report of the House Committee on Interior and Insular Affairs, which was subsequently incorporated into the Senate Report:

> rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.
> (c) The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section AS AREAS OVER WHICH THE SEVERAL STATES HAVE EXCLUSIVE JURISDICTION. [11/25/70]
> * Editor's Note: Underlining is used to indicate redlined material.

8. Act of August 15, 1953, Pub.L. 83–280, 67 Stat. 588.

9. *Id.*

10. *Id.*

11. *Id.*

12. *Id.*

13. *Id.*

Need for such legislation on a general, rather than limited basis is grounded on the following: These States lack jurisdiction to prosecute Indians for most offenses committed on Indian reservations or other Indian country, with limited exceptions. The applicability of Federal criminal laws in States having Indian reservations is also limited. The United States district courts have a measure of jurisdiction over offenses committed on Indian reservations or other Indian country by or against Indians, but in cases of offenses committed by Indians against Indians that jurisdiction is limited to the so-called 10 major crimes: murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and larceny.

As a practical matter, the enforcement of law and order among the Indians in the Indian country has been left largely to the Indian groups themselves. In many States, tribes are not adequately organized to perform that function; consequently, there has been created a hiatus in law-enforcement authority that could best be remedied by conferring criminal jurisdiction on States indicating an ability and willingness to accept such responsibility.

Similarly, the Indians of several States have reached a stage of acculturation and development that makes desirable extension of State civil jurisdiction to the Indian country within their borders. Permitting the State courts to adjudicate civil controversies arising on Indian reservations, and to extend to those reservations the substantive civil laws of the respective States insofar as those laws are of general application to private persons or private property, is deemed desirable.[14]

In 1958, P.L. 85–615 extended both the criminal and civil provisions of P.L. 280 to "all Indian country" within Alaska.[15] Three paragraphs from the Report of the Senate Committee on Interior and Insular Affairs distill the reasons for this amendment:

One of the needs for the enactment of the proposed legislation is due to a decision of the United States District Court for the District of Alaska in the cases of In re McCord (No. A–13,363) and In re Nickanorka (No. A–13,364), wherein the defendants were charged with statutory rape under the Territorial law of Alaska. The court held (1) that the Territorial law did not apply because the incident occurred in Indian country and (2) that the Federal law mentioned above and popularly referred to as the Ten Major Crimes Act (18 U.S.C. 1153) did not apply because statutory rape is not included in the Federal crime of rape. The defendants were therefore released.

In construing the Federal statute the court also decided that the native village of Tyonek, Alaska, where the rape occurred, came within the definition of Indian country. Such a construction affects a large number of other native villages in Alaska similarly situated. The committee has been advised that these native villages do not have adequate machinery for enforcing law and order. They have no tribal court, no police, no criminal code, and in many instances no formal organization. This is for the reason that the Territorial government in Alaska has maintained law and order in the native villages as well as in the rest of Alaska and the native tribal councils have had no reason to nor have they ever exercised these functions. Since the natives are not prepared to take over these activities, the recent court decision has left the villages and the people without protection. The instant legislation seeks to remedy this situation by restoring what, until the court decision, was the actual practice in the enforcement of the law in the Indian country in Alaska.

The bill also extends the Territorial law of Alaska to Indian country with regard to

14. S.Rep. No. 83–699 (1953), *reprinted in* 1953 U.S.C.C.A.N. 2409, 2411–12. The report begins with a lengthy explanation of the committee's general aims reflected in numerous pieces of legislation during the session: "withdrawal of Federal responsibility for Indian affairs wherever practicable, and ... termination of the subjection of Indians to Federal laws applicable to Indians as such." *Id.* at 2409.

15. Act of August 8, 1958, Pub.L. 85–615, 72 Stat. 545.

civil matters. This action is consistent with previous enactments of Congress, as in the case of Public Law 280, 83d Congress, whereby criminal and civil jurisdiction over Indian country within the States of California, Minnesota, Nebraska, Oregon, and Wisconsin was transferred to those States.[16]

In 1970 Congress again amended P.L. 280 by enacting P.L. 91–523. P.L. 91–523 excepted the Metlakatla Indian community from the area of Indian country subject to the exclusive criminal jurisdiction of Alaska, changing 18 U.S.C. § 1162(a) (section 2 of P.L. 280).[17] And it described the Indian country subject to the criminal jurisdiction of the mandatory states as "areas over which the several States have *exclusive* jurisdiction."[18]

The legislative history of the 1970 amendment is extensive and I will discuss it at some length later in this addendum.[19] It suffices for purposes of this introduction to quote the one sentence "Purpose" section of the House Report:

> The purpose of the proposed legislation is to amend section 1162 of title 18, United States Code, by adding language permitting the Metlakatla Indian community on the Annette Islands in Alaska to exercise jurisdiction over minor offenses concurrent with the State of Alaska.[20]

### B. *The Supreme Court and P.L. 280*

In *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*,[21] the Supreme Court declined to address the question of whether P.L. 280 conferred exclusive or concurrent jurisdiction on the states.[22]

Nevertheless, the Court has made statements suggestive of exclusive state jurisdiction. For example, in *Yakima Indian Nation*, the state of Washington enacted a law whereby it assumed "[f]ull criminal and civil jurisdiction to the extent permitted by Pub.L. 280" but which only "extended to all fee lands in every Indian reservation and to trust and allotted lands therein when non-Indians were involved."[23] In analyzing the effect of this statute, the Court stated that "[s]tate jurisdiction is *complete* as to all non-Indians on reservations and is also *complete* as to Indians on nontrust lands [on the reservation]."[24]

Earlier, in *Organized Village of Kake v. Egan*,[25] the Supreme Court apparently endorsed the view that P.L. 280 granted exclusive jurisdiction to the states:

> In 1953 Congress *granted to several States full civil and criminal jurisdiction over Indian reservations*, consenting to the assumption of such jurisdiction by any additional States making adequate provision for this in the future. 67 Stat. 588, 18 U.S.C. § 1162, 28 U.S.C. § 1360. Alaska was added to the list of such States in 1958, 72 Stat. 545. This statute disclaims the intention to permit States to interfere with federally granted fishing privileges or uses of property.[26]

The words "complete" in *Yakima Indian Nation* and "full" in *Kake* are terms most logically associated with exclusive, rather than concurrent, jurisdiction.

Further, in *Solem v. Bartlett*,[27] the court strongly implied that state criminal jurisdiction is exclusive, rather than concurrent, with tribal jurisdiction, stating that: "[Within Indian country] Tribes exercise concurrent jur-

16. S.Rep. No. 85–1872 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3347, 3348.

17. Act of November 25, 1970, Pub.L. 91–523, 84 Stat. 1358.

18. *Id.* (emphasis added).

19. *See infra* Dissent Addendum Part II.A.

20. H.R.Rep. No. 91–1545 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4783, 4783.

21. 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979).

22. *Id.* at 488–89 n. 32, 99 S.Ct. 740.

23. *Id.* at 475, 99 S.Ct. 740.

24. *Id.* at 498, 99 S.Ct. 740 (emphasis added).

25. 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962).

26. *Id.* at 74, 82 S.Ct. 562 (emphasis added).

27. 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984).

isdiction over certain minor crimes by Indians, 18 U.S.C. § 1152, 1153, *unless a State has assumed jurisdiction under § 1162* [P.L. 280 § 2]." [28]

The Court also addressed the extent of state civil jurisdiction under P.L. 280 in *Bryan v. Itasca County* [29] and *California v. Cabazon Band of Mission Indians.* [30] According to the Court, section 4 of P.L. 280 was "primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians." [31] The Court stated clearly that this jurisdiction did not include the power to tax or "general civil regulatory authority"; however, section 4 of P.L. 280 did "grant States jurisdiction over private civil litigation involving reservation Indians in state court[s]." [32] Authority over private civil litigation is the issue in the present case.

## II. *P.L. 280 As Amended Conferred Exclusive Jurisdiction*

In *Native Village of Nenana v. State, Department of Health & Social Services,* [33] we held that P.L. 280 grants Alaska exclusive jurisdiction to adjudicate cases involving the custody of Native children. [34] The issue arose in the context of a child-in-need-of-aid proceeding in which the village of Nenana sought to transfer jurisdiction from the state court under the Indian Child Welfare Act. [35] Under section 1918(a) of that act, "any Indian tribe which became subject to State jurisdiction pursuant to" P.L. 280 "may reassume

jurisdiction over child custody proceedings." [36] However, reassumption is permitted only if the tribe presents "a suitable plan to exercise such jurisdiction" to the Secretary of the Interior and the Secretary approves the plan. [37] No reassumption plan had been approved for Nenana, [38] but Nenana argued that this was unnecessary because P.L. 280 did not preempt its jurisdiction and that it continued to have concurrent jurisdiction with the state over children's matters. We rejected this contention and concluded that "Congress intended that Public Law 280 give certain states, including Alaska, exclusive jurisdiction...." [39] We followed *Nenana* in *In re K.E.* [40] and *In re F.P.* [41]

I believe *Nenana, K.E.* and *F.P.* were correctly decided. Congress in 1970 explicitly described the Indian country subject to state jurisdiction under P.L. 280 "as areas over which the several States have exclusive jurisdiction." [42] The 1970 amendment was consistent with the prior text of P.L. 280 which the Department of the Interior interpreted as bestowing exclusive jurisdiction on the states. [43]

### A. *The 1970 Amendment to P.L. 280*

In 1970 Congress enacted P.L. 91–523, which amended the codification of P.L. 280 set out in 18 U.S.C. § 1162. [44] The area of Indian country in which the State of Alaska was granted criminal jurisdiction was changed in section 1 from "all Indian country" to "[a]ll Indian country within the State,

28. *Id.* at 465 n. 2, 104 S.Ct. 1161 (emphasis added).

29. 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976).

30. 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).

31. *Bryan,* 426 U.S. at 383, 96 S.Ct. 2102.

32. *Cabazon Band of Mission Indians,* 480 U.S. at 208, 107 S.Ct. 1083 (citing *Bryan,* 426 U.S. at 385, 388–90, 96 S.Ct. 2102).

33. 722 P.2d 219 (Alaska 1986), *cert. denied,* 479 U.S. 1008, 107 S.Ct. 649, 93 L.Ed.2d 704 (1986).

34. *Id.* at 221.

35. *Id.* at 220.

36. *Id.* at 221 (citing 25 U.S.C. § 1918(a)).

37. 25 U.S.C. § 1918(a).

38. *Nenana,* 722 P.2d at 221.

39. *Id.*

40. 744 P.2d 1173, 1174 (Alaska 1987).

41. 843 P.2d 1214, 1215 (Alaska 1992).

42. Act of November 25, 1970, Pub.L. 91–523, 84 Stat. 1358.

43. *See infra* Dissent Addendum Part II.B.

44. Act of November 25, 1970, Pub.L. 91–523, 84 Stat. 1358.

except that on Annette Islands, the Metlakatla Indian community may exercise jurisdiction over offenses committed by Indians in the same manner in which such jurisdiction may be exercised by Indian tribes in Indian country over which State jurisdiction has not been extended." [45] This language contrasts with the exceptions for reservations pertaining to other states in section 2 of P.L. 280. For example, in Minnesota the Indian country affected is "all Indian country within the State, except the Red Lake Reservation." [46] The reason for the difference was well considered. On excepted reservations, such as Red Lake, the writ of state law under P.L. 280 did not run. With respect to Metlakatla, Congress intended that state law would continue to apply but that the Metlakatla Indian community would have concurrent jurisdiction over those offenses committed by Indians which would be within the jurisdiction of tribes located in areas where P.L. 280 does not apply.

This amendment is important because it recognizes that the Metlakatla community lacked concurrent jurisdiction prior to the amendment. This, in turn, represents a recognition of pre-amendment exclusive jurisdiction in the state. Although the amendment affected only criminal jurisdiction, the language of section 2 of P.L. 280, conferring criminal jurisdiction on the states, and section 4 of P.L. 280, conferring civil jurisdiction on the states, is parallel. Section 2(a) provides: "Each of the States listed in the following table shall have jurisdiction over offenses ... to the same extent that such State has jurisdiction over offenses committed elsewhere within the State." [47] The language of section 4(a) is: "Each of the States listed in the following table shall have jurisdiction over civil causes of action ... to the same extent that such State has jurisdiction over other civil causes of action...." [48] In view of these similarities it is impossible to con-

clude that Congress intended to confer on the states exclusive criminal jurisdiction, but only concurrent civil jurisdiction. Indeed, the Department of the Interior reported to Congress with respect to the 1970 amendment that P.L. 280, when made applicable to Alaska, "acted to *remove,* with limited exceptions, the *civil and criminal* jurisdiction for law and order purposes previously held by the Indian and native groups and the Federal Government." [49] The first section of the 1970 amendment thus reflected Congress's belief that P.L. 280, as applied to Alaska, granted exclusive jurisdiction to the state.

Section 2 of the 1970 amendment reflects more than merely a belief of Congress:

> Subsection (c) of section 1162 of title 18 United States Code, is amended to read as follows: "(c) The provisions of section 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section as areas over which the several States have *exclusive jurisdiction.*"[50]

Prior to this amendment, subsection (c) of section 1162, a part of section 2 of P.L. 280, provided: "The provisions of sections 1152 and 1153 of this chapter shall not be applicable within the areas of Indian country listed in subsection (a) of this section." [51] U.S.C. § 1152 extends the criminal laws of the United States to Indian country but does not apply to offenses committed by one Indian against another. U.S.C. § 1153 is the so-called Major Crimes Act which extends the criminal law of the United States to major felonies committed by one Indian against another in Indian country. Section 2 of the 1970 amendment was necessary because under section 1 Metlakatla remained Indian country covered by P.L. 280. But Congress wanted the Indian community to have concurrent jurisdiction with the state in that area. Congress therefore chose to define the

---

45. *Id.*

46. *Id.*

47. Act of August 15, 1953, Pub.L. 83–280, 67 Stat. 588.

48. *Id.*

49. H.R.Rep. No. 91–1545 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4783, 4786 (emphasis added).

50. Act of November 25, 1970, Pub.L. 91–523, 84 Stat. 1358 (emphasis added).

51. Act of August 15, 1953, Pub.L. 83–280, 67 Stat. 588.

remaining Indian country in Alaska covered by P.L. 280 and all Indian country in the other five states, except for the excepted reservations, as "areas over which the several States have *exclusive* jurisdiction." [52]

This language is more than merely an expression of Congress's belief that P.L. 280 granted exclusive jurisdiction to the states; it ratifies that belief. It cannot be dismissed as merely the opinion of a later Congress concerning the meaning of a law passed by an earlier Congress. The later Congress changed the original act's language to both reflect and enact its belief. As such, P.L. 280 read in conjunction with its 1970 amendment more than adequately rebuts the presumption favoring tribal jurisdiction in Indian country because "Congress has expressly provided that State laws shall apply." [53]

The 1970 amendment's importance should not be dismissed as merely the view of a subsequent Congress regarding the intent of an earlier one. In *United States v. Philadelphia National Bank* [54] and *South Dakota v. Yankton Sioux Tribe* [55] the Supreme Court observed that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." [56] The references in *Yankton Sioux* and *Philadelphia National Bank* were not amendatory to previous acts of Congress and are thus distinguishable from the present case. Moreover, in *Bryan,* a case that actually focuses on interpreting P.L. 280, the Supreme Court observed that "intervening" acts of Congress that are "intimately related" to jurisdictional issues of Indian law *should* be considered:

Title IV of the 1968 Act is intimately related to § 4, as it provides the method for further state assumptions of the jurisdiction conferred by § 4, and *we previously have construed the effect of legislation affecting reservation Indians in light of "intervening" legislative enactments.* [57]

There is no question that P.L. 91–523, the 1970 amendment, is "intimately related" to P.L. 85–615, the 1958 amendment that added Alaska to P.L. 280. Its unambiguous purpose was to modify the 1958 amendment. As such, the 1970 amendment is particularly probative of Congress's intent in enacting P.L. 85–615.

### B. *Contemporaneous Administrative Construction*

In determining a statute's meaning, courts will defer to the contemporaneous construction of the statute given by an agency charged with its administration. [58] Contemporaneity of construction is important because often agency personnel have assisted in formulating the legislation and are thus knowledgeable of its intent and meaning. [59] Interpretations which contradict contemporaneous interpretations, on the other hand, are entitled to little weight. [60]

**52.** Act of November 25, 1970, Pub.L. 91–523, 84 Stat 1358 (emphasis added).

**53.** *Bryan,* 426 U.S. at 376 n. 2, 96 S.Ct. 2102 (quoting *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 170–71, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)).

**54.** 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

**55.** 522 U.S. 329, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998).

**56.** *Id.* at 803 (quoting *Philadelphia Nat'l Bank,* 374 U.S. at 348–49, 83 S.Ct. 1715).

**57.** *Bryan* 426 U.S. at 386, 96 S.Ct. 2102 (emphasis added) (citation omitted).

**58.** *See Totemoff v. State,* 905 P.2d 954, 967–68 (Alaska 1995).

**59.** *See Howe v. Smith,* 452 U.S. 473, 485, 101 S.Ct. 2468, 69 L.Ed.2d 171 (1981) ("the [agency's] interpretation of the statute merits greater than normal weight because it was the [agency] that drafted the legislation and steered it through Congress with little debate"). *See also Frontier Airlines, Inc. v. Civil Aeronautics Bd.,* 621 F.2d 369, 372 (10th Cir.1980) (holding that the construction of a statute by an agency charged with its administration is entitled to substantial deference by courts, especially where the administrative practice at stake involves the contemporaneous construction of the statute by those charged with the responsibility of setting its machinery in motion); 2B Norman J. Singer, *Sutherland Statutory Construction* § 49.04 at 11 (5th ed. 1992) ("[L]egislative history in the form of information as to how draftsmen of a provision understood it and that their meaning was communicated to the Congress which enacted it has been held to be entitled to greater weight than subsequent administrative interpretation.") (citation omitted).

**60.** *See General Elec. Co. v. Gilbert,* 429 U.S. 125, 142–46, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (declining to defer to agency interpretation

These principles apply to this case because the Department of the Interior, contemporaneously with the passage of P.L. 280 and for a long period of time thereafter, interpreted P.L. 280 as conferring exclusive jurisdiction on the states. A 1954 departmental opinion explained that P.L. 280 conferred exclusive criminal jurisdiction on the states.[61] This confirmed an earlier departmental interpretation that the jurisdiction conferred by P.L. 280 was exclusive and which gave the following textual analysis for that conclusion:

> Although there has been no interpretation of the act of August 15, 1953 (Public Law 280—83d Cong.), by the Federal courts, *it is our view that the act,* by providing that the State shall have jurisdiction over crimes and offenses committed by or against Indians in the Indian country *to the same extent* that the State has jurisdiction over crimes and offenses committed elsewhere within the State, except as limited in Section 2(b), *made such jurisdiction of the State exclusive. The extent of the State's jurisdiction is full and complete* and permits of no such jurisdiction by any other body save the Federal Government and subordinate agencies of the State itself. The act also explicitly states that the criminal laws shall have the same force and effect within Indian country as they have elsewhere within the State. The effect of this provision clearly is to extend both the substantive and procedural laws of the State to crimes committed by Indians. Thus, State law defines not only the criminal offenses against the State and the penalties therefor, but it also defines the courts in which and the manner in which persons accused of committing such offenses are to be tried.[62]

These contemporaneous interpretations of exclusivity were published and thus known to Congress when it extended P.L. 280 to Alaska in 1958. As they were not addressed or changed, they were presumably approved by the 1958 Congress.[63] The Senate Report accompanying the 1958 amendment states that under P.L. 280 "criminal and civil jurisdiction over Indian country within [the five mandatory states] was *transferred* to those States."[64] As the primary meaning of "transfer" in this context is the conveyance of authority from one entity to another,[65] the report suggests that the committee agreed with the Department's view that the state's jurisdiction was exclusive.

The Department continued to interpret P.L. 280 as vesting exclusive jurisdiction in the states into the 1970's. I have previously

---

which contradicted previous, longstanding interpretation and following earlier interpretation); *Totemoff,* 905 P.2d at 967–68.

**61.** Op. Solic. Dep't Interior, No. M–36241 (Sept. 22, 1954), *reprinted in* II U.S. Dep't of Interior, Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs, 1917–1974, 1648, at 1648 (1979) ("Criminal jurisdiction conferred upon a state by 18 U.S.C. 1162 is exclusive except as against the United States.").

**62.** *Id.* at 1650 n. 4 (first and third emphasis added); Op. Solic. Dep't Interior No. M–36907 (November 14, 1978), 85 I.D. 433, 435 (1978) (quoting June 4, 1954 letter from Assistant Secretary of the Interior Lewis to Mr. Morgan E. Pryse, Area Director, Bureau of Indian Affairs, Minneapolis, Minnesota (June 4, 1954)).

**63.** *See Zemel v. Rusk,* 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) (in "some circumstances, Congress' failure to repeal or revise in the face of [an] administrative interpretation has been held to constitute persuasive evidence that that interpretation is the one intended by Congress."). *See also* 2B Norman J. Singer, *Sutherland Statutory Construction* § 49.05 at 19 (5th ed. 1992) ("If the legislature has amended portions of the statute, but left intact the portion sought to be construed, the legislature has declared an intent to adopt the construction placed on the statute by the administrative agency.") (citation omitted). *Cf. Bob Jones Univ. v. United States,* 461 U.S. 574, 600–01, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) ("In view of its prolonged and acute awareness of so important an issue, Congress' failure to act on the bills proposed on this subject provides added support for concluding that Congress acquiesced in the [agency's] rulings...."); *Casperson v. Alaska Teachers' Retirement Bd.,* 664 P.2d 583, 585 (Alaska 1983) ("we must assume that the legislature was conscious of what it was doing when it amended the statute in 1970, but left [a related statute] unchanged.").

**64.** S.Rep. No. 85–1872 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3347, 3348 (emphasis added).

**65.** *Webster's Third New Int'l Dictionary* 2426–27 (1966).

discussed the 1970 amendment to P.L. 280.[66] The House Report regarding the 1970 amendment indicates a shared assumption by Commissioner Bruce of the Department of the Interior's Bureau of Indian Affairs and the House Judiciary Committee that P.L. 280 as applied to Alaska effectively eliminated all tribal jurisdiction over minor offenses. The report states that Metlakatla originally

had jurisdiction over minor criminal offenses under its federally recognized government. However, when the act of August 8, 1958 [applying P.L. 280 to Alaska] was passed giving Alaska jurisdiction over offenses by or against Indians in all Indian country within the Territory of Alaska, *it had the effect of eliminating* the legal basis for the jurisdiction exercised by the community over minor offenses. As Commissioner Bruce stated at the hearing, enactment of the bill would reinvest the Metlakatla Community Council with local legislative authority and police powers to enforce its laws over minor criminal offenses concurrently with the State.[67]

A letter written by Undersecretary of the Interior Russell to the Senate Committee on the Judiciary concerning the 1970 amendment clarifies the Department's position on the transfer of exclusive jurisdiction and makes it clearly applicable to the civil as well as the criminal sections of P.L. 280:

Since 1958, the State of Alaska has had the responsibility for providing law and order services to Indians in the Indian country within its borders. *The transfer of such jurisdiction to Alaska acted to remove, with limited exceptions, the civil and criminal jurisdiction for law and order purposes previously held by the Indian and native groups and the Federal Government.* This bill would reinvest the

Metlakatla Community Council with local legislative authority and police powers to enforce its law over minor criminal offenses concurrently with the State.[68]

By 1978 the Department had changed its views. It began to regard P.L. 280 as a grant of concurrent jurisdiction to the state.[69] In 1991 the Ninth Circuit adopted the same position.[70]

I do not believe that P.L. 280 was designed to terminate Indian reservations or to eliminate all tribal authority. Tribal power granted by federal law over fish and game and trust property is specifically preserved under sections 2 and 4 of that act. But P.L. 280 was enacted in the heyday of what one authority has described as "the termination era" of 1945–1961.[71] By contrast, the 1970's were part of a different trend in Indian law, "the self-determination era."[72] This period is "characterized by expanded recognition and application of the powers of tribal self-government, and by the general exclusion of reservations from state authority."[73] The 1978 departmental opinion should, therefore, be seen as consistent with the trends of the period during which it was issued. However, the earlier departmental opinions—those contemporaneous with the passage of P.L. 280 and its 1958 and 1970 amendments—were obviously more in tune with the Congresses which enacted and amended P.L. 280. As such, it is these departmental opinions which require our deference, not the later departmental opinions that contradict the contemporaneous interpretations of P.L. 280.[74]

III. *Conclusion*

Congress in 1970 explicitly described the Indian country subject to state jurisdiction

---

66. *See supra* Dissent Addendum II.A.

67. H.R.Rep. No. 91–1545 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4783, 4784 (emphasis added).

68. *Id.* at 4786 (emphasis added).

69. *See* Op. Solic. Dep't Interior, No. M–36907 (Nov. 14, 1978), 85 I.D. 433, 434–37 (1978).

70. *Native Village of Venetie, I.R.A. Council v. Alaska*, 944 F.2d 548, 561–62 (9th Cir.1991).

71. American Indian Lawyer Training Program, Inc., *Indian Tribes as Sovereign Governments* 11 (1988).

72. *Id.* at 14.

73. *Id.*

74. *See General Elec.*, 429 U.S. at 142–46, 97 S.Ct. 401; *Totemoff*, 905 P.2d at 967–68.

under P.L. 280 "as areas over which the several States have exclusive jurisdiction." [75] This enactment was consistent with the text and the contemporaneous and long-standing interpretation of P.L. 280 by the Department of the Interior that the act bestowed exclusive jurisdiction on the states. For these reasons, I believe that Congress intended P.L. 280 as a grant of exclusive jurisdiction to the states. Accordingly, our decisions in *Nenana, K.E.,* and *F.P.* were correct.

MATTHEWS, Chief Justice, with whom COMPTON, Justice, joins, dissenting.

**75.** Act of November 25, 1970, Pub.L. 91–523, 84 Stat. 1358.